UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA             :
                                     :
        - v -                        :
                                     :          **18 CR 16 (RJS)**
**AKAYED ULLAH,**                    :
        Defendant.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# SENTENCING MEMORANDUM
# ON BEHALF OF AKAYED ULLAH


DAVID PATTON, ESQ.
Federal Defenders of New York
Attorney for Defendant
**Akayed Ullah**
52 Duane Street, 10th Floor
New York, NY 10007
Tel.: (212) 417-8728 / (917) 612-3274
**Amy Gallicchio**, Esq.
**Julia Gatto**, Esq
**Colleen Cassidy**, Esq.
Of Counsel


TO:      Audrey Strauss, Esq.
         Acting United States Attorney
         Southern District of New York
         1 St. Andrew's Plaza
         New York, NY 10007

Attn:    AUSA Rebekah Donaleski
         AUSA George Turner

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 25, 2021

**BY ECF AND EMAIL**

Honorable Richard J. Sullivan
United States Circuit Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   **United States v. Akayed Ullah**
       **18 CR 16 (RJS)**

Dear Judge Sullivan:

> *Mr. Ullah first encountered fundamentalist Islamic theology at a time of extraordinary personal fragility. The moment was a perfect storm of risk factors for Mr. Ullah: alienation from family and friends, severe depression, grief, direct exposure to the indescribable pain and suffering of Muslim refugees in Myanmar, and relentless harassment from people in the United States. Mr. Ullah was unmoored and desperate for answers. His love of the United States and its values had withered in the wake of his father's death and the subsequent unraveling of his support systems. Mr. Ullah tried to reconnect with his community in Bangladesh and attempted to return to his country of origin where he felt safe and understood, but his efforts were blocked at every turn. As Mr. Ullah's path to fulfillment continued to narrow, his desperation increased and he became increasingly vulnerable to the deeply distorted values of radical Islam.*

*Erik Mercer, L.C.S.W.  See* Mitigation Report, Exhibit A, p. 14-15.

The Honorable Richard J. Sullivan                          March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

 Akayed Ullah's crime did not result from a long standing commitment to
violent extremism or jihadist movements.  He had no personal connection to nor did
he communicate with any individual or group that advocated terrorist activities.  As
Erik Mercer, a clinical social worker and mitigation specialist, quoted above,
describes in detail in his report, Mr. Ullah committed this offense while in the grip
of a personal crisis that left him isolated, depressed, vulnerable and suicidal.  The
reasons for Mr. Ullah's conduct were and remain aberrational and there is no
chance such conduct will be repeated.

 Akayed Ullah is a 31 year old man with no prior criminal record.  Should the
Court accept the guideline analysis provided by the Department of Probation
("Probation"), he faces a mandatory minimum sentence of 35 years and an
unreasonably excessive guideline range of life in prison.[1]  The mandatory minimum
sentence that the Court is required to impose is more than sufficient, if not greater
than necessary, to achieve the statutory goals of sentencing.  Incarcerating Mr.
Ullah until he is in his sixties is more than necessary to "send a message," prevent
Mr. Ullah from committing further crimes, or protect the public.

## PERSONAL HISTORY AND MITIGATION

 Attached for the Court's consideration is the aforementioned mitigation
report prepared by Erik Mercer who conducted numerous interviews with Mr. Ullah
and members of his family to provide the Court with a full picture of Mr. Ullah's life
history and insight into what drew him to extremist ideals.  Exhibit A.  We rely on
Mr. Mercer's report here as a comprehensive description of Mr. Ullah's personal
history.   In addition, we submit seven letters of support, attached as Exhibits B to
H, from those who know Mr. Ullah best as evidence of his peaceful, nonviolent and
gentle character.  The emotions and affection displayed in the letters of support are

---

[1] As outlined in the Guideline analysis section below, we disagree, in part, with Probation's
calculations.

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

palpable.  Mr. Ullah was raised in a loving environment by law abiding parents who held moderate religious beliefs.  His father was a great man and a hero to many, most importantly to Mr. Ullah.  There can be no doubt that Mr. Ullah is a man of profoundly decent character and that his actions on December 11, 2017 do not reflect his true nature nor foretell future danger to the community.

Mr. Ullah is a loving son and brother.  The letters of support from his mother and sisters portray a family traumatized and in great despair over the fate of their beloved Akayed.  They would never in a million years have thought him capable of the act he committed on December 11, 2017.  His mother writes, "When I learned about what Akayed did I was in disbelief and utter shock.  To this day I cannot comprehend what happened, or how it happened.  I never saw anything aggressive or violent in Akayed. From his childhood to his day, he had no bad habits, no aggressive behavior.  He always shares his feelings and everything with me but I don't know what happened this time I cannot imagine what he was thinking or feeling.  Respected Judge, I have only ever known my son to be honest, hardworking, with such a good heart.  As his mother, I feel great remorse for the event."  *See* Exhibit B.  Mr. Ullah's younger sister, Liakat Jahan, writes, "I do not understand what happened on that day in December.  In my heart, I struggle to match the incident to the person.  The Akayed I know is my second father, my guardian, my shelter, my support, my closest friend.  Akayed is an affectionate and kind person . . . Having a brother like Akayed I always felt blessed and secured. Now every single moment I feel I am helpless without him.  I sincerely request that you give Akayed a second chance at life.  You're not only giving him a second chance.  You're giving everyone in his family a second change."  *See* Exhibit C.  And Mr. Ullah's youngest sister, Ayfa Hayat, writes, "The news of what Akayed did completely turned my life around.  I couldn't understand it.  We watched horrifying news on the media, but never have we ever thought this appalling occurrence could be part of our reality.  To this day, I cannot match the brother I know to the man behind those bars.  But I do know his true characteristics: soft, generous, with a

The Honorable Richard J. Sullivan                              March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

free-spirited mind.  The brother we know was always full of laughter and this image
of him still lingers in my eyes.  I wish I could ask him at his moments of despair:
What happened? What happened, brother? I wish I could give him a shoulder to
lean on in his deepest dispirited moments of life." *See* Exhibit D.  Ms. Hayat adds,
"The Akayed we have known for years is in complete contrast to what he has done.
In the past few years, Akayed did not know how to climb out of his own despair.  He
was depressed and hopeless.  He did not have a figure to console his own grief after
losing his father and favorite nephew in the family.  I think these traumatizing
events led to his distress.  The constant pressure of staying strong and providing for
his mother in this country and being the sole provide for his wife and son in
Bangladesh pushed him towards depression and vulnerability. This depression
played a role in his actions." *Id*.

Mr. Ullah is also a loving husband and devoted father.   His son, now 3 ½,
was born six months before Mr. Ullah's arrest.   Because his wife, Jannatul
Ferdous, and son live in Bangladesh, Mr. Ullah has only ever spent six weeks with
his son.  The letters of support from his wife, her parents and her friend, attached
as Exhibits E to H, reveal Mr. Ullah to be a kind, gentle, honest and peaceful man
who adores his wife and son.  His mother-in-law writes, "After the marriage he won
everyone's heart in our family and he especially won my heart with his behavior
and nature.  He is very much a simple and soft-hearted person.  He did not have
any bad habits.  In our family, everyone was so happy to welcome him as our family
member." *See* Exhibit F.  Mr. Ullah's wife's good friend writes, "Akayed is a
wonderful husband with lots of love and compassion.  He treats his wife like a
queen . . . He was such a loving father to his child . . . He is the most loving father I
have ever seen in my entire life." *See* Exhibit H.   The photos of Mr. Ullah, his wife
and his son, attached as Exhibit I, capture the love and affection he has for his
family.

Despite the distance from his son, Mr. Ullah felt a deep connection with him
immediately upon meeting him four months after he was born.  Exhibit A at 7.

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

"During his time with his wife and newborn son, Mr. Ullah recalls feeling a kind of
clarity that had eluded him since his father died: he became absolutely convinced
that his happiness depended on returning to his country." *Id*. Unfortunately,
neither his wife and in-laws in Bangladesh nor his family in the United States,
would sanction a move to Bangladesh. His wife "flatly rejected Mr. Ullah's
proposal. Mr. Ullah pleaded with his wife and her family. He begged for their
understanding and pointed to his significant weight loss as evidence of his extreme
distress in the United States. But Ms. Ferdous and her family were unmoved: they
were angry with Mr. Ullah for even considering a return to Bangladesh and insisted
that generating income in the United States was Mr. Ullah's primary responsibility
as a husband, and even more so as a father . . . Mr. Ullah's longing to be with his
son was framed as a selfish impulse and his wish to live in a country where he felt
welcome and understood was dismissed as unimportant." Exhibit A at 7-8. In
hindsight, Mr. Ullah's family deeply regrets that they denied Mr. Ullah's desire to
stay in Bangladesh with his wife and son. His wife writes, "Sometimes I hurt
Akayed by saying harsh words to him, but he never got angry with me. He never
hurt me. This gives so much pain now that he is gone. I realize how valuable
Akayed is to me." *See* Exhibit E.

When Mr. Ullah returned to the United States in October of 2017, he was in
crisis. Describing this period of his life, Mr. Ullah recalls, "I was dying. I was like a
fish without water." Exhibit A at 8. Unhappy and defeated, he returned to find
that his family had moved to apartment located away from the security and
familiarity of his former Bengali community. Mr. Ullah recalls, "If I had one
friend, maybe things would have been different. But I didn't. I felt so much
pressure and I didn't have anyone to share my feelings with. I was totally alone in
America." *Id*. at 9. And he felt "suffocated under his wife's constant demands for
more money." *Id*. at 8. He was in the middle of a major depressive episode and,
regrettably, searched for and ultimately found hope on the internet in the distorted
messages of the Islamic State and its radical supporters. *Id*. at 14. "When Mr.

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

Ullah began building the bomb that he ultimately detonate in the Port Authority subway station, he was in an unprecedented state of confusion, disconnection and desperation." *Id*.


## NATURE AND HISTORY OF THE OFFENSE OF CONVICTION

The jury found Mr. Ullah guilty of Counts One through Six of the Indictment. Having presided over the trial, the Court is familiar with the evidence and the defense arguments about that evidence.  For sentencing purposes, we recall the Court's attention to the fact that the evidence at trial did not establish that Mr. Ullah had any actual connection with a terrorist organization.  That is because there wasn't, and isn't, any.  He didn't communicate or coordinate with any foreign or domestic radical leaders or groups, including ISIS.

Mr. Ullah's conduct on December 7, 2017 was undeniably the culmination of a downward spiral resulting from a series of destabilizing events in his life. "Disconnected from his family, his community and his country of origin, Mr. Ullah sunk into a deep depression . . . [he] describes this time as a 'fog' and acknowledges that his thinking became catastrophically distorted by the ideology of the Islamic State." *Id*. at 9.  Mr. Ullah's actions were without a doubt dangerous, intolerable and deserving of punishment, but they were also an attempt to take his own life, which evinces a man in extreme crisis.


## GUIDELINES ANALYSIS

Based on the jury's verdict, we agree with the Department of Probation that Counts One through five group together and that the proper base offense level for Counts One through Five is 42.  PSR ¶ 26.  However, for the reasons state below, we disagree that the "terrorism" enhancement advocated by the Department of Probation, pursuant to U.S.S.G. § 3A1.4 (b), applies to enhance either the offense level or the criminal history category.  Furthermore, despite having gone to trial,

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

Mr. Ullah should receive a two level reduction for acceptance of responsibility, resulting in an adjusted offense level of 40.  Mr. Ullah has no prior criminal convictions and therefore falls in criminal history category I.  The resulting applicable guideline range for Counts One through Five is 292 to 365 years.

        In light of the wealth of mitigating factors outlined in this submission, we submit that the mandatory minimum sentence of 30 years on Count Six plus the 5 year mandatory minimum sentence on Count Four is more than sufficient to serve the goals of sentencing.  Despite a guideline range of 292 to 365 years for Counts One through Five, we respectfully ask the Court to impose no additional time on those Counts.

## I.    The Correctly Calculated Guidelines Should Not Include the Terrorism Enhancement

        The Probation Department calculates Mr. Ullah's total offense-level as 43 and, based on its calculation, recommends a "Guidelines sentence" of life imprisonment. The Probation Department's calculation yields the highest offense-level on the sentencing table and the most severe penalty recommended under the Guidelines. In other words, on the spectrum of offenses covered by the Guidelines--including offenses committed by strategic actors resulting in mass carnage--the Probation Department's calculation for Mr. Ullah's offense--committed by a psychologically broken man resulting in no loss of human life--places him in a rare category reserved for the single worst offenders in the Federal system. Mr. Ullah's offense was undeniably serious but it does not and should not elevate him to the highest level on the Guidelines Table.

        As explained below, the correctly calculated range is lower than the Probation Department's calculation--a level 40, as opposed to a level 43, with a corresponding advisory range of imprisonment between 292 and 365 months. This guideline range still factors in the seriousness of Mr. Ullah's offense but also

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

recognizes that his offense can be proportionately and reasonably punished short of
a life sentence.

The Probation Department's calculation is driven by two provisions in the
Guidelines.  First, the Probation Department applies the enhanced base offense-
level in U.S.S.G. 2M6.1(a)(1) for an offense "committed with intent (A) to injure the
United States; or (B) to aid a foreign nation or a foreign terrorist organization."
Application of the provision nearly doubles the base-offense level from 28 to 42. The
Probation Department's calculation also applies U.S.S.G. 3A1.4(a)'s "terrorism
enhancement." The "terrorism enhancement" is applicable when the offense
"involved, or was intended to promote, a federal crime of terrorism." A "federal
crime of terrorism" is defined in 18 U.S.C. 2332b(g)(5) as relating to certain
enumerated offenses, including those Mr. Ullah was convicted of, where the offense
was "calculated to influence or affect the conduct of government by intimidation or
coercion, or to retaliate against government conduct." Application of the "terrorism
enhancement" increases the offense-level by 12 (the largest enhancement
contemplated under the Guidelines) and propels the defendant into a Criminal
History Category of VI regardless of prior criminal history.

Standing alone, either provision results in extraordinarily long recommended
prison sentences. Together, as evidenced here, the provisions can drive a
defendant's Guidelines calculation irrationally off the sentencing chart. For the
reasons that follow, U.S.S.G. 3A1.4(a)'s enhancement is factually inapplicable.
Alternatively, the enhancement cannot be applied because, when combined with
U.S.S.G. 2M6.1(a)(1)'s enhanced base offense-level, it results in impermissible
double counting.

### A.   The Terrorism Enhancement Does Not Apply

Based on the jury instructions and the jury verdict that followed, Mr. Ullah
does not dispute that U.S.S.G. 2M6.1(a)(1)'s enhanced base-offense level applies
because the jury found, in connection with its verdict on Count One, that Mr.
Ullah's conduct in detonating an IED was intended to support ISIS. However, the

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

jury's verdict did not address whether Mr. Ullah's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Based on the trial testimony, the government cannot meet its burden to sustain the terrorism enhancement.

Support of a terrorist organization, even where that organization is ISIS, does not automatically equate to a specific intent to influence, affect, or retaliate against a government. *See, e.g., United States v. Alhaggagi*, No. 19-10092, 2020 WL 6192982, at *7–9 (9th Cir. Oct. 22, 2020) (reversing district court's application of terrorism enhancement where defendant provided material support to ISIS); *United States v. Stewart*, 590 F.3d 93, 138-139 (2d Cir. 2009) (affirming district court's refusal to apply terrorism enhancement to translator convicted of lending material support to a terrorist conspiracy).

In order to sustain the terrorism enhancement, the government must establish that the defendant had the specific intent to commit an offense that was "calculated" to impact or retaliate against government conduct. As explained by the Second Circuit, "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) The appropriate focus is on the "'offense,' asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object." *Id.*

The government's expert, Aaron Zelin, testified that ISIS's goals include "to take over territory in Iraq and Syria and to continue to eventually everywhere around the globe and institute its form of Islamic governance based on its particular interpretation, as well as to of course defeat its enemies, whether locally, including what they describe as apostate Arab regimes or so-called Western governments." Tr. 362. Mr. Zelin confirmed that, while some of ISIS's goals clearly are directed at impacting government action, other goals of the organization--particularly as those goals relate to ISIS's religious objectives-- do not. There is a scenario where an individual can support ISIS's goal of spreading its interpretation of Islam globally

The Honorable Richard J. Sullivan                    March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

without harboring an intent to impact or alter government action. At Mr. Ullah's
trial, the government failed to introduce evidence that could support a finding
regarding which ISIS goal Mr. Ullah's offense was calculated to achieve. On this
record, therefore, the enhancement cannot apply.

**B.    Alternatively, Application of the Terrorism Enhancement
Results in Impermissible Double Counting.**

Alternatively, the terrorism enhancement cannot be used to enhance Mr.
Ullah's already enhanced base offense-level. Application of the terrorism
enhancement on top of U.S.S.G. 2M6.1(a)(1) results in impermissible double
counting. "Impermissible double counting occurs when one part of the Guidelines is
applied to increase a defendant's sentence to reflect the kind of harm that has
already been fully accounted for by another part of the Guidelines." *United States v.
Volpe,* 224 F.3d 72, 76 (2d Cir. 2000) (quoting *United States v. Napoli,* 179 F.3d 1,
12 n. 9 (2d Cir. 1999), *cert. Denied,* 528 U.S. 1162 (2000)) (internal quotation marks
omitted); *accord, United States v. Sabhnani,* 599 F.3d 215, 251 (2d Cir. 2010), *cert.
Denied* 131 S. Ct. 1000 (2011).

While under certain circumstances both provisions can apply, here they
cannot. U.S.S.G. 2M6.1(a)(1) is triggered because the jury found that Mr. Ullah's
conduct in exploding the IED was in support of ISIS. The Probation Department's
justification for application of the terrorism enhancement appears to be the exactly
the same: that, because Mr. Ullah's conduct in exploding the IED was calculated to
support ISIS's political goals, the enhancement applies. As such, the enhanced base
offense-level and the terrorism enhancement are duplicative of each other and
application of both is impermissible.

**II.    Acceptance Points**

Despite the fact that Mr. Ullah exercised his constitutional right to a trial,
under the circumstances of this case, he is entitled to a two level decrease of the
offense level pursuant to U.S.S.G. § 3E1.1.   "Conviction by trial [ ] does not

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

automatically preclude a defendant from consideration of such a reduction.  In rare
situations a defendant may clearly demonstrate an acceptance of responsibility for
his criminal conduct even though he exercises his constitutional right to trial."
U.S.S.G. § 3E1.1, cmt. n.2.   That is indeed the case here.  Mr. Ullah has never
denied his actions.  From his hospital bed, immediately following his arrest, he
confessed his guilt to law enforcement and cooperated with their investigation, and,
at trial he did not testify or introduce any evidence.  Mr. Ullah's theory of defense
did not negate his factual guilt but instead challenged the applicability of the
charged statues to his conduct.  *Id.*

    Mr. Ullah has "clearly demonstrated acceptance of responsibility" and his
offense level should be reduced by two levels.


## SENTENCE OF THIRTY FIVE YEARS IS GREATER THAN NECESSARY TO FURTHER THE GOALS OF 18 U.S.C. § 3553(a)

    In selecting a sentence, this Court takes as its "lodestar the parsimony clause
of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013).
That provision directs sentencing courts to "'impose a sentence sufficient, but not
greater than necessary, to comply with' the factors set out in 18 U.S.C. §
3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id.*
In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit
explained that if the Court believes a lower sentence will be as effective as a higher
sentence in serving the purposes of sentencing, it must choose the lower sentence.
*Id.* at 142 (observing that where a guidelines sentence is "in equipoise with [a]
below-the-range sentence," the parsimony clause requires imposition of the lower
sentence).

    The applicable guidelines in this case are draconian and produce an unduly
harsh and exceedingly excessive sentencing range.   They were promulgated in
response to a congressional and political directive without empirical evidence to
support the presumption that terrorism defendants are uniquely dangerous and

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

incapable of being deterred and rehabilitated. This presumption is unsupported
and has led to unreasonably high sentences that fail to account for the nature and
circumstances of an individual case and the history and characteristics of the
defendant. This Court should therefore not anchor its sentence to the applicable
guidelines and should instead weigh the other § 3553(a) factors to arrive at the
parsimonious sentence.

## I.     Punishment and Rehabilitation

There comes a point when a term of imprisonment no longer serves the goals
of sentencing and only serves to incapacitate. For Mr. Ullah, that point would be
any term beyond the statutory minimum of 35 years. Thirty five years in prison is
an extreme sentence even for the most hardened criminal, which Mr. Ullah
certainly is not. It is a misconception that, unlike other offenders, those convicted of
acts of terrorism are uniquely dangerous and difficult to deter and rehabilitate and,
therefore, longer and excessive sentences are necessary to incapacitate them. This
misconception mirrors the way young African Americans were perceived in the late
1980s and 1990s as "super-predators." That perception led to the "War on Drugs"
and unreasonably harsh sentences disproportionately targeting African Americans.
While neither terrorism nor drug sentencing laws explicitly target a specific
religious, ethnic, or racial group, they have disproportionately affected Muslims and
African-Americans. The War on Drugs and the War on Terror have similar harmful
results through lengthy sentences separated from any rehabilitative rationale. *See*
Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in
the War on Terror*, 126 Yale L.J. 1520 (2017).

Mr. Ullah must be punished but does not need to be incapacitated for the rest
of his life. He is not a "super-predator" or incapable of reform. In fact, the
reformation process is well under way. Mr. Ullah has long disavowed,
unequivocally, any allegiance to radical and violent Islamist ideals and
organizations. He clearly sees the error of his ways and he has already been

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

rehabilitated from his distorted thinking.  He is remorseful and profoundly laments

his actions. He has genuine sorrow for the physical and psychological damage his

actions inflicted upon David Wall, Veronica Chavez, and others presents in the

walkway on December 7, 2017.  Furthermore, he deeply regrets the wide ranging

effect his actions had on law enforcement and New York City generally.

█████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

████████████         He was prepared to provide the government with insight into the

grievances and personal struggles that drove him to extremist ideals in the first

place.  The Government was not interested, and, we suspect, will argue at

sentencing that he is dangerous and irredeemable.

        Finally we ask the court to consider that Mr. Ullah's incarceration will

undoubtedly be onerous simply due to the nature of his offense.  His time in pretrial

detention has already been exceedingly difficult, isolating and punitive. Mr. Ullah

has not seen his family since the coronavirus pandemic gripped the nation shutting

down the ability for inmates to have visits and much needed physical contact with

loved ones.  Furthermore, Mr. Ullah is thousands of miles away from his wife and

son, whom he has not seen in over three years and who very likely will never have

the ability to travel to the United States to visit him even after he is sentenced.


**II.    Deterrence**

        In 2010, The Sentencing Project released a report analyzing the deterrent

effects of sentencing. It explained that:

> Existing evidence does not support any significant public safety benefit
> of the practice of increasing the severity of sentences by imposing
> longer prison terms. In fact, research findings imply that increasingly
> lengthy prison terms are counterproductive. Overall, the evidence

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

indicates that the deterrent effect of lengthy prison sentences would not be substantially diminished if punishments were reduced from their current levels.[2]

A study conducted by the National Institute of Justice made similar findings, concluding that the **certainty of being caught rather than the severity of punishment** is the more powerful deterrent.[3] *See also* Michael Tonry, *Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research* at 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").[4]

Furthermore, regarding general deterrence, studies have shown that individuals committing terrorism-related offenses are generally less concerned about being punished and more concerned with their movement and personal significance, so strategies that might be effective general deterrents for other crimes are not deterrents for violent terrorism. Laura Dugan, *Moving Beyond Deterrence: The Effectiveness of Raising the Expected Utility of Abstaining from Terrorism in Israel*, 77 American Sociological Review 597, 598 (2012).

For Mr. Ullah, a 35 year prison sentence would more than provide adequate specific deterrence. In fact, social science research indicates low recidivism rates for individuals like Mr. Ullah with no prior criminal history. In 2004, the United States Sentencing Commission ("U.S.S.C.") issued a report as part of its research series on the recidivism rate of federal guidelines offenders entitled: *Recidivism and the "First Offender."* In its report, the U.S.S.C. notes:

---

[2] Wright, Valerie, *Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment,* (2010), *available at* https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/
[3] *Five Things About Deterrence* (2016), National Institute of Justice, *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence
[4] *Available at* https://scholarship.law.umn.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1504&context=faculty_articles.

The Honorable Richard J. Sullivan                          March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

> The 'first offender' philosophy in sentencing policy generally
> encourages lower sentences for offenders who have little or no prior
> criminal conduct. This philosophy, which can be derived directly from
> the guidelines' Chapter Four introductory commentary, postulates that
> first offenders are less culpable and less likely to re-offend. As such,
> they are deserving of reduced punishment.[5]

The recidivism rate for individuals convicted of terrorism-related offenses
follows similar patterns as other criminal offenses. Sentence length and age upon
release reduce the risk of recidivism, and affiliation with a terrorist organization,
which Mr. Ullah has not, increases the risk. Badi Hassi, *Crime and Terror:
Examining Criminal Risk Factors for Terrorist Recidivism*, J. of Quantitative
Criminology 1, 16 (2019).

Prior to this case, Mr. Ullah had never before been arrested, nor had he
committed any crimes for which he had not been caught. For 31 years, he has lived
a thoroughly law abiding life outside of the criminal justice system. Thirty-five
years in prison, an amount of time that is impossible to fathom, is more than
sufficient to ensure that Mr. Ullah will not recidivate.

## III.     A Sentence of 35 Years Would Not Create Any Unwarranted Sentence Disparities.

The Court must consider similarly situated defendants to avoid unwarranted
sentencing disparities. 18 U.S.C. § 3553(a)(6). A review of recent and similar cases
demonstrates that Mr. Ullah's conduct does not warrant more than 35 years in
prison.  While it is true that the United States' aggressive War on Terror policies
and the resultant trend to incapacitate rather than rehabilitate have led to the
imposition of incapacitating prison sentences, there are many examples of
thoughtful restraint that can be analogized to Mr. Ullah's circumstances. Below are
some of those examples:

---

[5] U.S. SENTENCING COMM'N, RECIDIVISM AND THE FIRST OFFENDER (2004), available at:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2004/200405_Recidivism_First_Offender.pdf., p. 1.

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

- *United States v. Mohamed Osman Mohamud*, 10 Cr. 475 (KI) (D. Ore): After
  a jury trial, the defendant was convicted of attempting to use a weapon of
  mass destruction, 18 U.S.C. § 2332a(a)(2)(A). The defendant had planned for
  months to detonate a massive truck bomb at the annual Christmas tree
  lighting celebration in downtown Oregon. He drove the truck to the location
  and dialed a cellphone – twice – that he believed would trigger the explosion
  but the bomb did not explode because it was a non-functioning device given to
  Mohamud by FBI operatives. Mohamud faced a guideline range of life in
  prison and the Government requested a variance of 40 years. Gov't Sent'g
  Mem, ECF No. 477. Mohamud was sentenced to 30 years in prison.

- *United States v. Nafis*, 12 Cr. 720 (E.D.N.Y.): The defendant was a 21-year-
  old Bangladeshi national, who attempted to detonate a truck bomb (that
  unbeknownst to him was inert) at the Federal Reserve Bank of New York.
  He pleaded guilty and was sentenced to 30 years' imprisonment.

- *United States v. Khalifi*, 12 Cr. 37 (JCC) (E.D. Va.): The defendant was a 28-
  year-old Moroccan national, who attempted to conduct a suicide bombing
  attack on the U.S. Capitol using a suicide bomb vest and automatic weapon
  (that unbeknownst to him were inert). He pleaded guilty and was sentenced
  to 30 years' imprisonment.

- *Kevin William Harpham, 11 Cr. 42 (E.D. WA):* The defendant pleaded guilty
  to attempted use of a weapon of mass destruction and attempt to cause bodily
  injury with an explosive device because of actual or perceived race, color, and
  national origin of any person. He had designed and constructed a functioning
  radio-controlled improvised explosive device filled with fishing weights coated
  in rat poison containing an anticoagulant as shrapnel. The device was placed
  in a backpack alongside a planned Martin Luther King Jr. Day Unity March
  in Spokane, Washington. The backpack was discovered by parade workers
  and defused by law enforcement. "The march was attended by
  approximately 2,000 individuals, including racial minorities. The explosive

16

The Honorable Richard J. Sullivan                    March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

device placed by Harpham was capable of inflicting serious injury or death, according to laboratory analysis conducted by the FBI. Harpham admitted that he is a white supremacist and white separatist, and that he placed the explosive device at the march with the intent to cause bodily injury to the person or persons in order to further his racist beliefs." *See* https://archives.fbi.gov/archives/seattle/press-releases/2011/washington-man-sentenced-to-32-years-for-attempted-bombing-of-martin-luther-king-unity-march.  Harpham was sentenced to 32 years in prison.

- *United States v. Stephen Powers*, No. 18 Cr. 37 (AWA) (E.D. Va), ECF No. 37: The defendant detonated a homemade explosive device on a commercial strip in Colonial Williamsburg and had additional bomb materials in his home. Gov't Sent'g Mem. 1–3, ECF No. 37. Powers connected the device to an outlet in the commercial area that was programed to receive electrical current at 5:00 pm each evening so that decorative lights would activate in the shopping area. When the outlet activated, the explosive device ignited and exploded and sent large fragments of metal in several directions, landing as far away as 200 feet.  No one was injured, though there was extensive property damage. <u>Id.</u>  Powers was sentenced to 120 months. ECF No. 40.

Sentences of life imprisonment have typically been reserved for defendants who demonstrated an abiding commitment to terrorist organizations through, among other things, communications, travel, and training:

- *United States v. Ahmad Khan Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y.):  After a jury trial, the defendant was convicted of eight counts including two counts of 18 U.S.C. § 924(c), for detonating one sophisticated pressure cooker bomb via cellphone trigger on a NYC street and unsuccessfully attempting to detonate another, injuring more than 30 people and causing hundreds of thousands of dollars in property damage. *See* Gov't Sent'g Mem. 2, ECF No.  188.  He also carried 6 bombs in a backpack which he left at a train station in New Jersey.

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

One of those bombs detonated as a law enforcement officer attempted to defuse it. *Id.* at 5. As law enforcement officers attempted to arrest the defendant the following day, he pulled out a Glock piston and shot one police officer in the stomach and shot at other officers as he fled. *Id.* Additionally, two days prior, he had planted a pipe bomb in a trash can along the anticipated route of the Seaside Semper Five Marine Corps Charity 5K Race. *Id.* at 6. The defendant's "path to jihad" began four years prior when he began researching terrorist ideology. *Id.* at 3. He failed to show remorse for his crimes, and instead attempted to radicalize his fellow inmates and made light of his attacks. *Id.* at 2. Rahimi was sentenced to life without parole.

- *United States v. Faisal Shahzad*, 10 Cr. 541 (MGC) (S.D.N.Y.): The defendant was convicted of several terrorism related statutes for attempting to detonate a car bomb in Times Square. He had previously travelled to Pakistan and received explosives training from a terrorists group. He pleaded guilty and was sentenced to life in prison.

- *United States v. Umar Farouk Abdulmutallab*, 10 Cr. 20005 (E.D. Mich): The defendant attempted to blow up a plane with explosives concealed in his underwear. He was a Nigerian national who has trained in terrorist camps in Yemen run by al Qaeda, who claimed responsibility for the attack. He was a student of Anwar al-Awlaki, who some believe was involve in orchestrating the attack. After his trial commenced, Abdulmutallab pleaded guilty and was sentenced to four consecutive life sentences plus 50 years.

The Honorable Richard J. Sullivan                                March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

## **CONCLUSION**

Mr. Ullah's attraction to extremism began at a time of profound personal crisis and vulnerability.   He was not raised with extremist beliefs and no one in his life tolerated violence of any sort.  Mr. Ullah was – and still is – a peaceful man who never exhibited a violent or aggressive character.   His conduct was an aberration in a life otherwise lived lawfully and peacefully.

Imprisoning Mr. Ullah for longer than 35 years will most certainly be punishing, excessively so, but it is not necessary to deter him specifically and will certainly not serve to prevent or eradicate acts of terror by others.

.                                                        Respectfully submitted,

                                                        */s/ Amy Gallicchio*
                                                        _____
                                                        Amy Gallicchio, Esq.
                                                        Assistant Federal Defender
                                                        Federal Defenders of New York
                                                        212-417-8728

Cc:    AUSA Rebekah Donaleski
       AUSA George Turner