UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

AKAYED ULLAH,

                    Defendant.

18 Cr. 16 (RJS)

## GOVERNMENT'S SENTENCING MEMORANDUM

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Rebekah Donaleski
George D. Turner
Assistant United States Attorneys
     *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND .................................................................................................. 2

   A.  The Terrorist Attack ............................................................................. 2

     1.  Radicalization ................................................................................ 2

     2.  Planning the Attack ....................................................................... 6

     3.  The Bombing ................................................................................ 11

     4.  Post-Arrest Statements ................................................................. 18

   B.  The Charges and Guilty Verdict ......................................................... 19

   C.  The PSR ............................................................................................. 20

   D.  Victim Impact Statements .................................................................. 21

ARGUMENT ..................................................................................................... 23

   A.  Applicable Law .................................................................................. 23

   B.  The Applicable Guidelines Sentence Is Life Imprisonment ................. 24

     1.  The Terrorism Enhancement Applies ............................................ 24

     2.  A Reduction for Acceptance of Responsibility Is Not Warranted .... 29

   C.  The Sentencing Factors Weigh Strongly in Favor of a Life Sentence ... 31

     1.  The Nature and Seriousness of Ullah's Crimes and the Need for Just Punishment Necessitate a Guidelines Sentence ................. 32

     2.  A Guidelines Sentence Will Serve the Purpose of Deterrence and Will Promote Respect for the Law ................................................ 35

     3.  A Guidelines Sentence Is Appropriate to Protect the Public from Further Crimes of the Defendant .................................................. 38

     4.  A Guidelines Sentence Is Necessary to Avoid Creating Unwarranted Sentencing Disparities ......................................................... 39

     5.  The Defendant's Arguments Do Not Support a Downward Variance ........ 41

CONCLUSION .................................................................................................. 44

## **TABLE OF AUTHORITIES**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)................................................................................................ 23, 39

*United States v. Abdul Hakim Murad*,
    93 Cr. 180 (S.D.N.Y 1998) ................................................................................ 40

*United States v. Alhaggagi*,
    978 F.3d 693 (9th Cir. 2020) .............................................................................. 28

*United States v. Alimehmeti*,
    16 Cr. 398 (S.D.N.Y. 2016)................................................................... 27, 28, 29

*United States v. Booker*,
    543 U.S. 220 (2005)............................................................................................ 23

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005)............................................................................... 23

*United States v. Cruz*,
    446 F. App'x 344 (2d Cir. 2011) ................................................................. 30, 31

*United States v. Davis*,
    139 S. Ct. 2319 (2019)....................................................................................... 20

*United States v. El Bahnasawy*,
    16 Cr. 376 (S.D.N.Y. 2016).......................................................................... 28, 29

*United States v. Fernandez*,
    443 F.3d 19 (2d Cir. 2006)........................................................................... 37, 39

*United States v. Mandhai*,
    375 F.3d 1243 (11th Cir. 2004) ......................................................................... 29

*United States v. Meskini*,
    319 F.3d 88 (2d Cir. 2003)............................................................. 25, 29, 35, 36

*United States v. Mohammed Mansour Jabarah*,
    02 Cr. 1560 (S.D.N.Y. 2002)............................................................................. 40

*United States v. Paredes-Batista*,
    140 F.3d 367 (2d Cir. 1998).......................................................................... 30, 31

*United States v. Rahimi*,
    16 Cr. 760 (S.D.N.Y. 2016)..................................................................... 28, 29, 41

*United States v. Rattoballi*,
    452 F.3d 127 (2d Cir. 2006)............................................................................... 39

*United States v. Richard Reid*,
    02 Cr. 10013 (D. Mass. 2003)............................................................................ 40

*United States v. Rubenstein,*
  403 F.3d 93 (2d Cir. 2005)........................................................................... 39

*United States v. Sayoc,*
18 Cr. 820 (JSR) (S.D.N.Y. 2018) .............................................................. 29

*United States v. Stewart,*
  590 F.3d 93 (2d Cir. 2009)............................................................... 25, 29, 35

*United States v. Volpe,*
  224 F.3d 72 (2d Cir. 2000)........................................................................... 29

**Statutes**

18 U.S.C. § 1992 ............................................................................................... 19

18 U.S.C. § 2332a ............................................................................................. 19

18 U.S.C. § 2332b ..................................................................................... *passim*

18 U.S.C. § 2332f ............................................................................................. 19

18 U.S.C. § 2339B ............................................................................................ 19

18 U.S.C. § 3553(a) .................................................................................. *passim*

18 U.S.C. § 844(i) ............................................................................................ 19

18 U.S.C. § 924(c) ............................................................................................ 19

**Other Authorities**

U.S.S.G. § 2M6.1(a) ................................................................................. 24, 29

U.S.S.G. § 3A1.4(a) ...................................................................... 24, 25, 27, 29

U.S.S.G. § 3E1.1(a) ............................................................................ 24, 30, 31

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Akayed Ullah, which is scheduled for April 8, 2021.  On December 11, 2017, Ullah attacked New York City, detonating a pipe bomb in a subway station in the heart of Manhattan.  He carried out the attack in the name of the Islamic State of Iraq and al-Sham ("ISIS"), to further that terrorist organization's depraved agenda of murdering and terrorizing innocent American civilians.  After growing angry at American foreign policy in the Middle East, Ullah chose to devote himself to ISIS's radical ideology; he accessed, consumed, and was inspired by online ISIS propaganda glorifying brutally violent stabbings, shootings, and bombings targeting Americans; and he ultimately answered ISIS's call for its supporters to carry out "lone-wolf" terrorist attacks in the United States.  Ullah's attack was premeditated and vicious.  He packed his pipe bomb with metal screws and struck during the morning rush hour in a crowded underground tunnel, in a calculated effort to kill, maim, and terrorize as many people as possible.  Shrapnel from Ullah's bomb sliced into the leg of one commuter, two victims partly lost their hearing in the blast, and countless others were traumatized by Ullah's attack, which brought midtown Manhattan to a standstill, disrupting the lives of hundreds of thousands of New Yorkers.  Following the attack, Ullah proudly declared to law enforcement that he carried out the bombing for ISIS, with the goal of causing maximum damage and terror.  And while incarcerated on the charges in this case, Ullah demonstrated the depths of his radicalization, as he chillingly warned a correctional officer: "You started this war, we will finish it.  More is coming, you'll see."

After a trial that laid bare Ullah's path to radicalization and meticulous planning and execution of his attack on this city for ISIS, a jury swiftly convicted him of all six counts in the

Indictment.  The Government respectfully submits that Ullah should now be sentenced to life imprisonment, which is the sentence called for by the Sentencing Guidelines and recommended by the Probation Department.  A life sentence is necessary and appropriate to reflect the abhorrent nature and extreme seriousness of Ullah's terrorist bombing, to provide just punishment for that conduct, to protect the public from potential future acts of terrorism by Ullah, to deter other young men and women from pursuing the path of radicalization chosen by Ullah and attempting to carry out a similar attack, and to avoid creating unwarranted sentencing disparities between Ullah and other defendants who have received life sentences after perpetrating or attempting to perpetrate similar terrorist attacks.

## BACKGROUND

### A.  The Terrorist Attack

#### 1.  Radicalization

Ullah was born in 1990 in Bangladesh.  (Presentence Investigation Report, dated July 8, 2019 ("PSR"), ¶ 41).  In 2011, at age 21, Ullah immigrated to the United States with his family. (*Id.* ¶ 44).  After arriving in the United States, the Ullah family resided in two adjacent apartments in a building on Ocean Parkway in Brooklyn; after his father died in 2012, Ullah lived with his mother and two of his siblings in one of the apartments.  (*Id.* ¶¶ 41, 49).  Ullah worked as a taxi driver in Brooklyn for a few years following his arrival in the United States.  (*Id.* ¶ 61).  In 2014, Ullah started working jobs in construction, including as an electrician.  (*Id.* ¶¶ 60-61).  Ullah was married in Bangladesh in 2016, and his wife gave birth to a son in June 2017; Ullah's wife and son remained in Bangladesh, while he lived in Brooklyn.  (*Id.* ¶ 48).

During the years following his immigration to the United States, Ullah radicalized, devoting himself to extremist Islamic jihadist ideology.  Ullah was angry at American foreign policy in the Middle East, and was particularly incensed at the 2014 bombing of Muslims in the Gaza Strip, for which he held the United States responsible.  (Trial Transcript ("Tr.") 227).[1]  Ullah sought out and consumed online materials spewing anti-American sentiment and espousing radical Islamic terrorism.  (Tr. 225-27).  In particular, Ullah accessed, viewed, and was inspired by propaganda promoting ISIS and its depraved jihadist mission bent on killing and terrorizing Americans.  (PSR ¶ 15; Tr. 226).  Ullah watched numerous ISIS propaganda videos glorifying ISIS, its leaders, and violent attacks in the name of ISIS against Americans, including truck attacks, stabbings, bombings, and beheadings of captives.  (Tr. 226).  Law enforcement recovered Ullah's laptop from his apartment following the attack on December 11, 2017, and the laptop contained a large volume of these terrorist propaganda materials, including dozens of videos disseminated by ISIS's official media outlet, al-Hayat Media Center, and hundreds of lectures by radical jihadist leaders, including Anwar al-Awlaki, the now-deceased former leader of al Qaeda in the Arabian Peninsula, whose video messages encouraged followers to carry out attacks against Americans and have inspired ISIS supporters around the world.  (PSR ¶ 16; Tr. 225, 368-70; GX 706).  For example, the ISIS propaganda that Ullah consumed, absorbed, and drew inspiration from included videos depicting:

---

[1] In July 2014, Israel launched airstrikes targeting Hamas in the Gaza Strip following Hamas's kidnapping and murder of three Israeli teenagers.  *See* https://www.nytimes.com/interactive/2014/07/15/world/middleeast/toll-israel-gaza-conflict.html.

- An ISIS fighter waving the black and white flag of jihad used by ISIS (GX 704; Tr. 372-73):



- A speech by ISIS's now-deceased leader, Abu Bakr al-Baghdadi, promoting radical jihadist ideology (GX 708; Tr. 378):



- ISIS operatives carrying out suicide bombing attacks (GX 706; Tr. 379-80):



- A chilling warning to Americans that ISIS "will surely come and slaughter you" (GX 705; Tr. 376-77):



5

- A montage glorifying four ISIS supporters who carried out lone-wolf attacks in the name of ISIS, including Omar Mateen, who mass murdered nearly 50 people on behalf of ISIS in a shooting at an Orlando nightclub in 2016 (GX 704; Tr. 372-75):



As Dr. Aaron Zelin, the Government's expert in militant jihadist groups including ISIS, explained at trial, ISIS specifically designs these videos to recruit and radicalize followers in the United States—like Ullah—and through the videos, ISIS instructs and inspires its supporters to commit lone-wolf terrorist attacks for ISIS.  (PSR ¶ 15; Tr. 364-68, 438).

### 2. Planning the Attack

By 2017, Ullah was fully radicalized and devoted to ISIS and its cause.  He was ready to answer ISIS's call and carry out a lone-wolf terrorist attack.  Ullah began researching how to build an improvised explosive device ("IED") about a year before his attack, watching videos and reading magazines with instructions for making a pipe bomb.  (PSR ¶ 15; Tr. 225).  In November 2017, Ullah put his plan into action, as he collected materials and began building the bomb.  (Tr. 228).  He obtained the materials to build the bomb from a construction site where he was working as an electrician, located at 39th Street and Eighth Avenue.  (Tr. 218; GX 303-10).  Ullah built the

IED using a metal pipe, match heads, sugar, electrical wiring, Christmas lights, and a nine-volt battery.  (PSR ¶ 13; Tr. 219, 227-28, 597-98).

In the weeks leading up to the attack, Ullah methodically assembled the pipe bomb at his apartment in Brooklyn.  (PSR ¶ 16; Tr. 228).  He ground up match heads and mixed them with sugar to create the explosive substance, and filled the pipe with that mixture.  (Tr. 219, 520-25).  He severed Christmas lights from their strands, broke the glass on the lights to expose the filaments, and added the light fragments to the pipe, to serve as the heat source for igniting the explosive substance.  (PSR ¶ 13; Tr. 219, 571).  He used heavy-duty pliers that he stored at the construction site to fasten metal caps to the ends of the pipe, pressurizing the device.  (Tr. 504; GX 302-1A).  He drilled a hole in one of the metal end caps, ran the electrical wiring into the pipe, and connected the wiring inside the pipe to the broken Christmas lights.  (PSR ¶ 13; Tr. 599-600; GX 105-1A).  The nine-volt battery was Ullah's power source—to detonate the pipe bomb, he would touch the loose end of the wiring to the battery, closing the electrical circuit.  (PSR ¶ 13; Tr. 602).

Ullah also filled his pipe bomb with dozens of metal screws.  (PSR ¶¶ 13-14).  The screws were completely unnecessary to make the bomb explode.  (*Id.* ¶ 14; Tr. 607).  Instead, the screws functioned as shrapnel.  (Tr. 607).  The purpose of the screws was to maim, kill, and maximize lethality.  (PSR ¶ 14; Tr. 607).  As the FBI explosives expert testified, Ullah's pipe bomb was capable of killing people, both from the force of the explosion and the shrapnel that it sprayed. (Tr. 619).

On November 29, 2017, as Ullah was building his bomb and gearing up to carry out the attack, ISIS released another propaganda video, "Flames of War II":



(GX 924; Tr. 446-47). In the video, ISIS reiterated its instruction to supporters that they should carry out attacks in the United States. (Tr. 371-72). The video shows U.S. military forces conducting operations in the Middle East, and then proclaims, "die in your rage, America," with an image of the U.S. Congress in the background:



(GX 924; Tr. 444-45). Ullah watched Flames of War II, and the video was a particularly important piece of inspiration for him. He specifically mentioned that video when interviewed by law enforcement following the attack. (Tr. 225-26). And Ullah left calling cards at his Brooklyn apartment containing the ISIS slogan that appears in the video and that Ullah adopted: "Die in your rage, America." (Tr. 458-59). Ullah chillingly scrawled that ISIS rallying cry in his passport, his visa, and on the bottom of a cardboard box containing some of the equipment he used to build the bomb, all of which were recovered from his apartment after the attack:







(PSR ¶ 16; GX 210-25, 210-26, 207-B, 210-12).  Ullah planned to die in the attack, a "martyrdom"

operation for ISIS (Tr. 228), and he left these calling cards so that the world would know he had

acted for ISIS.

Ullah finished building his bomb about a week before the attack.  (Tr. 229).  He stored the

bomb in his apartment, biding his time.  Ullah carefully selected his target: the subway station

("42nd Street Station") underneath the Port Authority Bus Terminal ("PABT") in midtown

Manhattan.  Ullah explained to law enforcement following the attack that he chose that location

because he believed it was the subway station shown in a television interview he had seen recently

where the reporter asked a commuter about a threat made by ISIS to attack Times Square, and the

commuter said he did not feel threatened by ISIS; that was not acceptable to Ullah, so he chose to

carry out his attack in that station, to send a message in the name of ISIS.  (Tr. 224-25).

Of the 472 stations in the New York City subway system, the 42nd Street Station is the

single busiest station in terms of passenger volume.  (Tr. 651).  The PABT is the primary bus

10

terminal in the city; on average, about 7,800 buses, carrying 260,000 passengers, travel in and out

of the PABT every day, and the busiest time of day for bus traffic is the morning rush hour.  (Tr.

629-32).  That is precisely when Ullah chose to strike.  He carried out the attack during rush hour

on the morning of December 11, 2017, a busy Monday during the holiday season.  Just 12 days

after ISIS released Flames of War II, Ullah answered ISIS's call to attack the United States.

### 3.  The Bombing

On the morning of December 11, 2017, at about 5:45 a.m., after waking and engaging in

morning prayer, Ullah strapped the pipe bomb to his chest, using zip ties, and concealed the bomb

under multiple layers of clothing.  (PSR ¶ 11; Tr. 219).  Ullah put the nine-volt battery—the power

source for the IED—in his right pants pocket, and ran the loose end of the IED's wiring through a

hole that he cut into the pocket, a tactic that other bombers have used and which enabled Ullah to

conceal the triggering mechanism.  (PSR ¶ 13; Tr. 609-10; GX 131-1F).  Surveillance video and

MetroCard swipes captured Ullah's movements through the city, as he traveled to his target.  (PSR

¶¶ 11-12; GX 1001).  He kept his right hand in his pants pocket, ready to connect the battery and

wiring, closing the circuit and triggering the detonation.  Ullah was, at that point, part of the

bomb—ready to blow up himself and others for ISIS.  After leaving his apartment, Ullah boarded

a subway in Brooklyn bound for the 42nd Street Station—along with numerous passengers

unaware that they were riding a train with a terrorist wearing a bomb that could explode at any

minute if he was jostled or bumped.  (Tr. 617-18).

11

As Ullah rode the subway, at 6:36 a.m., he posted the following message to his Facebook account (using the alias "Abu Azzam"), stating that the then-President of the United States had failed to protect the country from Ullah's attack, and proclaiming his allegiance to ISIS:



(GX 401; PSR ¶ 14).  "Baqiah" is an Arabic term that literally means "remaining."  (Tr. 380-81). As Dr. Zelin explained, ISIS uses "Baqiah" as a slogan in its propaganda to signify that the group is remaining and expanding, and will attack and defeat its enemies.  (PSR ¶ 14; Tr. 381-82).  Ullah later explained to law enforcement that he posted the Facebook message so that ISIS would know he had carried out the attack in its name, that he was acting for ISIS.  (Tr. 222).

When Ullah arrived at the 42nd Street Station, he exited the subway and strode purposefully toward the long underground tunnel that connects the Port Authority and Times

Square subway stations, both of which are part of the 42nd Street Station complex.  (Tr. 52, 650).

He kept his right hand in his pants pocket, ready to trigger the bomb:

 

(GX 1001-18, 1001-19).  Ullah reached the tunnel, which was crowded with morning commuters, and began walking through the tunnel:



13

(GX 1001-23).  A few moments later, at 7:20 a.m., with commuters all around him, Ullah touched the wire to the battery in his pocket and detonated the pipe bomb; red flames burst from the bomb as it exploded:



(GX 1001-20).

The explosion shattered the pipe and caused the pipe fragments and screws inside the pipe to fly through the tunnel.  (PSR ¶ 13).  The shattered pipe fragments were sharp like a knife.  (Tr. 163).  As the FBI explosives expert explained, by choosing to detonate the IED in a narrow, underground, and enclosed space like the tunnel, Ullah increased the power and force of the

14

explosion.  (Tr. 581-82).  After the explosion, smoke spread through the tunnel, and terrified commuters ran screaming to get out of the station:



(GX 1001-22).  First responders rushed to the scene, and found Ullah lying on the ground of the tunnel, alive but with injuries to his torso, where the bomb had detonated, ripping through his clothing:



15

(GX 103-2).  First responders also found remnants of the bomb strewn across the tunnel.  (PSR

¶ 13; Tr. 66).  Some of the shattered pipe fragments and screws found at the scene of the attack—

the shrapnel that Ullah's bomb sprayed through the tunnel—are shown below:

 



(GX 106-2A, 106-1B, 116-1B).

Ullah injured, terrorized, and forever altered the lives of people in that tunnel. Two of his victims, David Wall and Veronica Chavez, testified at trial. (PSR ¶ 20).[2] Mr. Wall, a construction project manager for New York City schools who was just a few feet in front of Ullah when he detonated the bomb, was treated at a hospital for a shrapnel wound to his leg, and also lost part of his hearing as a result of the explosion. (Tr. 43-44). Ms. Chavez was walking towards Ullah in the tunnel, in the midst of her morning commute to a factory where she worked as a seamstress, when Ullah detonated the bomb. (Tr. 662, 664). As a result of the blast, Ms. Chavez lost part of her hearing, was unable to work at the factory due to the trauma from the attack, lost her job, and required therapy to cope with the trauma. (PSR ¶ 20; Tr. 666-67). Another victim ("Victim-3") was similarly diagnosed with post-traumatic stress disorder following the attack, and was prescribed medication for anxiety resulting from the trauma. (PSR ¶ 19). A fourth victim ("Victim-4") was treated at a hospital for heart palpitations and ringing in his ears as a result of the explosion in the tunnel. (PSR ¶ 19).

Ullah's attack also wreaked havoc on the city's mass transportation systems. Immediately after the attack, the Metropolitan Transportation Authority ("MTA") shut down the 42nd Street Station, and suspended service entirely on the A, C, and E subway lines. (Tr. 658-60). A photo of the tunnel in that complex in the aftermath of the attack—closed to pedestrians, eerily empty, and with cones marking evidence and debris from the explosion—is below:

---

[2] Mr. Wall and Ms. Chavez have previously been referenced in filings as Victim-1 and Victim-2, respectively.

17



(GX 102-8).  The MTA executive responsible for train movement testified that in his 32 years at

the MTA, he did not recall any other time when service was entirely suspended at the 42nd Street

Station—the busiest subway station in the city.  (Tr. 660).  Meanwhile, following the attack, the

PABT also shut down entirely for an extended period that morning, another unprecedented event

over at least the last three decades.  (Tr. 630, 635-36, 645).  Hundreds of buses were delayed,

diverted, or canceled.  (Tr. 641).  Ullah's attack disrupted the lives of hundreds of thousands of

people, brought swaths of the city to a standstill, and took a physical, emotional, and financial toll

on the city and its residents.

### 4.  Post-Arrest Statements

After the attack, Ullah waived his *Miranda* rights and spoke with law enforcement.  During

the interview, Ullah proudly declared that he carried out the attack "on behalf of the Islamic State."

(PSR ¶ 14; Tr. 226).  Ullah also stated, among other things, that he chose a busy weekday morning

for his attack because "there would be more people to terrorize"; he filled his bomb with screws

to cause "maximum damage"; and he knew people might die.  (PSR ¶ 14; Tr. 225, 228, 230-31).

While in custody in the days following the attack, Ullah made additional, unprompted statements to law enforcement officers about the bombing.  On December 14, 2017, Ullah told a Deputy U.S. Marshal guarding him at the hospital, "System is not working, think who will come after me," and repeatedly warned, "More is coming."  (PSR ¶ 17).  More than a week later, on December 22, 2017, while incarcerated at the Metropolitan Correctional Center, Ullah began chanting "more is coming" to a correctional officer, and then told the officer: "You started this war, we will finish it.  More is coming, you'll see."  (*Id.*).

## B. The Charges and Guilty Verdict

The Indictment charged Ullah with six counts of terrorism-related offenses based on his attack: (1) providing material support to a designated foreign terrorist organization, ISIS, in violation of 18 U.S.C. § 2339B; (2) using a weapon of mass destruction, in violation of 18 U.S.C. § 2332a; (3) bombing a place of public use and a public transportation system, in violation of 18 U.S.C. § 2332f; (4) destroying property by means of explosive, in violation of 18 U.S.C. § 844(i); (5) committing a terrorist attack against a mass transportation system, in violation of 18 U.S.C. § 1992; and (6) using a destructive device during and in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c).  (Dkt. 6).

In November 2018, a jury found Ullah guilty after trial of all six counts in the Indictment. Ullah filed multiple rounds of post-trial motions challenging his convictions.  On December 31,

2020, the Court issued an opinion denying Ullah's motions in their entirety.  (Dkt. 104).[3]  Ullah faces a statutory maximum penalty of life imprisonment, with a mandatory minimum of 35 years' imprisonment—five years on Count Four, and 30 years on Count Six, which must run consecutively to the sentence imposed on the other counts.  (PSR ¶¶ 65-66).

### C.  The PSR

The Probation Department issued the final PSR on July 8, 2019.  The Probation Department calculates that the applicable offense level under the Guidelines is 43—the highest possible offense level—and that the defendant's criminal history category is VI, because he committed multiple federal crimes of terrorism.  (PSR ¶¶ 23-37).  Based on those calculations, as set forth in the PSR, the applicable Guidelines sentence is life imprisonment—specifically, life imprisonment on Counts One through Five and 30 years' consecutive imprisonment on Count Six.  (*Id.* ¶ 67).

The Probation Department recommends that the Court impose the Guidelines sentence of life imprisonment on Counts One through Five, to be followed by 30 years on Count Six.  (*Id.* at 21-23).  In reaching its recommendation, Probation cites, among other things, the fact that Ullah filled his pipe bomb with metal screws, which were not necessary for the bomb to function, in order to inflict maximum damage, and that he chose a busy weekday morning to detonate the bomb in an attempt to injure and kill as many people as possible.  (*Id.* at 22).  In response to defense counsel's contention that Ullah has a history of depression, Probation states: "[W]e do not believe

---

[3] Among other things, the Court held that, following the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), Counts Three and Five remain valid predicate crimes of violence for Count Six.  (Dkt. 104 at 13-18).

even the most acute case of depression should have any impact on sentencing in this case. Depression neither explains nor mitigates an act of terrorism.  Terrorism is catalyzed by hatred and extremism." (*Id.* at 22).  Ultimately, in light of the exceptionally serious and depraved nature of Ullah's terrorist bombing, Probation determined that a sentence of life in prison "could not be more suitable for Ullah's offense."  (*Id.* at 22 ("It was extremely fortunate that no deaths of innocent bystanders were caused by his actions, but the defendant should not be rewarded for his failure with anything less than a guideline sentence.  Victims did suffer physical and emotional trauma from which they will likely never fully recover.")).

### D.  Victim Impact Statements

Mr. Wall and Ms. Chavez elected to submit victim impact statements in connection with sentencing.[4]  As reflected in those statements, Ullah's attack caused significant harm to Mr. Wall and Ms. Chavez and forever changed their lives.  Mr. Wall writes of how he had taken the same commute for ten years, but walking through the tunnel that day "changed [his] life forever."  (PSR ¶ 20).  The blast "pushed [Mr. Wall] forward," and he later learned in the hospital that he had suffered "severe concussion from the explosive waves and suffered from shock," and that a piece of shrapnel had burned into his leg.  (*Id.*).  Mr. Wall explains that learning of Ullah's motives also significantly affected him: "[t]he shock of being the target of a hate attack put me in emotional shock that devastated me for months, and unfortunately is a permanent part of my personality."

---

[4] Mr. Wall and Ms. Chavez submitted victim impact statements to the Probation Department, which are reflected in the PSR, as well as directly to the Government, which are attached hereto as Exhibit A.  The Government has redacted personal identifying information contained therein, and will submit unredacted copies to the Court and defense counsel under separate cover.

21

(*Id.*).  Mr. Wall also experienced lasting physical ailments from the attack, including a seventy-percent damage to his hearing and tinnitus.  (*Id.*).  Mr. Wall describes the angst of not being able to hear the pitch of his daughter's voice, or the sound of his daughter playing music in the same way he used to.  "To have my hearing damaged by the terrorist bomber pains me every day of my life."  (*Id.*).  Mr. Wall also suffers from severe anxiety as a result of the defendant's attack, which is triggered anytime he rides the subway.  (*Id.*).  In sum, Mr. Wall explains that "[e]motionally and mentally I struggle daily with this near death experience."  (*Id.*).

Similarly, Ms. Chavez describes the enduring physical and emotional toll of the defendant's attack.  Ms. Chavez explains that she lost her job because of her "frayed nerves" and inability to take the same commute to work, which caused financial difficulties.  (*Id.* ¶ 20).  Ms. Chavez sees a therapist for the trauma she experienced as a result of the attack, and tragically explains that "[i]n a sense, [her two children] have lost me, because when I hear a loud noise I get distressed and upset."  (*Id.*).  Ms. Chavez also experienced a loss in hearing as a result of the attack.  (*Id.*).[5]

---

[5] The Government has attempted to contact each of Mr. Wall, Ms. Chavez, Victim-3, and Victim-4 to determine whether they wish to seek restitution.  Ms. Chavez has informed the Government that she does not wish to seek restitution.  To date, the Government has been unable to reach Victim-3 and Victim-4.  Mr. Wall notified the Government earlier this week that he wishes to seek restitution, and the Government is in the process of conferring with Mr. Wall to determine the applicable amount; the Government will also confer with defense counsel to obtain their position before submitting a proposed order to the Court.  If the Government is in a position to propose a restitution order to the Court by sentencing, it will do so in a supplemental filing.  Alternatively, the Government will respectfully request that the Court defer final determination of restitution for up to 90 days following sentencing pursuant to 18 U.S.C. § 3664(d)(5), to ensure the victims have sufficient opportunity to provide the relevant information to the Government.  In that event, the Government would propose to provide the Court with an update as soon as practicable and no later

## ARGUMENT

### A. Applicable Law

The Guidelines continue to provide strong guidance to district courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). While *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

---

than 30 days following sentencing as to whether Victim-3 and/or Victim-4 are seeking restitution and in what amount(s), as well as the amount of restitution sought by Mr. Wall, and the Government will submit a proposed restitution order to the Court as soon as feasible.

23

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B.  The Applicable Guidelines Sentence Is Life Imprisonment

The defendant objects to two aspects of the Guidelines calculation set forth in the PSR. First, he argues that the terrorism enhancement in U.S.S.G. § 3A1.4(a) should not apply, because his conduct was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *see* U.S.S.G. § 3A1.4, App. Note 1; 18 U.S.C. § 2332b(g)(5), and because application of the terrorism enhancement in conjunction with the base offense level specified in U.S.S.G. § 2M6.1(a)(1) constitutes impermissible "double counting."  (Defendant's Sentencing Submission, Dkt. 106 ("Def. Sub."), at 8-10).  Second, the defendant argues that, notwithstanding that he was convicted after trial, he is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  (*Id.* at 10-11). Both arguments are meritless.

### 1.  The Terrorism Enhancement Applies

The terrorism enhancement is squarely applicable in this case, in which the defendant carried out a terrorist bombing attack on behalf of a foreign terrorist organization.  In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for

terrorism offenses to ensure that defendants convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting "terrorism enhancement" set forth in U.S.S.G. § 3A1.4(a), which increases the applicable offense level by 12 and places the defendant in criminal history category VI, reflects Congress's intent that defendants, like Ullah, convicted of terrorism offenses serve sentences that are appropriate in light of their uniquely dangerous crimes and risk of recidivism. As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).

The terrorism enhancement applies when the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). The defendant concedes that he was convicted of offenses enumerated in the applicable definition of "federal crime of terrorism" set forth in Section 2332b(g)(5). (Def. Sub. 8). Nonetheless, he argues that the Government has not established the other prong of that definition—that the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A)(1)—such that the enhancement should not apply. That argument is easily rejected based on the trial record.

25

As an initial matter, the defendant was convicted of providing material support to ISIS by carrying out a terrorist attack on behalf of the organization. As Dr. Zelin explained at trial, ISIS's mission is clearly directed at impacting the conduct of governments, including through violence, intimidation, and coercion, both in the Middle East and the West. (*See, e.g.*, Tr. 362 (ISIS's primary goals are to "take over territory in Iraq and Syria . . . institute its form of Islamic governance . . . [and] defeat its enemies, whether locally, including what they describe as apostate Arab regimes or so-called crusader Western governments"); *id.* (ISIS seeks to impact U.S. policy in the Middle East because "they want the U.S. to be driven out of the Middle East so that the U.S. has no interests there and that they're able to take on a more important and larger role, since their goals are to take over the whole region"); *id.* (ISIS's methods for implementing its agenda include "military operations in the areas they operate; they also use terrorist attacks abroad, as well as intimidating locals so that they don't go against them, by beheading people or by drowning people live or lighting them on fire")). Thus, the fact that the defendant sought to serve ISIS and its cause, by answering the group's call to carry out a lone-wolf terrorist attack in its name, firmly supports finding that the offense conduct meets the definition of "federal crime of terrorism" set forth in Section 2332g(b)(5)(A). *See United States v. Alimehmeti*, 16 Cr. 398 (PAE) (S.D.N.Y.), Dkt. 133 at 9 (rejecting challenge to application of terrorism enhancement to material-support offense involving defendant's attempt to facilitate travel of undercover agent to join ISIS, based on finding that "Alimehmeti was aware of the undercover's purported affiliation with ISIS and that his actions were aiding that cause").

Furthermore, the evidence at trial demonstrated not only that Ullah sought to advance ISIS's agenda in a general sense, but also that his attack was specifically calculated to impact U.S. foreign policy, and to intimidate and retaliate against the U.S. government.  For example, following the attack, Ullah told law enforcement that he was motivated by his anger at American foreign policy in the Middle East and the bombings of Muslims.  (Tr. 227).  In the days leading up to the attack, Ullah drew inspiration from the ISIS propaganda video Flames of War II, which shows U.S. military forces conducting operations in the Middle East and then proclaims—against the backdrop of the U.S. Congress—"die in your rage, America."  (GX 924; Tr. 444-45).  Indeed, Ullah scrawled versions of that anti-American ISIS slogan on multiple items recovered from his apartment, including, on his passport, the statement "O AMERICA, DIE IN YOUR RAGE."  (PSR ¶ 16; GX 210-26).  And on the morning of the attack, Ullah posted the Facebook message referencing the then-President of the United States: "O Trump you fail to protect your nation. Baqiah."  (GX 401; PSR ¶ 14).  Ullah also proudly declared to interviewing agents after the attack that he intended to "terrorize" as many people as possible.  (PSR ¶ 14; Tr. 225).  This evidence eviscerates any suggestion that the defendant's attack does not meet the definition of "federal crime of terrorism" set forth in Section 2332b(g)(5)(A)(1).   The record easily establishes by a preponderance of the evidence (and well more) that the terrorism enhancement applies in this case, and application of the enhancement is consistent with other recent terrorism prosecutions in this District.  *See United States v. El Bahnasawy*, 16 Cr. 376 (RMB) (S.D.N.Y.) (applying terrorism enhancement over defense objection where defendant was convicted of conspiring to carry out a terrorist bombing on behalf of ISIS in New York City); *Alimehmeti*, 16 Cr. 398 (PAE), Dkt. 133

at 7-17 (applying terrorism enhancement over defense objection where defendant was convicted of attempting to provide material support to ISIS by facilitating travel of ISIS supporter to join ISIS overseas, and specifically rejecting argument that Government had failed to show defendant's conduct was directed at impacting government conduct); *see also United States v. Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y.) (applying terrorism enhancement where defendant was convicted of carrying out terrorist bombings in Chelsea neighborhood of Manhattan and New Jersey).[6]

Nor does application of the terrorism enhancement result in any impermissible "double counting." The base offense level specified in U.S.S.G. § 2M6.1(a)(1) does not "fully account[]" for the nature of and harm caused by the defendant's offenses absent application of the terrorism enhancement in U.S.S.G. § 3A1.4. *See United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000). Among other things, the terrorism enhancement, unlike § 2M6.1, depends on the offense being calculated to affect or retaliate against government conduct—which, as discussed above, was a

---

[6] The defendant's reliance on *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020), is misplaced. That decision is not controlling in this Circuit and in any event does not support finding the terrorism enhancement inapplicable on the facts of this case. *Alhaggagi*, in stark contrast to this case, involved a defendant convicted of attempting to provide material support to ISIS by opening six social media accounts for ISIS sympathizers. *See id.* at 694-95. The court, in concluding that the Government had not established that this non-violent material-support offense was intended to influence government conduct under Section 2332b(g)(5)(A)(1), explicitly noted that "[i]n cases involving violent acts of terrorism, specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense." *Id.* at 701; *see id.* at 699 (explaining that terrorism enhancement "does not automatically apply to all material support offenses," and "Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed non-violent crimes"). This case, of course, involves a violent terrorist attack, and as explained above, the nature of Ullah's conduct and statements make abundantly clear that the attack was calculated to affect and retaliate against government conduct. The reasoning of *Alhaggagi* thus supports applying the enhancement here.

component of the defendant's attack in this case. *Cf. Meskini*, 319 F.3d at 92 (holding, in rejecting challenge to terrorism enhancement, that "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal"); *Stewart*, 590 F.3d at 93 ("[T]he Sentencing Commission 'unambiguously cast a broad[] net when drafting the terrorism enhancement.'" (quoting *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004))).  The defendant cites no authority supporting the proposition that applying the terrorism enhancement constitutes double counting if the base offense level is determined pursuant to § 2M6.1(a)(1), and in fact, the terrorism enhancement has been consistently applied in terrorist attack-related cases in this District (and others) where the applicable base offense level is set forth in § 2M6.1(a)(1). *See, e.g.*, *Rahimi*, 16 Cr. 760 (RMB); *El Bahnasawy*, 16 Cr. 376 (RMB); *United States v. Sayoc*, 18 Cr. 820 (JSR) (S.D.N.Y.); *see also Alimehmeti*, 16 Cr. 398 (PAE), Dkt. 133 at 17-18 (rejecting similar challenge to application of terrorism enhancement on ground that it resulted in "double-counting" because base offense level for underlying material-support offense already accounted for terrorist nature of the crime, noting that Second Circuit has implicitly rejected such claims of the enhancement resulting in impermissible double counting in terrorism cases (citing cases)).  The double-counting argument is meritless, and should be rejected.  The terrorism enhancement plainly applies in this case.

## 2.  A Reduction for Acceptance of Responsibility Is Not Warranted

The surprising contention that the defendant is entitled to a reduction in his offense level pursuant to U.S.S.G. § 3E1.1(a) for his purported acceptance of responsibility should be squarely

rejected.  "'This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.'"  *United States v. Paredes-Batista*, 140 F.3d 367, 379 (2d Cir. 1998) (quoting U.S.S.G. § 3E1.1, App. Note 2).  "'In rare situations,' a defendant can proceed to trial and be convicted and still be eligible for an acceptance-of-responsibility reduction if, 'for example, . . . a defendant goes to trial to assert and preserve issues that do not relate to factual guilt.'"  *United States v. Cruz*, 446 F. App'x 344, 346 (2d Cir. 2011) (quoting U.S.S.G. § 3E1.1, App. Note 2); *see Paredes-Batista*, 140 F.3d at 380 (whether defendant is entitled to reduction for acceptance of responsibility is predominantly factual determination within district court's discretion and will not be disturbed unless it is "without foundation").

This is not one of those rare situations.  The defendant did not merely proceed to trial and put the Government to its burden, he contested his factual guilt in numerous respects, perhaps most prominently by arguing that the bombing was not a terrorist attack at all and was unrelated to ISIS, such that he was not guilty of the charged terrorism crimes, including providing material support to ISIS.  Indeed, the defense summation was rife with arguments contesting guilt that make application of a reduction for acceptance of responsibility post-trial wholly unwarranted.  (*See* Tr. 850-85 (arguing, for example, that "[t]his is not a terrorist attack"; "[t]his act is not about ISIS"; and the defendant "never intended to harm or to hurt anyone else")).  Moreover, following trial, the defendant filed motions challenging the sufficiency of the evidence on multiple counts of conviction, including Count One, continuing to advance the argument that he is not guilty of providing support to ISIS.  *See Cruz*, 446 F. App'x at 346 (concluding that "[defendant] cannot

sustain his burden of demonstrating that this is one of the rare situations where he is qualified for an adjustment in sentence due to acceptance of responsibility even though he proceeded to trial," where "[e]ven on appeal, [defendant] continues to maintain that there was insufficient evidence to support his guilt"); *Paredes-Batista*, 140 F.3d at 381 (defendant not entitled to reduction for acceptance of responsibility after conviction at trial for illegal reentry, where defense challenged guilt at trial based on claim that defendant lacked specific intent to reenter illegally). Not surprisingly, the defendant does not cite any case supporting application of the reduction under the circumstances here. Ullah carried out a terrorist bombing, proceeded to trial, contested his factual guilt, and filed substantial post-trial motions challenging the sufficiency of the evidence. A reduction under § 3E1.1 would be entirely unwarranted.

Accordingly, both of the defense's objections to the Guidelines calculation set forth in the PSR are meritless. The applicable offense level is 43, and the Guidelines sentence is life imprisonment.

## C.  The Sentencing Factors Weigh Strongly in Favor of a Life Sentence

A life sentence is not only called for by the Guidelines and recommended by the Probation Department, it is the only sentence that adequately reflects the seriousness of Ullah's depraved terrorist attack; appropriately deters Ullah and others from seeking to attack New York City in the name of a terrorist organization; and reflects the harm Ullah has caused to his victims. As the Probation Department aptly notes: "Ullah was willing to give his life for his radical beliefs. We believe it is justified that he gives his freedom instead." (PSR at 21).

31

1.  **The Nature and Seriousness of Ullah's Crimes and the Need for Just Punishment Necessitate a Guidelines Sentence**

A Guidelines sentence of life imprisonment will appropriately "reflect the seriousness of the offense" and will "provide just punishment" to Ullah.  *See* 18 U.S.C. § 3553(a)(2)(A).  Indeed, it is difficult to overstate the seriousness of Ullah's offense: he attacked New York City in the name of ISIS by detonating an IED in the city's busiest subway station, during a busy weekday morning rush hour.  He packed his bomb with screws, which served no purpose other than to rip through human flesh.  In other words, Ullah not only detonated a bomb in the middle of a crowded subway station, he chose the precise time (rush hour), location (a crowded tunnel), and method (an IED filled with screws) to maximize the potential for loss of life.

The impacts of Ullah's attack also compel a Guidelines sentence.  Not only did Ullah disrupt the lives of hundreds of thousands of New Yorkers on the morning of his bombing, and cause the shutdown of the busiest subway station in New York City, he caused lasting physical and emotional damage to his victims.  It is nothing short of miraculous that Ullah did not kill anyone as he had hoped: his bomb was certainly capable of doing so, and he chose a location within the subway station that amplified the effects caused by the bomb's detonation.  That being said, Ullah forever changed the lives of some of his victims, and he should receive no mitigation at sentencing for his failure to murder, rather than injure and terrorize, his victims.  (PSR ¶ 20; *see also id.* at 21 ("the defendant should not be rewarded for his failure with anything less than a guideline sentence")).  David Wall suffered severe and permanent hearing loss, and still struggles with anxiety.  While the immediate physical injuries caused by shrapnel being seared into Mr. Wall's leg have healed, he can no longer hear the tone of his daughter's voice as a result of the

injuries he sustained in the attack.  Similarly, Veronica Chavez suffered from significant anxiety as a result of the attack.  She lost her job as a result of her "frayed nerves" and fear of taking the same commute to work.  Ms. Chavez also lost a portion of her hearing in the attack.  On the morning of December 11, 2017, Ullah set out to strike fear in the hearts of New Yorkers in the name of ISIS.  For some of those unlucky New Yorkers who were in the tunnel when Ullah detonated his bomb, Ullah's attack caused significant and lifelong damage that they struggle with each and every day.

The premeditated nature of Ullah's attack also weighs heavily in favor of a Guidelines sentence.  This was not the result of a momentary lapse in judgment, or the immediate aftermath of a painful life event, or a "state of confusion."  (*See* Def. Sub. 6).  It was the very definition of a well-planned, long-contemplated terrorist attack.  Ullah began researching how to build an IED about a year before the attack.  He gathered the materials to build the pipe bomb more than a month before the attack.  And Ullah built the bomb carefully and methodically in his apartment in the weeks leading up to the attack.  It was painstaking, time-consuming work.  One by one, he ground down match heads to create an explosive substance; he broke the glass on individual Christmas lights to expose the filaments that would serve as the heat source for igniting the explosive substance.  Ullah completed building the pipe bomb a week before the attack, and day after day, a deadly weapon of murder and destruction sat in Ullah's apartment while he bided his time and picked the ideal day, time, and location for the attack.  Ullah had every opportunity to abandon his plan: in the year before when he researched IEDs; in the month before when he gathered materials;

and in the week before when he had completed, but not yet detonated the bomb.  Yet Ullah made the decision, day after day, to continue with his deadly attack in the name of ISIS.

The motivation for Ullah's attack is equally reprehensible.  Ullah offered his life to support ISIS and its murderous goals.  He radicalized over the course of several years, by accessing and absorbing gruesome propaganda designed to recruit and inspire young men like Ullah.  Although now, more than two years after the attack and in an effort to gain a significantly-below Guidelines sentence, Ullah attempts to place his radicalization in the context of his father's death and his wife's demands for money, his actions and words in the days leading up to and immediately after the attack are a better indication of his motivation than his post-hoc efforts to win leniency.  Ullah made crystal clear that the motivation for his attack was ISIS, and the desire to cause terror and carnage.  He was so inspired by the message of Flames of War II that he scrawled variations of "Die in Your Rage, America" in both of his passports and in a box in his apartment that held screws and other bomb-making components.  While riding the subway on the way to commit the attack, Ullah posted a message to Facebook that included the word "baqiah," an ISIS slogan meant to signify that the group is expanding and will attack and defeat its enemies.  As he later told law enforcement, Ullah wanted to make clear that he had carried out the attack in the name of ISIS.

Ullah's post-arrest statements, not his self-serving claims at sentencing, are the best indication of his motivations for committing the attack.  While lying in a hospital bed with serious injuries he himself suffered in the attack, Ullah proudly declared that he had committed the attack "on behalf of the Islamic State."  He chose a busy morning for the attack because "there would be more people to terrorize," filled his bomb with screws to cause "maximum damage," and he knew

people might die.  In the days following the attack, Ullah echoed those sentiments and his commitment to radical jihadist ideology by warning that "more is coming" and "we will finish [this war]."  Taken together, it is clear that these are not the words of a depressed man.  They are not the words of a man who missed his father or was struggling with the demands of new fatherhood and marriage.  They are the words of a terrorist.  A terrorist who dedicated his life to the deadly mission of ISIS, who was willing to die for ISIS and leave his family behind, and who was proud that he had attacked New York City in ISIS's name.  There can be no leniency for such a heinous crime, for such an affront to the values that we hold dear as Americans.  Ullah's conduct deserves a Guidelines sentence of life in prison.

### 2.  A Guidelines Sentence Will Serve the Purpose of Deterrence and Will Promote Respect for the Law

A Guidelines sentence is necessary in this case because it will "afford adequate deterrence to criminal conduct," *see* 18 U.S.C. § 3553(a)(2)(B), and "promote respect for the law," *see id.* § 3553(a)(2)(A).  The need for deterrence is of critical importance here.  Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult for those convicted of it.  *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"); *see also Stewart*, 590 F.3d at 181 ("In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life.") (Walker, J., concurring).  In this case, there is an overwhelming need for both individual and general deterrence.

Individual deterrence is particularly necessary here for two related reasons. First, Ullah wholly dedicated himself to ISIS. He radicalized over a multi-year period, and took the extreme step of plotting and carrying out a terrorist bombing in the heart of New York City in the name of ISIS. Ullah's actions and statements at the time of the attack demonstrated his desire to ensure that ISIS knew his attack was committed in its name, and plainly evince Ullah's pride at having committed a terrorist bombing for ISIS. While Ullah now claims, again in an effort to win leniency at sentencing, that he has denounced ISIS, there is little if any reason to credit that claim in light of the facts and evidence before the Court. Ullah was plainly radicalized and fully committed to ISIS's deadly ideology and goals two years ago, when he detonated a bomb strapped to his chest. Second and related, Ullah is a young man, who is still fully capable of extreme and deadly violence. Simply put, the risk is too great to accept Ullah's unsupported claim that he has renounced ISIS. His actions and words in December 2017 show that Ullah is dangerous and in need of significant individual deterrence. Further, the fact that the defendant does not have a prior criminal record (*see* Def. Sub. 14)—a fact that is not unusual in the context of a young, radicalized defendant who carries out an attack for a foreign terrorist organization like ISIS—does not in any way moderate the need for deterrence in this case. While the defendant does not have any prior convictions, his criminal history category is VI as a result of the application of the terrorism enhancement, which reflects the Sentencing Commission's sound assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed. *See Meskini*, 319 F.3d at 92 (explaining that "[c]onsidering the

serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level").

In support of his claim that he has renounced ISIS and is no longer a threat, Ullah asserts that he "offered to assist the Government" and provided information through counsel about "another individual whom he suspected sympathized with extremist groups." (Def. Sub. 13). Prior to trial, Ullah's counsel contacted the Government and offered for Ullah to meet with the Government. However, due to the seriousness of Ullah's conduct, as well as the Government's doubts—based on, among other things, Ullah's radicalization and post-arrest statements—that Ullah's offer of assistance was sincere or that he could even provide substantial assistance with respect to any other individual, the Government declined to meet with Ullah, but conveyed that it would evaluate any information that Ullah's attorneys wished to proffer. Through his attorneys, Ullah provided the name of one man in New York City, whom Ullah claimed he suspected of having been radicalized. Law enforcement was unable to corroborate this information, and to be clear, it did not provide any assistance whatsoever to the Government. Ullah's purported offer of assistance does not in any way warrant leniency at sentencing. *Cf. United States v. Fernandez*, 443 F.3d 19, 24-25 (2d Cir. 2006) (affirming determination that defendant who provided information to Government was not entitled to credit under Section 3553(a) factors, where Judge Cote explained: "[C]ooperation has many components to it. There is the obvious component of assisting the government in the prosecution of other wrongdoers, but I think that's really only the beginning. Of course there is a significant failure with respect to that component.").

As for general deterrence, it is essential for our country's national security that other young men and women be deterred from engaging in similar conduct. A life sentence will serve the goal of deterring future generations of young people who are exposed to hateful extremist teaching from engaging in acts of terrorism against innocents. General deterrence is particularly important in today's environment, where so many young men and women, including Americans, are gravitating toward purported "spiritual leaders" on the Internet and may be tempted to answer ISIS's or another extremist group's call for supporters to carry out attacks. Those who are considering devoting their lives to terrorism, violence, and death must be shown that, when they are caught, they will be prosecuted and face severe consequences. Specifically, the sentence in this case should send the message that an individual who carries out a terrorist bombing in the heart of an American city will never have the opportunity to do so again.

### 3. A Guidelines Sentence Is Appropriate to Protect the Public from Further Crimes of the Defendant

For many of the same reasons, a Guidelines sentence in this case is necessary "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(2)(C). As described above, Ullah not only dedicated himself to ISIS, but he took affirmative and extreme steps to carry out its agenda by planning and committing a terrorist bombing. Ullah is a young man who is clearly capable of heinous and dangerous acts. Ullah's willingness to kill innocent civilians and martyr himself for ISIS, his absolute commitment to ISIS at the time of the attack, and his deeply disturbing statements while incarcerated following the attack—including chanting at a correctional officer the warning that "more is coming"—powerfully support the conclusion that Ullah should be sentenced to life in prison to protect the public from potential future terrorist acts that he might

commit.  Ullah could seek to resume such radical activities at any point if released, whether for ISIS or another group espousing the sort of anti-American terrorist ideology that he previously embraced and was willing to kill and die for.  He should not be given that opportunity.

### 4. A Guidelines Sentence Is Necessary to Avoid Creating Unwarranted Sentencing Disparities

The need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" strongly supports the imposition of a Guidelines sentence of life imprisonment in this case.  *See* 18 U.S.C. § 3553(a)(6).

As an initial matter, the Guidelines imprisonment range is life.  As the Second Circuit has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors."  *United States v. Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (internal quotation marks and citations omitted); *cf. Fernandez*, 443 F.3d at 28 (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005))).  "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50.  Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).  As discussed above, a life sentence is commensurate with the seriousness of Ullah's terrorist attack, and will provide just punishment for the offense.

While a sentence of life imprisonment is never routine, life sentences are regularly imposed in federal courts in cases where, as here, the defendant knowingly and willfully associates himself

with a foreign terrorist organization—like ISIS or al Qaeda—that is dedicated to murdering U.S. citizens and attacking U.S. interests.  Importantly for purposes of this case, courts both within and outside of this District have imposed life sentences in terrorism cases where, as here, the defendant carried out an attack targeting Americans, or conspired or attempted to, but the plot ultimately was thwarted or unsuccessful in the sense that nobody was killed, and life imprisonment was therefore not mandatory.  *See, e.g.*, *United States v. Mohammed Mansour Jabarah*, 02 Cr. 1560 (BSJ) (S.D.N.Y. Jan. 18, 2008) (life sentence for al Qaeda operative who conspired to bomb U.S. embassies in Singapore and the Philippines); *United States v. Richard Reid*, 02 Cr. 10013 (WGY) (D. Mass. Jan. 30, 2003) (life sentence for al Qaeda supporter who attempted to detonate shoe bomb during international flight); *United States v. Abdul Hakim Murad*, 93 Cr. 180 (LAK) (S.D.N.Y. May 15, 1998) (life sentence for al Qaeda operative who participated in plot to place bombs on airliners bound for United States from Asia).

In an attempt to sidestep such precedent making clear that a life sentence in a terrorist attack case would be anything but disparate, the defense cites to a number of inapposite and distinguishable cases to argue that Ullah is entitled to a significantly below-Guidelines sentence. (*See* Def. Sub. 16-18 (citing cases)).  For example, the *Mohamud*, *Nafis*, and *Khalifi* cases cited by the defendant were *sting* cases involving defendants who attempted to use inert explosive devices provided to them by law enforcement; they have absolutely nothing to do with this case, which involves one of the few consummated terrorist attacks on New York City since 9/11.  And contrary to the defendant in the *Harpham* case, Ullah's bomb actually did detonate, and harmed numerous victims.  Similarly, in the *Powers* case, in stark contrast to this case, no one was injured,

and the defendant was not motivated by terrorist ideology.  Finally, while the defendant attempts to distinguish the instant case from those, including the cases cited in the preceding paragraph, in which a life sentence was imposed, his efforts fall well short.  The defendant in *Rahimi* faced a mandatory life sentence.  And *Shahzad* and *Abdulmutallab*—both of which involved a lone attacker who attempted to carry out a bombing in support of a foreign terrorist group, later pled guilty, and received a life sentence—are precisely the sort of precedent that supports imposing a life sentence here.  Indeed, unlike the defendants in *Shahzad* and *Abdulmutallab*, Ullah succeeded in executing his terrorist bombing attack, and proceeded to trial, underscoring that a life sentence is appropriate here as it was in those cases.  In sum, a life sentence is not only warranted by the seriousness of the offense conduct, and called for by the Guidelines, it is firmly supported by the precedent cited above involving other, similar terror attacks.

### 5.  The Defendant's Arguments Do Not Support a Downward Variance

The defense does not dispute the seriousness of Ullah's offense—nor could they—but instead largely devotes their submission to efforts to place his radicalization in context and assign the blame for his actions on the depression he was allegedly suffering at the time.  To be sure, the death of a loved one and the birth of a new child can be stressful life events.  It may be that Ullah suffered some depression in the months leading up to the attack.  But Ullah's actions and words at the time of the attack provide a much better insight into his motivations and mindset than his after-the-fact efforts to evade full responsibility and secure a reduced sentence, and in any event, none of those alleged life circumstances raised in the defense submission, even if true, can excuse, mitigate, or account for the heinous and depraved attack that Ullah perpetrated.  None of the

arguments advanced in Ullah's submission, including the "Mitigation Report" attached as Exhibit A and cited throughout, provide any basis for a downward variance.

Ullah argues that it is a mitigating factor that he was purportedly in a moment of "extraordinary personal fragility" when he first encountered extremist Islamic theology.  (Def. Sub. 1).  In support of his argument that his actions were simply an aberration, Ullah claims that he committed the attack "while in the grip of a personal crisis that left him isolated, depressed, vulnerable and suicidal."  (*Id.* at 2).  As an initial matter, it bears noting that Ullah has never "met with a mental health professional or been treated for any mental health condition."  (PSR ¶ 53). While the defense opines, as they did at the time of the Probation Department interview, that Ullah was experiencing depression at the time of the attack, there is no independent evidence that this was the case.  (*See id.* (noting that "[d]efense counsel opined that Ullah has a history of depression," and Ullah said "for few months," which the Probation Department understood to mean "not a long history")).

But even assuming Ullah was experiencing depression at the time of the attack, it still provides no justification or mitigation for his conduct.  As the Probation Department fittingly writes: "Frankly, we do not believe that even the most acute case of depression should have any impact on sentencing in this case.  Depression neither explains nor mitigates an act of terrorism. Terrorism is catalyzed by hate and extremism."  (PSR at 21).  Indeed, Ullah's attack was carefully planned and premeditated over a significant period of time.  His painstaking efforts to collect materials for the bomb, and build the bomb, speak of a man who knew precisely what he was doing.  Critically, if Ullah was truly depressed and only wanted to kill himself, there was no reason

42

for him to pack his pipe bomb full of screws.  Screws that were capable of—and that did—sear

into and rip through human flesh.  Screws designed to cause maximum carnage.  And there was

no reason to pick a crowded tunnel, during rush hour, on a weekday, if Ullah's primary objective

was only to hurt himself.  When Ullah was arrested and asked why he committed the attack, he

did not cite his depression or the stress of providing for a family, he proudly affirmed he did it for

ISIS.  When Ullah was asked why he chose the time and location of the attack, he did not say he

wanted only to kill himself, he said he wanted to "terrorize as many people as possible."  And

when Ullah explained why he packed the bomb with screws, he did not profess ignorance at their

purpose, he said he used screws to cause "maximum damage," and he knew people might die.  In

sum, Ullah's alleged mental health issues at the time of and leading up to the attack are belied by

his own actions and words, and in any event, provide no justification or mitigation for his conduct.

The fact that Ullah did not directly communicate with members of ISIS deserves no

leniency.  (Def. Sub. 2, 6).  Ullah did not need to communicate directly with ISIS to act in

furtherance of its murderous agenda.  He answered ISIS's call to attack America, and New York

City, in the name of ISIS.  He accepted the invitation to strike terror in the heart of Americans and

to serve ISIS's twisted and deadly goals by detonating a pipe bomb in the middle of a crowded

tunnel, during rush hour, in New York City.  And his Facebook message on the morning of the

attack, and post-arrest statements to law enforcement, made clear that ISIS had motivated his

attack, and that he was answering their call.  Indeed, as Dr. Zelin explained at trial, lone-wolf

attacks are a core component of ISIS's global strategy, and by carrying out such an attack as

directed by ISIS in its propaganda videos, Ullah acted as a soldier for the terrorist organization just as if he were fighting on the battlefield in the Middle East.

Ullah's family and personal circumstances similarly do not justify any downward variance. In this respect, it bears noting that Ullah had a "happy, middle-class childhood" in Bangladesh. (PSR at 21).  He was employed and earning a decent living as an electrician at the time of his arrest. (*Id.* ¶ 59).  In other words, Ullah had many advantages in life, yet he affirmatively chose to turn his back on a loving family and paying job, and to dedicate his life instead to a deadly terrorist organization bent on murdering Americans.   Ullah also points to his familial responsibilities in seeking leniency.  The Government does not doubt that Ullah's family loves him, and that Ullah likewise wishes to be with his family and his young son.  Yet the fact remains that Ullah did not abandon or rethink his terrorist plot because of his family, and indeed Ullah sought to blow himself up for ISIS notwithstanding his family.  Nearly every defendant that appears before this Court has family members who love them; families that depend on them; and children who will be affected by their incarceration.  Ullah's family situation does not warrant any leniency, particularly in the face of the heinous nature of his terrorist attack and the other sentencing factors discussed above.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should sentence Ullah to life imprisonment on Counts One through Five—specifically, 20 years' imprisonment on Counts One and Four, and life imprisonment on Counts Two, Three, and Five, to run concurrently—to be followed by 30 years' imprisonment on Count Six.  Such a sentence,

which is the sentence called for by the Guidelines and recommended by the Probation Department, would be sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Dated:  New York, New York
        April 1, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York

                          By:     _____/s/_____
                                        Rebekah Donaleski / George D. Turner
                                        Assistant United States Attorneys
                                        212-637-2423 / 2562