21-1058
*United States of America v. Ullah*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/21/2026 __

# In the
# United States Court of Appeals
# for the Second Circuit

August Term 2021
Argued:  April 27, 2022
Decided:  April 21, 2026

No. 21-1058

UNITED STATES OF AMERICA,
*Appellee*,

v.

AKAYED ULLAH,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of New York
No. 18-16, Richard J. Sullivan, Judge

Before:  MENASHI and PÉREZ, *Circuit Judges*,[*] and RAKOFF, *District Judge*.[†]

On appeal from a criminal judgment entered in the United States District Court for the Southern District of New York (Sullivan, *J.*).[‡]

---

[*] Judge Rosemary S. Pooler, originally a member of the panel, passed away before the filing of this opinion. Judge Steven J. Menashi was added to the panel.  *See* 2d. Cir. IOP E(b).

[†] Judge Jed S. Rakoff of the United States District Court for the Southern District of New York, sitting by designation.

[‡] Judge Richard J. Sullivan, United States Circuit Judge, sitting by designation.  Judge Sullivan was a District Judge when Defendant-Appellant was indicted.  Judge Sullivan retained the case when he became a Circuit Judge in October 2018.  All references to the District Court in this opinion are to Judge Sullivan's rulings filed in the District Court.

CERTIFIED COPY ISSUED ON 04/21/2026

A jury convicted Defendant-Appellant on six counts related to a December 11, 2017 attack in which Defendant deflagrated a homemade pipe bomb in an underground tunnel between the Times Square/42nd Street subway station and the Port Authority Bus Terminal in Manhattan, New York.  As relevant here, Defendant challenges the following counts: (1) Count One—providing material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B; (2) Count Five—committing a terrorist attack against mass transportation systems, in violation of 18 U.S.C. § 1992(a)(2); and (3) Count Six— using a destructive device during and in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii).  He also challenges his sentence on numerous grounds, including that his sentence was procedurally and substantively unreasonable.

We affirm the judgment on all of the challenged counts except Count One. First, because the evidence was insufficient to show that Defendant provided material support and resources to a foreign terrorist organization under a proper construction of 18 U.S.C. § 2339B, we reverse his conviction on Count One. Second, because sufficient evidence supported the conviction on Count Five, and the indictment as to that count was not constructively amended, we affirm the conviction on Count Five.  Third, even if the verdict on Count Six was legally erroneous pursuant to *Yates v. United States*, 354 U.S. 298 (1957), any error did not affect Defendant's substantial rights because it is clear beyond a reasonable doubt that a rational jury would have found him guilty of at least one predicate crime of violence; namely, for the completed offense under 18 U.S.C. § 2332f(a)(1) when he deflagrated a bomb in a place of public use.  We therefore affirm the conviction on Count Six.  Finally, we conclude that Defendant's sentence was not unreasonable and, accordingly, his sentence is affirmed, except to the extent that the sentence on Count One is vacated.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

JUDGE MENASHI dissents in a separate opinion.

COLLEEN P. CASSIDY, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant.*

GEORGE D. TURNER, (Rebekah Donaleski, Won S. Shin, *on the brief*), Assistant United States Attorneys *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

MYRNA PÉREZ, *Circuit Judge*:

Defendant-Appellant is serving multiple life sentences as well as other terms of imprisonment related to an atrocious attack he committed when he deflagrated a bomb inside a busy subway tunnel in Manhattan, New York. While nothing we have decided should or will reduce his sentence below his well-deserved life imprisonment, this case calls upon us to address three significant legal issues.

*First*, we must interpret 18 U.S.C. § 2339B to determine whether the evidence at trial—that Defendant committed a terrorist attack, inspired by a foreign terrorist organization's broadcast propaganda, intending to advance that organization's goals—was sufficient to prove that he provided or attempted to provide "material support" to that organization as is required for conviction under § 2339B. We hold the evidence was insufficient and reverse Defendant's conviction on Count One.

3

While Defendant was inspired by a general online exhortation by a foreign terrorist organization, the evidence did not prove that he worked or attempted to "work under [the] direction or control" of that organization or coordinated with the organization in any way, as would be required to prove a violation of § 2339B under either of the government's theories.

*Second*, we must determine whether one "places any . . . destructive device in, upon, or near . . . a mass transportation vehicle," in the meaning of 18 U.S.C. § 1992(a)(2), by affixing to one's person a destructive device and carrying such a device in, upon, or near such a vehicle. We hold that it does. Given the nature of the bomb Defendant used, the distinction between "placing" and "carrying" that Defendant seeks to draw collapses and is immaterial. Because the evidence established that Defendant carried a destructive device on his person and put both himself and the bomb he was carrying on a subway train, we affirm his conviction on Count Five under § 1992(a)(2).

*Third*, we must determine whether the completed offense under 18 U.S.C. § 2332f(a)(1)—a statute prohibiting the unlawful delivery, placement, discharge, or detonation of an explosive in a place of public use—is a crime of violence that supports Defendant's conviction under 18 U.S.C. § 924(c). In other words, whether

4

§ 2332f(a)(1) is a crime that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). We hold that the completed offense under § 2332f(a)(1) is a crime of violence because it always requires the government to prove that a defendant, at minimum, attempted to use physical force against the person or property of another. Although we hold that the completed offense under § 2332f(a)(1) is a crime of violence, we acknowledge that the indictment, jury instructions, and verdict do not allow us to determine whether Defendant's § 924(c) conviction was predicated on the completed offense under § 2332f(a)(1) or on the attempted offense under 18 U.S.C. § 2332f(a)(2). But we do not need to decide whether the attempted offense under § 2332f(a)(2) is a crime of violence because we would affirm Defendant's § 924(c) conviction in either scenario.

If the attempted offense under § 2332f(a)(2) were a crime of violence, then Defendant's § 924(c) conviction would be affirmed because it necessarily rests on two predicates that are both crimes of violence. If the attempted offense under § 2332f(a)(2) were not a crime of violence, the verdict on the § 924(c) conviction would be legally erroneous under *Yates v. United States*, 354 U.S. 298 (1957), because the verdict would rely on both improper and proper predicates, and it is

5

uncertain of which one Defendant was convicted. However, even if a *Yates* error occurred, it could not have affected Defendant's substantial rights because it is clear beyond a reasonable doubt that a rational jury would have found him guilty of the completed offense under § 2332f(a)(1) for deflagrating a bomb in a place of public use. We therefore affirm Defendant's conviction under § 924(c).

As to Defendant's other challenges on appeal, we affirm the District Court's judgment, as explained in detail below.

## BACKGROUND

### I. Defendant's Attack

Beginning in 2011, Defendant started consuming anti-American propaganda promoting the Islamic State of Iraq and al-Sham ("ISIS"), which the Secretary of State has designated as a foreign terrorist organization. While the Defendant eventually watched videos and read magazines online with instructions on how to make a bomb, there is no suggestion that the materials Defendant used to learn how to make a bomb were produced by ISIS.

Later, Defendant used materials from his job site to assemble a pipe bomb, which he filled with metal screws to function as shrapnel. After Defendant began to assemble his bomb, he watched a YouTube video issued by ISIS that urged supporters to commit attacks against America. The video also contained a slogan,

"So die in your rage, America," which conveyed that ISIS was fighting the United States.  Defendant copied this slogan in his passport, visa, and on the bottom of a box containing some of the equipment he used to build his bomb.  App'x at 626, 636–37.

On the morning of December 11, 2017, Defendant strapped the bomb to his chest—concealing it under his clothes—and traveled on the subway from his apartment in Brooklyn to the Times Square/42nd Street subway station in Manhattan.  As he rode the subway to his destination, Defendant posted to his social media account, writing: "Oh, Trump, you failed to protect your nation. Baqiya."  ISIS uses the phrase "Baqiya," which means "long live" or "remaining" in Arabic, as a rallying cry.

Defendant arrived at the Times Square/42nd Street subway station before approaching his target location, an underground tunnel between the subway station and the Port Authority Bus Terminal.  At 7:20 A.M., while commuters were near him, Defendant deflagrated the bomb, causing shrapnel to project inside the tunnel.[1]  First responders arriving at the scene found Defendant on the ground with his clothes torn and tattered, a white zip tie across his chest, and wires near

---

[1] For a further discussion of the legal significance of the term "deflagrate," refer to footnote 24, *infra*.

his waistline. Surrounding commuters suffered injuries from the deflagration, including shrapnel wounds and hearing loss. Some victims also experienced emotional trauma, with several describing suffering from post-traumatic stress disorder and one victim testifying at trial that the trauma caused her to lose her job in the wake of the attack. And, obviously, Defendant's actions created a meaningful risk that even more serious injuries might have occurred.

After the attack, Defendant spoke with detectives while he was in the hospital being treated for his injuries. He told detectives that he carried out the attack "on behalf of the Islamic State" and "for Allah." Defendant stated that he chose a busy weekday morning for his attack because "there would be more people to terrorize," and that he filled his bomb with metal screws "to inflict maximum damage." Defendant acknowledged that his attack could have killed people.

## II.    Defendant's Trial, Rule 29 Motions for Acquittal, and Sentencing

After a one-week trial, a jury convicted Defendant on the following six counts: (1) providing material support and resources to a designated foreign terrorist    organization—here,    ISIS—in    violation    of    18    U.S.C.    § 2339B

("Count One");[2] (2) using a weapon of mass destruction, in violation of 18 U.S.C. §§ 2332a(a)(2)(A)–(D) ("Count Two"); (3) bombing a place of public use and a public transportation system, in violation of 18 U.S.C. §§ 2332f(a)(1)(A)–(B), 2332f(b)(1)(B), and 2332f(b)(1)(E) ("Count Three"); (4) destroying property by means of fire or explosive, in violation of 18 U.S.C. § 844(i) ("Count Four"); (5) committing a terrorist attack against mass transportation systems, in violation of 18 U.S.C. §§ 1992(a)(2), (a)(4)(B), (a)(7), (a)(10), (b)(1), and (c)(1) ("Count Five"); and (6) using a destructive device during and in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (c)(1)(B)(ii) ("Count Six").  *See United States v. Ullah*, No. 18-cr-16, 2021 WL 21902, at *1 (S.D.N.Y. Jan. 4, 2021).[3]

The District Court twice denied Defendant's motion for a judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29(c).  The District Court then proceeded to impose a within-Guidelines sentence of twenty years' imprisonment for Counts One and Four and life imprisonment for Counts Two, Three, and Five, all to run concurrently.  On Count Six, the court

---

[2] The District Court instructed the jury "that ISIS has been designated by the Secretary of State as a terrorist organization and has been so designated since 2004."

[3] These six counts were all of the counts charged in the indictment, "although the government abandoned one of its bases for liability under Count Five."  *Ullah*, 2021 WL 21902, at *1.

9

imposed the thirty-year mandatory minimum sentence to run consecutively, for a total sentence amount of life imprisonment plus thirty years' imprisonment.

### III.    Defendant's Appeal

Defendant timely appealed his convictions on Counts One, Five, and Six, along with his sentence.  Initial briefing was completed on February 22, 2022. Following the Supreme Court's decision in *United States v. Taylor*, 596 U.S. 845 (2022), we directed the parties to file supplemental briefs to address whether that case affects Defendant's challenge to Count Six.  Supplemental briefing was completed on November 16, 2022.

### DISCUSSION

A jury of New Yorkers found beyond a reasonable doubt that Defendant committed an act of terrorism.  We do not disturb Defendant's conviction for committing that attack, nor his four convictions on charges of deploying a weapon of mass destruction against civilians.  Nor do we disturb any of the three concurrent life sentences he continues to serve for those crimes.

Before we get to those charges, however, we resolve a narrow legal question presented by Count One (one of the Counts with the shortest terms of imprisonment): Whether the evidence permitted the jury to conclude that, by committing a "lone-wolf" terrorist attack, Defendant also provided "material

support or resources" to ISIS. The resolution of that question will not affect the Defendant's punishment, but it may make a difference in future cases, and it is our unflagging duty to say what the law is, in cases within our jurisdiction.

## I. Defendant's Conviction on Count One Is Reversed Because the Evidence at Trial Was Insufficient Under a Proper Construction of 18 U.S.C. § 2339B

Defendant was found guilty on Count One for violating 18 U.S.C. § 2339B(a)(1), which prohibits "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] . . . to do so." The statute defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1); *see also id.* § 2339B(g)(4) (incorporating this definition into § 2339B). Defendant was indicted under two theories: that he provided material support to ISIS either by providing it with "personnel" (himself) or by performing a "service" on its behalf (the bombing).

Defendant argues that the evidence was insufficient to sustain a conviction on either theory. Defendant "bears 'a heavy burden'" in challenging the

11

sufficiency of the evidence.  *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 112 (2d Cir. 2008) (quoting *United States v. Tran*, 519 F.3d 98, 105 (2d Cir. 2008)).  We must "view[] the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor."  *United States v. Al Kassar*, 660 F.3d 108, 128 (2d Cir. 2011) (citing *United States v. Abu-Jihaad*, 630 F.3d 102, 135 (2d Cir. 2010)).  Our task is limited to determining whether "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*"  *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  We may not "intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Id.* (quoting *Jackson*, 443 U.S. at 319).  However, "[w]e review questions of the sufficiency of the evidence, including embedded questions of statutory interpretation, *de novo*."  *United States v. Calk*, 87 F.4th 164, 177 (2d Cir. 2023) (citing *United States v. Jones*, 965 F.3d 190, 193–94 (2d Cir. 2020)), *cert. denied*, 145 S. Ct. 144 (2024).

For the reasons explained below, we conclude that the evidence at trial was insufficient to sustain a conviction under either the "personnel" or "service" prong of § 2339B.  "The statute reaches only material support coordinated with or under

the direction of a designated foreign terrorist organization." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010).  Under both the language of 18 U.S.C. § 2339B(h) and the holding of *Humanitarian Law Project*, Defendant did not "coordinate[] with" ISIS, *id.*, or "work under that terrorist organization's direction or control," 18 U.S.C. § 2339B(h).  Whatever superficial appeal a contrary conclusion might have, Congress and the Supreme Court have unmistakably dictated the result we reach today.  Therefore, we reverse Defendant's conviction on Count One.[4]

## A.    The Evidence Was Insufficient to Convict Defendant on Count One Under the "Personnel" Theory

Defendant's conviction on Count One cannot stand under a "personnel" theory because the statute expressly excludes individuals acting entirely independently to advance a foreign terrorist organization's goals.  Being inspired

---

[4] We disagree with the dissenting opinion's suggestion that this ordinary exercise in statutory interpretation somehow usurps the role of the jury in weighing the trial evidence.  Dissenting Op. at 23–24.  To the contrary, it is not unusual for the government to offer evidence that is indisputably—even overwhelmingly—sufficient for a conviction based on one interpretation of a statute, only for an appellate court to determine that the interpretation used by the government and the district court is incorrect.  For example, in *Fowler v. United States*, the Supreme Court vacated the Eleventh Circuit's rejection of a sufficiency-of-the-evidence claim, holding that the Court of Appeals incorrectly applied the offense's intent element.  563 U.S. 668, 670–71, 678 (2011).  While there was no dispute the defendant had committed murder, the question was whether he did so with intent to stop the victim from communicating with federal law enforcement, as required by the federal witness-tampering statute.  *Id.* at 671–72.  Our task is similar here.  While the evidence was certainly sufficient to convict Defendant of several crimes related to his attack (several of which Defendant does not challenge on appeal), we must dispassionately determine whether this *specific* statute also prohibits that act.

by ISIS propaganda and claiming to further ISIS's cause through his acts do not, by themselves, establish that he acted as ISIS "personnel" as it is defined in the statute and further refined by the Supreme Court's decision in *Humanitarian Law Project*.

1.  *The Statutory Text and Context Make Clear that Defendant's Independent Action Is Not Covered by § 2339B's "Personnel" Prong*

We begin with the text of § 2339B.  As relevant here, § 2339B(h) defines and limits "personnel" as follows:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control . . . .  Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

We conclude that the evidence in this case was insufficient for any rational trier of fact to find beyond a reasonable doubt that Defendant provided or attempted to provide himself to ISIS as "personnel" under that definition. Yes, the evidence at trial established that Defendant watched videos online, including propaganda made by ISIS.  The ISIS videos exhorted followers to carry out attacks in the United States as part of a global terrorism strategy.  The evidence also

14

established that Defendant was motivated by those videos to carry out an attack. That is indicated by messages he wrote online, on his passport, and elsewhere, and by statements he made after the attack. Drawing all inferences in favor of the government, ISIS wanted people to do what Defendant attempted to do, and Defendant attempted his attack intending to further ISIS's global strategy. But that is not enough to establish that Defendant did or attempted to "work under [ISIS's] direction or control" within the meaning of the statute. 18 U.S.C. § 2339B(h).

As a matter of ordinary meaning, a person cannot "work under [ISIS's] direction or control" if he is acting alone, and if ISIS does not know he exists, has no expectation he will hear ISIS's messages or act on them, and will not know, or care, or have any recourse if he ignores the message completely. To hold otherwise would stretch the meaning of the phrase "under [the] direction or control" beyond its breaking point. That Defendant subjectively conceived of himself as a soldier of ISIS does not establish that ISIS did, in fact, control or direct his actions. *See*, *e.g.*, Restatement (Second) of Agency § 221 cmt. a ("One does not become a servant by believing that he is one and intending to render service as one.").

To the extent dictionaries can illuminate the common understanding of what the statute means by working "under th[e] terrorist organization's direction

or control," they support this common-sense reading of § 2339B(h). The videos that Defendant watched that were issued by ISIS did not "order" or "command" him to do anything under any common understanding of those terms. *Direction*, Webster's Third New International Dictionary 640 (2002).[5] Nor did they provide "guidance or supervision of action, conduct, or operation"—since they were silent on specifics. *Id.* Indeed, ISIS could hardly provide "guidance or supervision" of an individual without knowledge of that individual's existence.

Furthermore, even if an ISIS YouTube video contained a "direction" in some sense, § 2339B(h) is not satisfied simply because one acts after hearing a direction from a terrorist organization. The statute requires that one "work *under* that terrorist organization's direction or control." 18 U.S.C. § 2339B(h) (emphasis added). The word "under" has many meanings, but in the context of the full phrase quoted above, it is most naturally read to mean "suffering restriction, constraint, or control by." *Under*, Webster's Third New International Dictionary 2487 (2002) (offering the example of "living [under] strict disciplinary rules"); *see also id.* (defining "under" to mean "subject to the bidding or authority of : led by,"

---

[5] We focus on "direction" because the government does not argue that ISIS "controlled" Defendant, and there is no evidence that it did so.

16

as in "served [under] three colonels").[6]  In its videos, ISIS urged supporters to attack the United States, and Defendant chose to do so after viewing those videos. But he was not constrained by ISIS's hortatory, open-ended message.  That total absence of constraint is inconsistent with the plain meaning, and the dictionary meaning, of acting "under" someone else's "direction or control."

A contrary interpretation would render Congress's exclusion of "entirely independent" actors nonsensical.  Congress expressly provided that "[i]ndividuals who act entirely independently of the foreign terrorist organization *to advance its*

---

[6] The dissenting opinion insists that this interpretation of "under" renders Congress's distinction between "direction" and "control" superfluous.  Dissenting Op. at 7.  But we do not read "under" to transform "direction" and "control" into synonymous terms, or to nullify the disjunctive effect of the word "or." Rather, "under" simply turns our focus to the nature of the "direction" at issue, such as whether the "direction" actually restricts or constrains its recipient in some way.  Regardless, to the extent our interpretation assumes *some* overlap in meaning, "redundancies are common in statutory drafting— sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 590 U.S. 222, 239 (2020).  Indeed, the Supreme Court has recognized that "[s]ometimes, the better overall reading of the statute contains some redundancy." *Id.* (quoting *Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019)).  To the extent our interpretation requires some overlap, this is one case where it is warranted, since as we discuss, the dissenting opinion's interpretation would "rewrite or eviscerate another portion of the statute," the exclusion of entirely independent actors, "contrary to its text." *Id.*  Our reading is further bolstered by the fact that the phrase "direction or control" is used in several contexts to represent a single concept, or to require satisfaction of a single standard. *See, e.g.*, *Thalle Const. Co., Inc. v. Whiting-Turner Contracting Co.*, 39 F.3d 412, 418 (2d Cir. 1994) (describing a "direction or control test" under New York law governing harms caused by general contractors); *Fischer v. BMW of N. America*, 376 F. Supp. 3d 1178, 1187 n.5 (D. Colo. 2019) (noting "a parent-subsidiary relationship" does not satisfy the required "direction or control"); *CBA Env't Serv's, Inc. v. Toll Brothers Inc.*, 403 F. Supp. 3d 403, 418 (D.N.J. 2019) (describing a "'direction or control' test" which may be satisfied where vicarious liability would traditionally apply).  We also note the two terms are often grouped together in legislation. *See, e.g.*, 22 U.S.C. § 611(c)(1) (FARA); 26 U.S.C. § 7609(e)(1) (tax code); 20 U.S.C. § 1087-2(r)(13) (student loans); 15 U.S.C. § 4651(6)(B)(iii) (semiconductor incentives).  Obviously, Congress believes the two terms' meanings are similar enough to warrant their frequent pairing.

17

*goals or objectives* shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. § 2339B(h) (emphasis added). Indisputably, Congress intended to exclude *some* individuals acting to advance a foreign terrorist organization's goals from liability. And knowingly acting to advance a foreign terrorist organization's goals, independently or otherwise, *requires* at least some exposure to that organization's general influence, including some knowledge or impression of what those goals or objectives are. Thus, it cannot be that in order to act "entirely independently" and outside of an organization's "direction and control," an individual must be totally free of a foreign terrorist organization's influence or messaging. *See United States v. Wright*, 937 F.3d 8, 29 (1st Cir. 2019) (holding jury instruction erroneously suggested jury could convict defendant even if he only coordinated "with the organization's strategy and tactics, if merely publicly available" rather than "with the terrorist organization itself"). The evidence at trial here established that Defendant learned about ISIS's goals and objectives from information publicly broadcast by ISIS and independently tried "to advance [those] goals or objectives." § 2339B(h). To give Congress's exclusion any meaning, that cannot be enough.

2. Humanitarian Law Project *and the History of § 2339B Confirm that the Statute's "Personnel" Prong Is Not Satisfied Here*

The Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), and the history leading up to it, underscore that one does not act "under [the] direction or control" of a terrorist group merely because one's actions were consistent with the group's general, public-facing propaganda.

In *Humanitarian Law Project*, the Supreme Court construed the narrowing definition of "personnel" that Congress added in § 2339B(h), as well as its interaction with the undefined term "service." The plaintiffs there wished to provide various types of support to two groups that had been designated as foreign terrorist organizations: the Kurdistan Workers' Party ("PKK") and the Liberation Tigers of Tamil Eelam ("LTTE"). Those organizations aimed to establish independent states for, respectively, Kurdish people living in Turkey and Tamil people living in Sri Lanka. *Humanitarian Law Project*, 561 U.S. at 9. The plaintiffs claimed that they wanted to support only the non-violent activities of the organizations, including through "monetary contributions, other tangible aid, legal training, and political advocacy." *Id.* at 10. The Court's 2010 opinion followed over a decade of court decisions, appeals, and remands, in which parts of § 2339B, including the definition of "personnel," were held unconstitutional as

19

applied to PKK and LTTE. *Id.* at 10–14. In response, Congress enacted, and President Bush signed, multiple amendments to § 2339B, including adding the definition of "personnel" quoted above. *Id.* at 12–13.

By the time the Supreme Court granted certiorari, the plaintiffs continued to challenge the amended law both as unconstitutionally vague and as contrary to the First Amendment. The Court rejected those claims, noting that Congress had taken "care to add narrowing definitions to the material-support statute over time," including the definition of "personnel," so the law was no longer vague as applied to the plaintiffs. *Id.* at 21. The Court concluded that some of the conduct in which the plaintiffs wanted to engage was clearly prohibited by § 2339B—including directly training members of PKK on how better to advocate for PKK in international legal forums—and some was clearly not prohibited—including engaging in independent political advocacy on PKK's behalf. *Id.* at 21–23.

The Court also held that the statute, as narrowed, did not violate plaintiffs' free-speech rights. *Id.* at 35–39. In doing so, the Court reasoned that, as written, § 2339B allowed the plaintiffs to "speak and write freely about the PKK and LTTE, the Governments of Turkey and Sri Lanka, human rights, and international law," so long as they did not do so "under the direction of, or in coordination with" the

20

terrorist groups. *Id.* at 25–26. Consistent with the Court's reasoning, then, if a journalist independently decides to write in support of an independent Tamil state—one goal of LTTE—that writing is not criminalized by § 2339B. If the journalist goes further to espouse the view that LTTE are freedom fighters, not terrorists, and that the Secretary of State should take LTTE off the list of foreign terrorist organizations, that writing still is not a crime. The outcome *would*, of course, change if the journalist took orders from LTTE.

The interpretation pressed by the government, and endorsed in the dissenting opinion, would undermine the Supreme Court's approach. Suddenly, were that same independent journalist to watch an online video produced by LTTE imploring supporters to speak out in support of their cause, that independent journalist would be deemed "personnel" if the journalist chose to continue doing the same work. Such an interpretation would make any line separating independent activity from material support so fine as to be imperceptible. Even independent actors must draw their inspiration from *somewhere*. We cannot adopt an interpretation that would erode the basis for the Supreme Court's decision that § 2339B did not infringe the *Humanitarian Law*

21

*Project* plaintiffs' rights and eviscerate Congress's careful work of narrowing § 2339B to withstand constitutional challenge.[7]

### 3. *Finding that the "Personnel" Prong of § 2339B Was Not Satisfied in This Case Respects Congressional Intent*

Our reading of the statute, required by its text, context, and history, and by Supreme Court precedent, is also consistent with Congress's intent.  In § 2339B, Congress did not write yet another law expressly aimed at prohibiting and punishing violent acts, though it could have.  Instead, Congress wrote § 2339B to play a unique role in preventing a range of non-violent acts that support terrorism, including "monetary contributions," "legal training," and (non-independent) "political advocacy."  *See Humanitarian Law Project*, 561 U.S. at 10.  Unlike bombing a train station, which is prohibited by a range of criminal laws carrying long sentences, much of the conduct covered by § 2339B is not illegal in other contexts.  Sometimes it is even constitutionally protected.  Congress thus wrote § 2339B "to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States . . . from providing

---

[7] Moreover, nothing about the reasoning of *Humanitarian Law Project* depended on the fact that some of the conduct at issue was protected speech.  Indeed, the Court noted that Congress "avoided any restriction on independent advocacy, *or indeed any activities* not directed to, coordinated with, or controlled by foreign terrorist groups."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010) (emphasis added).

material support or resources to foreign organizations that engage in terrorist activities." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(b), 110 Stat. 1214, 1247 (1996). Of course, § 2339B may cover violent acts as well, for example if they are committed "under [a] terrorist organization's direction or control." But honoring Congress's intent does not require us to construe § 2339B to criminalize independent activity, no matter how violent.

There is other support for our reading. The Foreign Intelligence Surveillance Act (FISA) was temporarily amended in 2004 to expand coverage under its warrant provisions. *See* Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub L. No. 108-458, § 6001, 118 Stat. 3638, 3742. Its text was amended to include an individual that "engages in international terrorism or activities in preparation thereof" under the statute's definition of an "agent of a foreign power." *Id.* Congress added this language to FISA to ensure the coverage of "lone wolfs," which it characterized as "the lone terrorist acting on inspiration rather than affiliation." *See* H.R. Rep. No. 108-724, pt. 5 at 170 (2004). Congress amended FISA through the IRTPA, the *very same* legislation that simultaneously amended § 2339B to expressly exclude entirely independent actors under its

definition of personnel.[8]  So while Congress had text and a model for covering these so-called lone wolf terrorists, it did not deploy that text in the definition of personnel in § 2339B.  In fact, as we have discussed, Congress went so far as to expressly carve out "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives" from being subject to the Act.  *See* 18 U.S.C. § 2339B(h).[9]  To put a finer point on it, the Congressional record on the very legislation that amended § 2339B shows that Congress expressly and explicitly amended FISA to *include* individuals acting on inspiration alone, among other things, yet amended the text of § 2339B to *exclude* independent actors.  The most logical conclusion to draw from these diverging approaches is that Congress

---

[8] The dissenting opinion suggests the congressional record demonstrates an intent to expand both FISA and § 2339B "in tandem."  Dissenting Op. at 12.  But cherry-picked statements summarizing the wide-ranging legislation's general effect do not change the analysis.  Indeed, the record reflects Congress's understanding that the legislation included a *single* provision covering lone wolfs: the FISA amendment.  *See* 150 Cong. Rec. S11958 (Dec. 8, 2004) ("I am pleased that *the* so-called 'lone wolf' terrorist provision . . . has been included in the intelligence reform legislation.") (emphasis added) (Statement of Sen. Ron Wyden); *id.* at S11984 ("I am troubled by . . . section 6001 what has come to be known as *the* 'lone wolf' provision.") (emphasis added) (Statement of Sen. Russell D. Feingold); *id.* at S11947 ("Valuable preliminary objectives have been accomplished in this legislation . . . [including the] authority to use our Foreign Intelligence Service Act powers against 'lone wolf' terrorists . . . .") (Statement of Sen. Arlen Specter).

[9] The text of the statute responds forcefully to the dissenting opinion's notion that "it is irrational" to conclude that the same Congress that contemplated an independent terrorist being an agent of a foreign power could also contemplate a lone wolf terrorist acting entirely independently of that organization.  Dissenting Op. at 12.  Again, Congress expressly excluded those acting entirely independently from the material support statute's definition of personnel, *even where they act* "to advance [the terrorist organization's goals or objectives]."  *See* 18 U.S.C. § 2339B(h).  Far from irrational, reading the text as we do gives force to that express intent.

did not intend for the definition of personnel under § 2339B to include those acting on inspiration.

The dissenting opinion reads Congress's purpose differently by seizing on Congress's statement that the "purpose" of the material support statute and related provisions was to "provide the Federal Government the fullest possible basis" to prevent the provision of material support to foreign terrorist organizations. Dissenting Op. at 20. But Congress's statement of purpose is never a free pass to ignore explicit textual limits in the relevant statutory provision. Section 2339B contains several such limits, including the exclusion of entirely independent activities from the statute's reach. We must enforce those limits in the first instance. *See Nichols v. United States*, 578 U.S. 104, 112 (2016) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text." (quoting *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012))). Moreover, the congressional statement of purpose to which the dissenting opinion cites accompanied Congress's original enactment of the material support statute in 1996. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(b), 110 Stat. 1214, 1247 (1996). But the language we are today tasked with construing was added in 2004 as part of

Congress's effort to "add narrowing definitions" to the statute. *Humanitarian Law Project*, 561 U.S. at 21.   Accordingly, Congress's earlier "fullest possible basis" language carries little, if any, interpretive weight.

In sum, under the only reasonable reading of § 2339B's operative text, there was insufficient evidence here to convict Defendant on a "personnel" theory.

4. *Prior Applications of the "Personnel" Prong of § 2339B Are Distinguishable*

Furthermore, the government has not identified a prior case in which this Court or another Court of Appeals has upheld a conviction for providing "personnel" in violation of § 2339B based on independent conduct like Defendant's, and we are not aware of any.   In *United States v. Farhane*, we upheld the conviction of a doctor who met with purported al Qaeda members, swore allegiance to al Qaeda, promised to be on-call in Saudi Arabia to treat wounded al Qaeda members, and provided his phone numbers for al Qaeda members to reach him for treatment.   634 F.3d 127, 149 (2d Cir. 2011).   In *United States v. Pugh*, we upheld the conviction of a U.S. citizen who consumed ISIS propaganda but then, rather than carrying out a lone-wolf attack, attempted to cross from Turkey to Syria to join ISIS.   945 F.3d 9, 20–21 (2d Cir. 2019).   And in *United States v. Alebbini*,

26

the Sixth Circuit upheld the conviction of another person who attempted to travel to Syria to serve as a solider for ISIS.  979 F.3d 537, 549–50 (6th Cir. 2020).

Each of those individuals plainly attempted to submit to the "direction or control" of a terrorist group by joining its ranks.  By contrast, Defendant's closest contact with a terrorist group was as a consumer of broadly disseminated YouTube videos.[10]  We do not hold that the "personnel" prong only applies to "foreign fighters"[11] who travel abroad or submit to operational command structures.  However, the apparent lack of precedent for a "personnel" conviction like this one makes clear that reversing Defendant's conviction will not upset settled law in the way suggested by the government.

5. *The Rule of Lenity Requires the Resolution of Any Remaining Doubt Against the Government*

We perceive no ambiguity in the statutory definition of "personnel."  However, if any remained after analyzing the "language and structure, legislative history, and motivating policies" of § 2339B, we would nonetheless be compelled

---

[10] We do not hold that the statute specifically excludes certain *types* of directions, or directions disseminated through *certain means* like YouTube, contrary to the assertions of the dissenting opinion.  Dissenting Op. at 6.  Instead, with an eye toward their content, we merely hold that the online videos at issue here are not "directions" at all, or at least do not demonstrate that Defendant acted "under" ISIS's direction.

[11] At trial, one of the government's expert witnesses used the term "foreign fighters" to refer to individuals who "travel to [a] war zone to join up with a group to fight" and explained how, in the case of ISIS, foreign fighters submit formally and completely to the direction and control of ISIS, typically under penalty of death if they "don't do what [ISIS] direct[s] [them] to do."  *See* App'x at 553, 560–61.

27

by the rule of lenity to resolve that ambiguity in Defendant's favor. *United States v. Gu*, 8 F.4th 82, 90 (2d Cir. 2021). For that reason, and for all the reasons above, we conclude that the evidence supporting the government's "personnel theory" was insufficient under a proper construction of § 2339B.[12]

## B. The Evidence Was Insufficient to Convict Defendant on Count One Under the "Service" Theory

Defendant's conviction under Count One cannot stand under a "service" theory for essentially the same reason: Defendant acted "entirely independently" of ISIS. In *Humanitarian Law Project*, the Supreme Court held that the term "service" in § 2339B cannot cover conduct that is specifically excluded by the statute's definition of "personnel." *Humanitarian Law Project*, 561 U.S. at 24

---

[12] We need not separately decide Defendant's argument that the District Court erred in sending the government's "attempt" theory on the personnel prong to the jury. Our conclusion that the evidence was insufficient—because Defendant acted "entirely independently" of ISIS in preparing for and carrying out a terrorist attack—holds whether we think of the attack as a completed or attempted act. However, we do take this opportunity to note our agreement with Defendant that he could not be convicted for attempt based on a theory that, if he had died in the attack, he would then have completed the offense of providing himself as "personnel" to ISIS. The simple reason is that the act of "provid[ing]" personnel logically cannot take place *after* all the "work" that qualifies that person as "personnel" has been completed. 18 U.S.C. § 2339B. The evidence that ISIS would have counted Defendant as one of its members if he had died in the bombing is irrelevant, since "[§] 2339B does not criminalize mere membership in a designated foreign organization." *Humanitarian Law Project*, 561 U.S. at 18. In other words, even if Defendant's death might have conferred "membership" in ISIS, that status would not have affected whether Defendant provided or attempted to provide himself to work under ISIS's direction or control, as required by § 2339B. To the extent the government would rely on any other "attempt" theory, it would lack merit. The only aspect of Defendant's crime that was arguably incomplete—that conceivably could have turned an attempted § 2339B offense into a completed one—would have been his own death, which is simply not a step toward providing material support.

("Congress would not have prohibited under 'service' what it specifically exempted from prohibition under 'personnel.'").  In other words, "independent activity in support of a terrorist group" may not "be characterized as a 'service'" provided to that group.  *Id.*  The term "service," like "personnel," covers only acts "performed in coordination with, or at the direction of, a foreign terrorist organization."  *Id.*; *see also id.* at 23 ("'[S]ervice' similarly refers to concerted activity, not independent advocacy." (brackets in original)).  Therefore, because Defendant acted entirely independently of ISIS's direction or control, *both* the "personnel" and "service" prongs of Count One must fail.

Our analysis could end there, but statutory context further confirms that the term "service" does not apply to this case.  As the Supreme Court noted in *Humanitarian Law Project*, § 2339B "prohibits providing a service '*to* a foreign terrorist organization,'" and "[t]he use of the word 'to' indicates a connection between the service and the foreign group."  *Id.* at 24 (quoting 18 U.S.C. § 2339B(a)(1)).  The Court further noted that "[t]he other types of material support listed in the statute, including 'lodging,' 'weapons,' 'explosives,' and 'transportation,' are not forms of support that could be provided independently of a foreign terrorist organization," so the Court "interpret[ed] 'service' along the

29

same lines." *Id.* (citation omitted) (quoting § 2339A(b)(1)). And recognizing that its interpretation posed "difficult questions of exactly how much direction or coordination is necessary" to establish such a connection, the Court clarified that "[i]t is apparent . . . that 'gradations of fact or charge would make a difference as to criminal liability.'" *Id.* at 24–25 (quoting *Zemel v. Rusk*, 381 U.S. 1, 20 (1965)). If an individual independently acting upon a terrorist organization's general exhortation were enough to establish a "service," the Supreme Court would not have insisted that "to" requires *some* "connection" between the service provider and the organization. Even putting the Supreme Court's assessment of "to" aside, drawing inspiration from a propaganda video plainly falls flat in comparison to the statute's other examples of material support, which the Supreme Court found instructive for determining what constitutes a "service." The statute's text, as interpreted by the Supreme Court, demands a conclusion that Defendant did not provide a "service 'to a foreign terrorist organization'" by independently carrying out his attack. *See id.* at 24 (quoting § 2339B(a)(1)).

The government's contrary argument is unpersuasive because it overreads one phrase from a dictionary cited in *Humanitarian Law Project*, suggesting that a "service" may be any "act done for the benefit or at the command of another."

*Humanitarian Law Project*, 561 U.S. at 23–24 (quoting Webster's Third New International Dictionary 2075 (1993)). Specifically, the government and the dissenting opinion focus on whether Defendant's actions conferred a "benefit" on ISIS. Gov. Br. at 26–29. In context, however, the Supreme Court's brief reference to acts done "for the benefit . . . of another," *Humanitarian Law Project*, 561 U.S. at 24, was just a small piece of the broader analysis described above. The Court's conclusion, again, was that "the term 'service'" covers acts "performed in coordination with, or at the direction of, a foreign terrorist organization." *Id.*; *see id.* at 31 ("The statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization."). If the government were correct, then *Humanitarian Law Project* would make little sense, because all kinds of activity that the Supreme Court put clearly outside the reach of § 2339B might be done "for the benefit" of a terrorist group, including independent political advocacy. The government's reading in this case is therefore foreclosed by *Humanitarian Law Project*.

The other cases relied upon by the government, for the proposition that any act done "for the benefit" of ISIS violates § 2339B, involved conduct with a much closer connection to a foreign terrorist organization than Defendant's. In *United*

*States v. Suarez*, for example, the defendant was convicted of attempting to provide material support after "[h]e coordinated directly with individuals whom he believed to be members of ISIS in order to acquire a bomb." 893 F.3d 1330, 1335 (11th Cir. 2018). And in *United States v. Jama*, defendants fundraised directly for a foreign terrorist group, operated safe houses for the group's members, and had access to the group's leadership. 217 F. Supp. 3d 882, 893 (E.D. Va. 2016). None of those defendants acted independently. Those cases fall in the heartland of § 2339B and do not resemble Defendant's conduct as proven at trial in any meaningful way.[13]

Accordingly, under the correct construction of the term "service" in § 2339B, the evidence was insufficient to convict Defendant under that theory as well.

The majority and dissenting opinions are aligned in concluding that the Defendant committed heinous crimes, and that those crimes warrant life imprisonment. The disagreement is over whether the specific statute that is

---

[13] The dissenting opinion ignores an important part of the discussion of "service" in *Humanitarian Law Project*. It is true that the Supreme Court recognized that "a person of ordinary intelligence would understand the term 'service' to cover advocacy performed in coordination with, *or at the direction of*, a foreign terrorist organization." Dissenting Op. at 16 (quoting *Humanitarian Law Project*, 561 U.S. at 24). But in doing so, the Court was merely summarizing its prior discussion, where it emphasized that "service" reaches only "*concerted* activity." *Humanitarian Law Project*, 561 U.S. at 23 (emphasis added). More relevantly, the Court indicated that "a person of ordinary intelligence would understand that independently advocating for a cause is *different* from providing service to a group that is advocating for that cause." *Id.* (emphasis added).

§ 2339B *also* covers his conduct. For the reasons above, we conclude that it does not. Accordingly, the judgment is reversed as to Defendant's conviction on Count One.[14]

## II. Defendant's Conviction on Count Five Is Affirmed Because It Was Supported by Sufficient Evidence and the Government Did Not Constructively Amend the Indictment

Defendant was found guilty on Count Five for, among other theories, violating 18 U.S.C. § 1992(a)(2). Section 1992(a)(2) prohibits, in relevant part:

> knowingly and without lawful authority or permission . . . plac[ing] any . . . destructive device in, upon, or near railroad on-track equipment or a mass transportation vehicle with intent to endanger the safety of any person, or with a reckless disregard for the safety of human life.

---

[14] The District Court also erred in instructing the jury that it could convict Defendant under the "service" theory merely because he acted "for the benefit of ISIS" or because ISIS "invited" him to do so. App'x 1075. Those instructions "misl[ed] the jury as to the correct legal standard" and failed to "adequately inform the jury" of key points of law. *United States v. Cabrera*, 13 F.4th 140, 146 (2d Cir. 2021). As the Supreme Court has held, "independent activity in support of a terrorist group" cannot be a "service" provided to that group, since providing a "service" requires "coordination" or "direction." *Humanitarian Law Project*, 561 U.S. at 24. Merely accepting an "invitation" to act independently is not enough.

The dissenting opinion attempts to draw an analogy between Defendant's actions in response to ISIS's "invitation," on one hand, and contract formation in response to a mass-market advertisement, on the other. This argument is self-refuting in several ways. First, contract law is irrelevant. Even if, for example, a fast-food restaurant *could* form a contract with its consumers via mass-market advertising, no one would say that its consumers were "work[ing] under" its "direction or control" or in "coordination" with it if they decided to buy a hamburger after reviewing its advertisement—even if that advertisement had clear, definite terms. *Cf. Chimienti v. Wendy's Int'l, Inc.*, 698 F. Supp. 3d 549, 562 (E.D.N.Y. 2023). Second, even if the common law of contract informed the interpretation of this statute, the case law cited uniformly holds that such an offer must be "clear" and "definite" so that all parties understand when a contract has been formed and what its terms are. Dissenting Op. at 16–17. But nothing in the record suggests that the YouTube videos viewed by Defendant contained specific instructions or terms for Defendant to follow, rather than vague exhortations to commit terrorist attacks in the U.S. Accordingly, it is hard to see how this line of cases could be helpful to the *government's* case.

We affirm Defendant's Count Five conviction because Defendant violated § 1992(a)(2) when he carried a bomb on his person and rode the subway. Additionally, we reject Defendant's argument that the government constructively amended the indictment as to Count Five.

> **A.      Sufficient Evidence Supports the Finding that Defendant Placed a Destructive Device On, Upon, or Near a Mass Transportation Vehicle with Reckless Disregard for the Safety of Human Life**

Defendant argues that "carrying" the bomb on his person as he rode the subway is not "placing" the bomb on the subway under § 1992(a)(2).[15]   We disagree.

The statute is silent as to the definition of "places."  Defendant does not offer a definition beyond claiming there is a distinction between "carrying" and "placing."   To resolve the question of whether "placing" a bomb necessarily excludes "carrying" a bomb affixed to one's person, we look to "the ordinary, contemporary, common meaning of the term."  *Delaware v. Pennsylvania*, 598 U.S. 115, 128 (2023) (internal quotation marks and citation omitted).

---

[15] The District Court instructed the jury on the government's two overarching theories for Count Five.  The theory relevant here was that Defendant "violated [§ 1992(a)(2)] when he boarded and rode the subway with a destructive device."  App'x at 1089.  The other theory was that the Defendant "violated [§ 1992(a)(7)] when he set off a destructive device at Port Authority."  *Id.* at 1092.

Pertinent here, "place" means "[t]o put or set (in a particular place, spot, or position); to station, position." *Place*, Oxford English Dictionary (3d ed. 2006). Defendant affixed the bomb to his person and boarded a subway train, "position[ing]" himself and the bomb affixed to him in that intended location. *Id.* Defendant's conduct is consistent with the meaning of the word "place."

Of course, as he points out, Defendant may have *also* been "transporting" or "carrying" the bomb at the same time. But the fact that Defendant's conduct can be described using multiple verbs is unremarkable, and certainly does not change our conclusion. For example, one could "place" a bomb in the trunk of one's car and "carry" or "transport" it across state lines, or one might "place" a gun in one's waistband and "carry" it to a drug deal. Indeed, the nature of the bomb Defendant created blurs the lines between these words even further. He designed the bomb to explode while affixed to him. The bomb's location, or placement, at every moment was wherever Defendant had positioned himself. In this case, any distinction between "carrying" and "placing" is illusory.

To put it plainly, we conclude that the verb "places" in § 1992(a)(2) includes the act of "carrying" a bomb on your person and putting or setting yourself in a location covered by the statute. We reject Defendant's contrary interpretation.

35

**B.    The Government Did Not Constructively Amend the Indictment as to Count Five**

Defendant's second substantial objection as to Count Five, that the government constructively amended the indictment by relying on a new theory at trial, fares no better.  The words and structure of Count Five in the indictment foreclose Defendant's contention.

The Grand Jury Clause of the Fifth Amendment of the United States Constitution states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V, cl. 1.  The Constitution requires, among other things, that an indictment "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The Grand Jury Clause "is violated, and reversal is required, if the indictment has been constructively amended."  *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021).  "A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted."  *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018).

"To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998)). Such an alteration occurs "either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered." *Khalupsky*, 5 F.4th at 293 (quoting *Dove*, 884 F.3d at 146).

With these protections in mind, we first note the text of Count Five of the indictment:

> On or about December 11, 2017, . . . the defendant, knowingly and without lawful authority and permission, through conduct engaged in, on, against, and affecting a mass transportation provider, (a) placed and attempted to place a destructive substance and destructive device in, upon, and near a mass transportation vehicle . . . . with intent to endanger the safety of persons, and with a reckless disregard for the safety of human life; (b) placed and attempted to place a destructive substance and destructive device in, upon, and near a garage, terminal, structure, track, electromagnetic guideway, supply, and facility used in the operation of, and in support of the operation of, a mass transportation vehicle—which was carrying passengers and employees at the time of the offense—and with intent to, and knowing and having reason to know, such activity would likely derail, disable, and wreck a mass transportation vehicle used,

operated, and employed by a mass transportation provider; and (c) committed, and attempted to commit, an act, including the use of a dangerous weapon, with the intent to cause death and serious bodily injury to persons who were on or in a garage, terminal, structure, track, electromagnetic guideway, supply, and facility used in the operation of, and in support of the operation of, a mass transportation vehicle, which mass transportation vehicle was carrying passengers and employees at the time of the offense, to wit, [defendant] detonated and attempted to detonate an [improvised explosive device] in the vicinity of the Port Authority Bus Terminal in New York, New York, which terminal was then in use by subway cars and buses that were carrying passengers and employees at the time of the offense.

App'x at 24–26.  Section (a) of the Count Five indictment corresponds directly with violations of 18 U.S.C. § 1992(a)(2), which creates liability for placing a destructive device in, upon, or near a mass transportation vehicle.  In turn, the jury convicted Defendant of "plac[ing] the destructive device in, upon, or near a mass transportation vehicle with the intent to endanger the safety of any person or with a reckless disregard for the safety of human life."  App'x at 1145 (reading of the verdict).  Therefore, the indictment is consistent with the government's theory and evidence presented to the jury.

Moreover, Defendant's argument that the "to wit" clause represents the only specific offense charged under Count Five ignores the text and structure of the Count Five indictment.  A plain reading of section (c) shows that the "to wit" clause qualifies only that section.  Its description of Defendant's conduct mirrors

38

the text of section (c) which immediately precedes it.  Additionally, as the District

Court correctly pointed out, *see Ullah*, 2021 WL 21902, at \*6, each of the three

sections—(a), (b), and (c)—are separated by semicolons whereas the "to wit"

clause is separated by a comma *within section (c)*.  There is no plausible reading of

Count Five of the indictment to support the position that the "to wit" clause

qualifies all of the theories alleged in the count.

Because section (a) of the Count Five indictment clearly "'encompasses the

specific legal theory or evidence used at trial,' there is no constructive

amendment."  *Salmonese*, 352 F.3d at 620 (quoting *United States v. Wallace*, 59 F.3d

333, 337 (2d Cir. 1995)).[16]  And, because the indictment was not constructively

amended, Defendant's challenge on that aspect of Count Five fails.[17]

### C.    Defendant's Other Challenges to Count Five Are Also Unavailing

Defendant mounts three other challenges to his conviction on Count Five,

none of which is persuasive.

---

[16] Defendant relies on the government's opening statements at trial to argue that the government failed to offer its theory for § 1992(a)(2).  But, as the District Court rightly stated to the jury: "The opening statements . . . are neither evidence nor argument."  App'x at 171.  Defendant's gripe with the government's opening statements is, therefore, immaterial here.

[17] Further, Defendant argues the District Court erred to the extent that he was also convicted on a theory under § 1992(a)(7).  We need not address that argument because his conviction on Count Five is affirmed based on his conviction on the theory under § 1992(a)(2).

First, Defendant argues in passing that the indictment was "duplicitous" as to Count Five, since it charged two separate offenses:  "placing" the bomb on the subway from Brooklyn to Manhattan in violation of § 1992(a)(2); and deflagrating the bomb in the tunnel between Times Square/42nd Street and the Port Authority Bus Terminal.  We need not decide whether the indictment was duplicitous because even if it was, Defendant cannot and has not attempted to show prejudice. *See United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (noting that "[a]n indictment is impermissibly duplicitous" only where "the defendant is prejudiced").  There was no prejudice because the District Court instructed the jury separately on both theories and instructed the jury that they must be unanimous as to one theory or the other, or both, and the jury returned a special verdict indicating their unanimity.  *See id.* (noting that in determining prejudice, a court must consider "whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another," "the risk that the jurors may not have been unanimous as to any one of the crimes charged," "adequate notice" to the defendant, "the basis for appropriate sentencing," and "protecting against double jeopardy in a subsequent prosecution" (quoting *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981)); App'x at 1088–96, 1145–46.

Second, we need not decide whether the District Court erred in instructing the jury on the sentencing aggravator provided by § 1992(b)(1) for both of the government's theories of liability, under § 1992(a)(2) and (a)(7). Section 1992(b)(1) increases the maximum sentence from 20 years to life in prison, for convictions under § 1992(a) where "the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense." Defendant takes issue with applying § 1992(b)(1) to a conviction under § 1992(a)(7) but does not contest that it can apply under § 1992(a)(2). Having concluded that Defendant's conviction under § 1992(a)(2) was valid, and because the District Court's jury instructions and special verdict assure us that the jury unanimously found the enhancement applied to that theory of conviction, we need not address Defendant's contentions regarding § 1992(a)(7).

Third, the District Court was right to state the government's theory of the case to the jury but not Defendant's while delivering jury instructions on § 1992(a)(2). The Court told the jury: "Under this theory the government contends that the defendant violated the statute when he boarded and rode the subway with a destructive device." App'x at 1089. But the Court declined to tell the jury: "The defense contends that the government has failed to meet its burden of proof on

41

this element because carrying a disconnected device under one's clothes on a mass transportation vehicle is not placing a device in, upon, or near a mass transportation vehicle." *Id.* at 949. This was not error because Defendant's proposed instruction constituted a legal argument about what it means to "place" a destructive device—the question we resolved above. *Id.* That question was not for the jury to decide.

For all of the foregoing reasons, we affirm Defendant's conviction on Count Five.

**III.  Defendant's Conviction on Count Six Is Affirmed Because, Even if the Verdict Was Legally Erroneous, the Error Did Not Affect Defendant's Substantial Rights**

Defendant was convicted on Count Six for carrying a bomb during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Defendant's Count Six conviction was predicated, in relevant part, on his Count Three conviction for violating 18 U.S.C. § 2332f(a). The final issue of significance we must decide is whether the offense of which Defendant was convicted on Count Three is a crime of violence that supports Defendant's conviction on Count Six.[18]

---

[18] Defendant was convicted on Count Six for using a destructive device during and in furtherance of a crime of violence. *See* 18 U.S.C. §§ 924(c)(1)(A) (prohibiting carrying a "firearm" during and in relation to a crime of violence), 921(a)(3), (a)(4)(i) (defining "firearm" to include a "destructive device," including a bomb").

Section 2332f(a)(1) prohibits unlawfully delivering, placing, discharging, or detonating an explosive or other lethal device in certain public places and facilities, with intent to cause either death or serious bodily injury, on one hand; or extensive destruction likely to result in major economic loss, on the other.  Section 2332f(a)(2) prohibits attempting to commit the offenses described in paragraph (1).

A "'crime of violence' means an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A).  Section 924(c)(3)(A) is often referred to as the "'elements' or 'force' clause."  *United States v. Davis*, 74 F.4th 50, 52 (2d Cir. 2023).[19]  "'To determine whether an offense is a crime of violence' under the elements clause, 'courts employ what has come to be known as the categorical approach.'"  *United States v. Pastore*, 83 F.4th 113, 118 (2d Cir. 2023) (citation modified) (quoting *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018)), *aff'd sub nom., Delligatti v. United States*, 604 U.S. 423 (2025).  "Under the categorical

---

Section 924 states, in pertinent part: "any person who, during and in relation to any crime of violence . . ., uses or carries a firearm" such that "the firearm possessed . . . is . . . a destructive device,  . . . shall be sentenced to a term of imprisonment of not less than 30 years."  18 U.S.C. §§ 924(c)(1)(A), (c)(1)(B)(ii).

[19] Section 924(c) also defines a "crime of violence" under the provision's "residual clause," *see* 18 U.S.C. § 924(c)(3)(B), but the Supreme Court held that the residual clause is unconstitutionally vague, *see United States v. Davis*, 588 U.S. 445, 470 (2019).  As such, only § 924(c)'s force clause is relevant here in defining a crime of violence.

approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute"; that is, "courts look only to the statutory definitions— *i.e.*, the elements—of the offense, and *not* to the particular underlying facts."  *Hill*, 890 F.3d at 55 (citation modified).

"For certain statutes that 'list elements in the alternative, and thereby define multiple crimes,' we have deemed the statute to be divisible and applied a 'modified' categorical approach."  *Pastore*, 83 F.4th at 118 (quoting *Mathis v. United States*, 579 U.S. 500 (2016)).  Under that approach, "we may review a limited class of documents from the record of conviction to determine what crime, with what elements, a defendant was convicted of."  *Id.* at 118–19 (internal quotation marks and citation omitted).  Once that determination is made, "[w]e then return to the categorical analysis and compare the elements of the offense of conviction with section 924(c)(3)(A)'s definition of a crime of violence."  *Id.* at 119 (internal quotation marks and citation omitted).  In other words, "the modified [categorical] approach merely helps implement the categorical approach when a defendant was convicted of violating a divisible statute."  *Descamps v. United States*, 570 U.S. 254, 263 (2013).

As such, we must first determine whether § 2332f(a) is divisible.

**A.      The Statute Underpinning Count Three—18 U.S.C. § 2332f(a)—Is a Divisible Statute Warranting the Modified Categorical Approach**

Whether § 2332f(a) is a divisible statute constitutes "a substantial question of statutory construction," *Schad v. Arizona*, 501 U.S. 624, 636 (1991) (plurality opinion), *abrogated on other grounds as recognized in Edwards v. Vannoy*, 593 U.S. 255, 265 n.4 (2021), which requires us to "look first to the language" of the statute, *Richardson v. United States*, 526 U.S. 813, 818 (1999).  We must read the "whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011) (quoting *Dolan v. Postal Serv.*, 546 U.S. 481, 486 (2006)).

Section 2332f(a) states:

> (a) OFFENSES.—
>
>> (1) IN GENERAL.—Whoever unlawfully delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a place of public use, a state or government facility, a public transportation system, or an infrastructure facility—
>>
>>> (A) with the intent to cause death or serious bodily injury, or
>>>
>>> (B) with the intent to cause extensive destruction of such a place, facility, or system, where such

> destruction results in or is likely to result in major economic loss,
>
> shall be punished as prescribed in subsection (c).
>
> (2) ATTEMPTS AND CONSPIRACIES.—Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (c).

We conclude that § 2332f(a) is divisible in two ways based on the text and structure of the statute and precedent concerning divisibility of similar statutes. First, § 2332f(a) can be divided between completed and attempted offenses. Second, § 2332f(a) can be divided between bombings committed with intent to cause death or serious bodily injury, and bombings with intent to cause "extensive destruction" of a place and "major economic loss."

At the outset, the statute's text and structure demand this conclusion. Section 2332f(a) starts with the heading, "Offenses." That is, offense *but plural*. The statute is then divided into subsection (a)(1), titled "In General," and subsection (a)(2), titled "Attempts and Conspiracies." Subsection (a)(1) is then *further* subdivided into (a)(1)(A) and (a)(1)(B), respectively defining offenses "with the intent to cause death or serious bodily injury" and those "with the intent to cause extensive destruction." These aspects of the statute provide us with a rather easily navigated map to divisibility. *See Merit Mgmt. Grp., LP v. FTI Consulting,*

46

*Inc.*, 583 U.S. 366, 380 (2018) ("[S]ection headings . . . supply cues as to what Congress intended . . . ." (internal quotation marks and citation omitted)).  The text and structure of the statute thus reflects Congress's intent to create separate offenses.  *See Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007) ("[I]f the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end our analysis."); *see also Schad*, 501 U.S. at 637–38 ("The enquiry is undertaken with a threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime.").

Second, the Supreme Court's treatment of the completed and attempted offenses of Hobbs Act robbery bolsters the conclusion that § 2332f(a) is divisible between completed and attempted offenses.  *See* 18 U.S.C. § 1951(a) (setting forth criminal penalties for "[w]hoever in any way . . . affects commerce . . . by robbery or extortion or *attempts* or conspires so to do" (emphasis added)).  In *Taylor*, the Supreme Court implicitly determined that the completed offense under the Hobbs Act robbery provision was divisible from the attempted offense by allowing for the possibility that the completed offense might be a crime of violence even if the attempt offense was not.  *See* 596 U.S. at 851 ("Whatever one might say about

*completed* Hobbs Act robbery, *attempted* Hobbs Act robbery does not satisfy the elements clause.").  And unlike Hobbs Act robbery, where the completed and attempted offenses are enumerated in the same subsection, *see* 18 U.S.C. § 1951(a), here the completed offense and attempted offense under § 2332f(a) are divided in separate subsections, which further suggests that § 2332f(a) is divisible.

Third, we have determined that other statutes were divisible between distinct offenses that require different mental states in connection with the same underlying conduct.  For example, in *United States v. Castillo*, we implicitly concluded that New York's first-degree manslaughter statute was divisible as between at least two subparts:  First, causing the death of another person "[w]ith intent to cause serious physical injury"; and second, causing the death of another person "[w]ith intent to cause the death of another person," but "under circumstances which do not constitute murder."  896 F.3d 141, 149–54 (2d Cir. 2018) (discussing N.Y. Penal Law § 125.20(1), (2)).  And in *Akinsade v. Holder*, we assumed without deciding that the crime of embezzlement by a bank employee was divisible as between the offenses of acting "with the intent to defraud" and with intent merely "to injure the bank."  678 F.3d 138, 145 (2d Cir. 2012).

We ultimately conclude that § 2332f(a) is divisible because "[i]t contains . . . distinct . . . elements," *United States v. Beardsley*, 691 F.3d 252, 273 (2d Cir. 2012) (internal quotation marks and citation omitted), that "offer[] alternative possibilities for determining guilt," "such that the minimum elements of conviction can be proven in discrete ways," *United States v. Laurent*, 33 F.4th 63, 85, 88 (2d Cir. 2022). § 2332f(a) is divisible as between (1) the two offenses defined in § 2332f(a)(1), and (2) the completed offenses defined by § 2332f(a)(1) and the attempted offenses defined by § 2332f(a)(2).[20] Given those conclusions, we must deploy the modified categorical approach.

## B.   Neither the Indictment, Jury Instructions, nor Verdict Allow Us to Know of Which Offense in § 2332f(a) Defendant Was Convicted

Because § 2332f(a) is divisible, we implement the modified categorical approach to determine whether Defendant was convicted of the bombing with intent to kill or seriously injure or with intent to destroy property, and whether he

---

[20] We also note that other circuits have come to the same conclusion that the completed offense and attempted offense for different criminal statutes are separate offenses, even where those offenses are not broken out into separate statutory subsections. *See, e.g.*, *United States v. Roof*, 10 F.4th 314, 403 (4th Cir. 2021) ("[B]ecause [18 U.S.C.] § 247(a)(2) criminalizes both obstruction of the free exercise of religion and 'attempts to do so,' it sets out multiple elements in the alternative and thus creates multiple versions of the crime, the statute being divisible along the lines separating completed and attempted versions of the crime." (citing *Descamps*, 570 U.S. at 262)), *cert. denied*, 143 S. Ct. 303 (2022); *United States v. Linehan*, 56 F.4th 693, 700 (9th Cir. 2022) ("In this case, we have little difficulty concluding that, at the very least, [18 U.S.C.] § 844(d) is divisible into completed and attempted offenses."), *cert. denied*, 144 S. Ct. 209 (2023).

49

was convicted of a completed or attempted offense. *See Mathis*, 579 U.S. at 505–06.

To make this determination, we may review "the indictment, jury instructions,

and verdict form." *Colotti v. United States*, 71 F.4th 102, 115 (2d Cir. 2023).

Count Three of the indictment alleged, in pertinent part, that Defendant

"did" and "attempted to" "knowingly and unlawfully deliver, place, discharge,

and detonate an explosive . . . with the intent to cause death and serious bodily

injury, and with intent to cause extensive destruction of such a place and system,

and where such destruction resulted in or was likely to result in major economic

loss." App'x at 23. The indictment cited 18 U.S.C. §§ 2332f(a)(1)(A), (a)(1)(B),

(b)(1)(B), and (b)(1)(E). *Id.* at 24. Notably, however, the indictment did not cite 18

U.S.C. § 2332f(a)(2)—the provision of the statute governing the attempted offense.

At trial, the District Court instructed the jury that, to convict Defendant on

Count Three, they had to find that he did or "attempted to" "knowingly and

unlawfully deliver[], place[], discharge[], or detonate[] an explosive." *Id.* at 1081.

The District Court further instructed the jury that to convict they had to find "that

the defendant did so or attempted to do so (a) intending to cause death or serious

bodily injury or (b) intending to cause extensive destruction of a public place or a

public transportation system where extensive destruction resulted in or was likely

50

to result in major economic loss." *Id.* at 1082. The District Court still further instructed the jury that the government did not need to prove both the completed offense and the attempted offense, but that the jury needed to vote unanimously as to which, if either, they chose. *Id.* The District Court then gave a similar instruction as to Defendant's intent: the government could prove either intent to kill or injure, or intent to cause extensive destruction, but the jury had to be unanimous as to which, if either, was proven. *Id.* at 1084. When the verdict was announced, however, the clerk of court asked only, "[a]s to Count Three, which charges the defendant with bombing places of public use and a public transportation system, how do you find the defendant[?]" *Id.* at 1144. The foreperson responded, "[g]uilty." *Id.*

Under these circumstances, the underlying materials do not enable us to determine whether Defendant was convicted of the offense with intent to kill or injure under § 2332f(a)(1)(A), or with intent to cause extensive destruction under § 2332f(a)(1)(B). Nor do they enable us to determine whether he was convicted of a completed offense or an attempt to commit either of the offenses under § 2332f(a)(2). Given this uncertainty, we must determine whether each of the offenses under § 2332f(a) is a crime of violence.

51

**C.     The Completed Offense Under § 2332f(a)(1)(A) Is a Crime of Violence**

Our inquiry begins with the completed offense, with intent to cause death or serious bodily injury, which we hold is a crime of violence.

"The only relevant question is whether [§ 2332f(a)(1)(A)] always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of [physical] force."  *Taylor*, 596 U.S. at 850; *see* 18 U.S.C. § 924(c)(3)(A) (stating that "the term 'crime of violence' means an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another").  The term "'physical force' . . . means no more nor less than force capable of causing physical pain or injury to a person *or* injury to property."  *Hill*, 890 F.3d at 58. "Attempt" means "an overt act that constitutes a substantial step toward completing the offense."  *Resendiz-Ponce*, 549 U.S. at 107 (internal quotation marks and citation omitted); *see also Collier v. United States*, 989 F.3d 212, 221 (2d Cir. 2021) ("The crime of attempt requires that the defendant have intended to commit each of the essential elements of the substantive crime.  In federal criminal law, an attempt also requires that the defendant take 'a substantial step' toward the actual completion of the substantive crime." (citation omitted)).  Taking those together,

52

the "attempt to use physical force" means taking a substantial step toward using force capable of causing physical pain or injury to a person or injury to property.

We have no trouble determining that the elements of § 2332f(a)(1)(A) require the government to establish that a defendant took a substantial step toward using the requisite force. Again, § 2332f(a)(1)(A) prohibits "unlawfully deliver[ing], plac[ing], discharg[ing], or detonat[ing] an explosive or other lethal device in, into, or against a place of place of public use . . . [or] a public transportation system . . . with the intent to cause death or serious bodily injury." Placing or delivering an explosive with the requisite intent necessarily entails taking a substantial step toward using force capable of injuring a person. Therefore, delivering or placing an explosive under § 2332f(a)(1) always requires the government to prove, at a minimum, the *attempted use* of physical force for purposes of § 924(c)(3)(A).[21]

Further, § 2332f(a) incorporates the definition of "explosive" under 18 U.S.C. § 844(j), which includes devices where "ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device

---

[21] We focus on delivering and placing an explosive because we must "identify 'the minimum criminal conduct necessary for conviction' to determine whether [a statute] requires the use of force." *Laurent*, 33 F.4th at 84 (quoting *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006) (per curiam)).

or any part thereof may cause an explosion." 18 U.S.C. § 844(j). An explosive under § 2332f(a) is also one that is "designed, or has the capability, to cause death, serious bodily injury, or substantial material damage." 18 U.S.C. § 2332f(e)(8). Accordingly, to convict under § 2332f(a)(1)(A), the government is always required to prove that a defendant placed or delivered an explosive that is, by definition, capable of exploding and "causing physical pain or injury to a person or injury to property." *Hill*, 890 F.3d at 58 (emphasis omitted).

Section 2332f(a)(1)(A), moreover, requires that a defendant deliver or place an explosive with the *intent* to cause death or serious bodily injury. *See* 18 U.S.C. § 2332f(a)(1)(A). As the Supreme Court recently held, "[t]he knowing or intentional causation of injury or death, whether by act or omission, necessarily involves the use of physical force against another person." *Delligatti*, 604 U.S. at 439. Although "[a]n intention is just that, no more," *Taylor*, 596 U.S. at 851, the intent required to convict under § 2332f(a)(1)(A), combined with the completed act of delivering or placing an explosive capable of causing physical force, establishes that the government must "prove that the defendant took specific actions against specific persons" with a violent purpose, *id.* at 856. So, while delivering or placing an explosive may not, by itself, require the use of force, the minimum conduct

required to convict categorically involves taking a substantial step toward using physical force.

This conclusion is also consistent with the developing jurisprudence regarding the attempted-use-of-force prong of the elements clause. The Ninth Circuit, for example, held that the completed offense of 18 U.S.C. § 844(d) for interstate transportation of an explosive device with intent to kill or injure was a crime of violence, reasoning that "someone who solicits a violation of § 844(d) categorically solicits the attempted use of physical force: *transporting* or *receiving* an explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any person, or damage property, is categorically a substantial step toward the use of violent force." *United States v. Linehan*, 56 F.4th 693, 702 (9th Cir. 2022) (emphases added), *cert. denied*, 144 S. Ct. 209 (2023). In doing so, the Ninth Circuit emphasized that the explosive for purposes of § 844(d) "must be readily capable of explosion through a basic act, such as ignition by fire" and that "[t]ransporting or receiving an explosive brings it closer to its contemplated or potential detonation." *Id.* at 702–03. The same holds true here because, for purposes of a conviction under § 2332f(a)(1)(A), the explosive must be capable of exploding and causing "death, serious bodily injury, or substantial material

damage," 18 U.S.C. § 2332f(e)(8), and delivering or placing such "an explosive brings it closer to its contemplated or potential detonation," *Linehan*, 56 F.4th at 702–03.[22]

In sum, under § 2332f(a)(1)(A), the government must always establish that a defendant intended to use physical force, and—at minimum—placed or delivered an explosive capable of causing such physical force. The placing or delivering of an explosive is not only a substantial step in completing the intended use of physical force, but also enables a defendant to cause the intended physical force. That is enough to show the attempted use of physical force for purposes of

---

[22] Defendant argues the completed offense under § 2332f(a)(1)(A) is not categorically a crime of violence because one could be convicted solely for attempting to commit suicide by bomb in one of the public places enumerated in the statute. Def.'s Br. at 63. That is, Defendant argues, § 2332f does not require the use or attempted use of physical force against the person "of another," as required by § 924(c)(3)(A). We reject this argument because nothing in the text or context of § 2332f(a)(1)(A) suggests that Congress intended to criminalize attempts at self-harm that are committed without intent to kill or seriously injure anybody else. We think it is reasonable to presume, unless a contrary intention is somehow manifest, that when Congress prohibits acting with the intent to kill or seriously injure, it generally means people *other* than the defendant. Otherwise, we might be compelled to find, for example, that "[f]oreign murder of United States nationals" is not a "crime of violence," because a suicide attempt abroad could technically satisfy the statutory language: "A person who, being a national of the United States, kills or attempts to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under [this statute]." 18 U.S.C. § 1119(b). We appreciate that the categorical approach sometimes leads to counterintuitive conclusions about which crimes are "crimes of violence," but that would be a bridge too far. Even after *Taylor*, we do not understand the categorical approach to require such an act of "legal imagination" to distort what appears to be the plain meaning of the statute. *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) (requiring a "realistic probability, not a theoretical possibility, that [a] State would apply its statute" to certain conduct in applying the categorical approach); *see Taylor*, 596 U.S. at 858–59 (cabining the *Duenas-Alvarez* "realistic probability" test in the interpretation of federal statutes).

§ 924(c)(3)(A).  Accordingly, the completed offense under § 2332f(a)(1)(A) is a crime of violence under § 924(c)(3)(A).

### D.  Even if the Property-Destruction Offense Under § 2332f(a)(1)(B) and the Attempted Offenses Under § 2332f(a)(2) Are Not Crimes of Violence, Any Legal Error in the Verdict Does Not Affect Defendant's Substantial Rights

Given our holding that the completed offense is a crime of violence, this case does not require us to decide whether the offense under § 2332f(a)(1)(B) or the attempted offenses under § 2332f(a)(2) are crimes of violence.[23]  The answer to that question will not change the outcome because, as we explain below, even if one offense (or more) is not a crime of violence, rendering the verdict on Count Six legally erroneous, that error would not have affected Defendant's substantial

---

[23] The parties devote much of their briefing (and supplemental briefing) to the issue of whether the attempted offense under § 2332f(a) constitutes a crime of violence.  This is no doubt because Defendant's precise argument is that the offense charged in Count Three does not qualify as a predicate crime of violence because the attempted offense under § 2332f(a) is not a crime of violence.

Defendant also argues that § 2332f(a)(1)(B) does not define a categorical crime of violence because it can be committed by using a bomb to destroy one's own property if one owns, for example, a "commercial" establishment that is "accessible or open to members of the public, whether continuously, periodically, or occasionally."  18 U.S.C. § 2332f(e)(6).  This argument, unlike the argument that one can commit the § 2332f(a)(1)(A) crime with intent to cause one's own death or serious bodily injury, has some persuasive force.  The § 2332f(a)(1)(B) offense is loosely analogous to arson, which courts have suggested is not a crime of violence.  *See Torres v. Lynch*, 578 U.S. 452, 465 (2016) (noting that analogous provision of the INA "would not reach arson in the many States defining that crime to include the destruction of one's own property" (citing *Jordison v. Gonzales*, 501 F.3d 1134, 1135 (9th Cir. 2007))).  And it is not absurd to imagine Congress meant to criminalize using an explosive device to destroy one's own property in § 2332f(a)(1).  However, there are powerful statutory interpretation arguments on the other side as well, and we need not decide whether § 2332f(a)(1)(B) defines a crime of violence, as explained in the balance of this section.

rights.  Given the uncontroverted record evidence that he deflagrated his bomb in a place of public use with intent to cause death or serious bodily injury of other people, we would affirm the Count Six conviction because it is not plainly erroneous.

Under *Yates v. United States*, 354 U.S. 298 (1957), "a jury verdict constitutes legal error when a jury, having been instructed on two disjunctive theories of culpability, one valid and the other invalid, renders a guilty verdict in circumstances that make it impossible to tell which ground the jury selected." *Laurent*, 33 F.4th at 86.  Because Defendant "made no objection at trial to the jury instruction that permitted the jury to convict [him] on Count [Six] based on Count [Three]," we review only for "plain error."  *Id.*  "Under plain error review, we consider whether '(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'"  *Id.* (quoting *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021)).

Importantly, a *Yates* error "does not violate the [defendant's] substantial rights under the plain error standard if the evidence left no reasonable doubt that

the jury would have convicted under a proper instruction." *Id.* at 87; *see also United States v. Blaszczak*, 56 F.4th 230, 245 (2d Cir. 2022) (stating that a "conviction may be affirmed if, after a 'thorough examination of the record,' the court 'concludes beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" (citation modified) (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999))). *But see Capers*, 20 F.4th at 123 (vacating conviction based on *Yates* error where defendant showed "a reasonable probability that the jury may not have convicted him" on the erroneous count (quoting *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010))).

Here, if the offenses under § 2332f(a)(1)(B) or (a)(2) were not crimes of violence, Defendant's Count Six verdict would be legally erroneous under *Yates*. The verdict would have relied on a valid predicate crime of violence—the completed offense under § 2332f(a)(1)(A)—and one or more invalid predicates—under § 2332f(a)(1)(B) or (a)(2). And the indictment, jury instructions, and verdict do not make clear the offense for which Defendant was convicted.

However, we conclude that even if the offenses under § 2332f(a)(1)(B) and (a)(2) are not predicate crimes of violence, making the Count Six verdict erroneous, Defendant's substantial rights were not affected. The evidence established beyond

59

a reasonable doubt that Defendant committed the completed offense under

§ 2332f(a)(1)(A) when he "deliver[ed], place[d], discharge[d], or detonate[d] an

explosive"[24] in the subway tunnel between the 42nd Street subway station and the

Port Authority Bus Terminal, with "intent to cause death or serious bodily injury"

to other people, which constitutes a crime of violence.  The *uncontested* evidence at

trial is more than sufficient to determine beyond a reasonable doubt that the jury

would have convicted Defendant on Count Six if instructed that Count Six could

be predicated only on the completed offense under Count Three, § 2332f(a)(1)(A).

For instance, the jury heard testimony from one of the police officers who

responded to the scene immediately after the attack.  The officer testified that

when he entered the subway tunnel, he saw a man lying on the ground with

lacerations and burn marks.  The officer also testified that the man on the ground

had wires protruding from his chest.  During the search of the person on the

ground, the officer recovered a 9-volt battery electrically taped to an AC cable

wire.  The officer then placed the man in handcuffs.  At trial, the officer identified

---

[24] An expert in explosives chemistry testified at Defendant's trial about the technical difference between "deflagrating" and "detonating" an explosive. *See* App'x at 694–95. We use "deflagrate" throughout our decision to be consistent with the trial record, but for our purposes here, there is no legal difference between the terms "discharge" and "detonate" contained in § 2332f(a)(1) and the term "deflagrate."

Defendant as the man he found lying on the ground in the subway tunnel and subsequently arrested.

The jury also heard testimony from a detective who interviewed Defendant in the hospital immediately following the attack. The detective testified that Defendant told him that he filled the bomb with metal screws and deflagrated the bomb in the subway tunnel. The detective further stated that Defendant told him that he committed the bombing on behalf of ISIS. The jury was also presented with surveillance footage from the subway tunnel that captured Defendant's attack. Perhaps most significantly, the jury heard that Defendant deliberately committed his attack at one of the most crowded subway stations, at one of the most crowded times of the day, using a bomb that he designed to inflict maximum damage. There is no "reasonable doubt" that he intended at least to seriously injure commuters that morning.

We can be confident on the record in this case that a *Yates* error on the Count Six verdict, if any occurred, did not impact Defendant's substantial rights. We therefore affirm Defendant's Count Six conviction.[25]

---

[25] Because we affirm Defendant's Count Six conviction based on Count Three serving as a predicate crime of violence, we do not address any of his other challenges to Count Six on the grounds that other counts could not serve as predicate crimes of violence.

## IV.    Defendant's Challenges to the Reasonableness of His Sentence Fail

Defendant makes numerous challenges to his sentence.  We reject them all. The District Court did not double count sentence enhancements, the District Court had reason to not give Defendant credit for his purported acceptance of responsibility, the District Court did not rely on clearly erroneous facts, and Defendant's sentence was substantively reasonable.

### A.    The District Court Did Not Impermissibly Double-Count when Calculating Defendant's Sentencing Guidelines Range

The District Court did not double-count when it applied the 12-level enhancement for a "federal crime of terrorism," under the United States Sentencing Guidelines ("U.S.S.G.") § 3A1.4, on top of the base offense level

---

Further, we reject Defendant's argument that Count Six is multiplicitous of the predicate offenses under Counts Three and Five in violation of the Double Jeopardy Clause.  "It is not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another."  *United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999).  "In a single prosecution charging a defendant with violations of two statutes, if the statutes make clear that Congress intended to impose cumulative punishments, the court is authorized to impose those punishments and the Double Jeopardy Clause is not violated."  *United States v. Khalil*, 214 F.3d 111, 117 (2d Cir. 2000).  We have previously held that, regardless of the overlap between § 924(c) and the elements of the underlying crime of violence, "§ 924(c) describes a firearm offense that is distinct from the underlying crime of violence in connection with which the firearm was carried or used, and that Congress intended the punishments imposed on a defendant convicted of both offenses to be cumulative."  *Id.* at 120.  We need not determine whether the § 924(c) offense is a "lesser included offense" of any of the predicate acts, because as we recently re-emphasized in *United States v. Aquart*, 92 F.4th 77, 102 (2d Cir. 2024), that is not "determinative."  Congress's clearly expressed intent to impose cumulative sentences for a § 924(c) offense and the underlying crime of violence controls.

prescribed by U.S.S.G. § 2M6.1 for an offense committed with the intent to aid a foreign terrorist organization.

"Impermissible double counting occurs under the Sentencing Guidelines when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines."  *United States v. Sabhnani*, 599 F.3d 215, 251 (2010) (citation modified) (quoting *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000)). "Nonetheless, 'multiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct.'"  *United States v. Stevenson*, 834 F.3d 80, 83 (2d Cir. 2016) (quoting *Volpe*, 224 F.3d at 76).  "The relevant question, then, is whether the two enhancements 'serve identical purposes'—in which case applying both would be double counting and would demonstrate procedural irregularity—or whether they 'address separate sentencing considerations.'"  *Id.* at 83–84 (quoting *Volpe,* 224 F.3d at 76).  The District Court did not impermissibly double-count here because the two enhancements here address separate sentencing considerations.

First, the 12-level enhancement under U.S.S.G. § 3A1.4 addresses harm emanating from intimidation, coercion, or retaliation aimed to influence or affect

government conduct. Specifically, the enhancement applies when the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). A "federal crime of terrorism," in turn, is a violation of an enumerated statute that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5); *see* U.S.S.G. § 3A1.4 cmt. n.1 ("'[F]ederal crime of terrorism' has the meaning given [to] that term in 18 U.S.C. § 2332b(g)(5).").

The enhancement was appropriate here because Defendant was convicted of violating multiple statutes identified in § 2332b(g)(5), including §§ 1992 and 2332f, and there was substantial evidence that he intended to influence the conduct of the government by intimidation or coercion. Defendant told detectives that he was motivated to commit his attack by American foreign policy in the Middle East, used the phrase "So die in your rage, America" multiple times, and posted a message on social media stating, "Oh, Trump, you failed to protect your nation. Baqiya."

Second, the base offense level prescribed by U.S.S.G. § 2M6.1, for an offense committed with intent to aid a foreign terrorist organization, targets harm beyond

intimidating or coercing governments. A "federal terrorism offense" can be committed without even the faintest connection to a foreign terrorist organization. Section 2M6.1, on the other hand, applies only where a defendant intends his efforts to strengthen an organization that the Secretary of State has determined "threatens the security of United States nationals or the national security of the United States," and thus to exacerbate that threat. 8 U.S.C. § 1189(a)(1)(C). That is a different harm, and a different sentencing consideration, than § 3A1.4 addresses.

The higher base level was appropriate here based on ample evidence that Defendant intended his lone-wolf attack to further ISIS's goals and objectives. Most starkly, that included his statement that he thought of his attack as being "on behalf of the Islamic State." Our conclusion that § 2M6.1 applies is consistent with our conclusion above, that Defendant did not commit the separate offense of providing material support to terrorism, because he did not act in coordination with or under the direction or control of ISIS. One can act "entirely independently" of a terrorist organization and still intend one's acts to aid that organization. Defendant did exactly that, so his sentence on the surviving counts was not unreasonable based on the District Court's Guidelines calculation.

**B.      The District Court Did Not Err in Denying Defendant Credit for Acceptance of Responsibility**

The District Court had ample foundation for denying Defendant credit for accepting responsibility.   "Whether a defendant has carried his burden to demonstrate acceptance of responsibility is 'a factual question' on which we defer to the district court unless its refusal to accord such consideration is 'without foundation.'"   *United States v. Broxmeyer*, 699 F.3d 265, 284 (2d Cir. 2012) (quoting *United States v. Taylor*, 475 F.3d 65, 68 (2d Cir. 2007)).   "[T]he adjustment is generally not available to a defendant . . . 'who put the government to its burden of proof at trial by denying the essential factual elements of guilt,' even if, after conviction, he admits guilt and expresses remorse."   *Id.* (citation modified) (quoting U.S.S.G. § 3E1.1(a) cmt. n.2).   "[I]n 'rare situations' such as 'where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt,' a defendant may be entitled to the reduction."   *United States v. Sewell*, 252 F.3d 647, 652 (2d Cir. 2001) (quoting U.S.S.G. § 3E1.1 cmt. n.2).   This case is not one of those rare situations.

Defendant's contention that he accepted responsibility is belied by the record and his arguments to this Court.   Even on appeal he denies key allegations, including his intention to harm anyone other than himself.   The District Court

found that, although Defendant made certain admissions, he never expressed remorse and went to trial to challenge the government's evidence. We agree and, therefore, Defendant's challenge to whether he accepted responsibility fails.

**C. The District Court's Factual Findings Were Not Clearly Erroneous**

The District Court did not commit reversible error by rejecting Defendant's position that he intended only to commit suicide, not to injure others. "A district court commits procedural error when it . . . selects a sentence based on clearly erroneous facts . . . ." *United States v. Traficante*, 966 F.3d 99, 102 (2d Cir. 2020) (quoting *United States v. Genao*, 869 F.3d 136, 140 (2d Cir. 2017)). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Wallace*, 937 F.3d 130, 141 (2d Cir. 2019) (quoting *United States v. Murphy*, 703 F.3d 182, 188 (2d Cir. 2012)).

During sentencing, the District Court stated that Defendant intentionally went to one of the most crowded subway stations, at the most crowded time, "for the purpose of killing indiscriminately men, women and children, of maiming and injuring others, of spreading terror and fear even wider." App'x at 1410. The court further stated that Defendant's attack was calculated "to kill as many people as [he] could." *Id.* at 1411. Those facts would be amply supported by the basic facts

of Defendant's attack—the time, the place, and his use of a pipe bomb filled with screws—even if he had never made a statement. But he did make statements, including stating that the purpose of choosing that time and place was so "there would be more people to terrorize," and the purpose of using that bomb was "to inflict maximum damage." *Id.* at 375–76, 380–81. This evidence does not leave us with any conviction—let alone a definite and firm one—that the District Court erred in finding that Defendant intended to kill and injure others, not only himself.

## D. Defendant's Sentence Was Substantively Reasonable

Finally, Defendant's sentence was substantively reasonable given the seriousness of his crimes. "A sentence is substantively unreasonable when it 'cannot be located within the range of permissible decisions' because it is 'shockingly high, shockingly low, or otherwise unsupportable as a matter of law.'" *United States v. Osuba*, 67 F.4th 56, 68 (2d Cir. 2023) (first quoting *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008); then quoting *United States v. Martinez*, 991 F.3d 347, 359 (2d Cir. 2021)). Federal life sentences are rare, but so are Defendant's crimes.

Defendant is wrong that only he was seriously injured, and even if he were right, that would not be dispositive. The trial record showed that, while no one was killed, Defendant's attack left several victims with severe, permanent injures.

And as discussed above, the bomb was designed and intended to do much more damage.  Many are fortunate that Defendant's attack largely failed, but Defendant does not deserve any credit for that.

Defendant's sentence was both within the guidelines set forth in the U.S.S.G. and the range of permissible decisions.  *See United States v. Kadir*, 718 F.3d 115, 126 (2d Cir. 2013) ("The defendants were convicted of conspiring to explode pipelines and jet-fuel tanks at JFK Airport in order to kill countless Americans and other travelers, disrupt air travel, and harm the American economy.  The gravity of the crimes for which they were convicted easily justifies the life sentences that were imposed.").  Thus, the District Court did not err.  Defendant's sentence is affirmed.

## CONCLUSION

To summarize:

1.      Under a proper construction of 18 U.S.C. § 2339B, the evidence was insufficient to support Defendant's conviction on Count One for providing material support to a foreign terrorist organization because he acted entirely independently of a foreign terrorist organization.

2.      One way someone "places" a "destructive device in, upon, or near . . . a mass transportation vehicle" in the meaning of 18 U.S.C.

69

§ 1992(a)(2), is by affixing such a device to one's person and boarding such a vehicle. Further, Count Five of the indictment charging Defendant with violating § 1992(a)(2) was not constructively amended.

3. The completed offense under 18 U.S.C. § 2332f(a)(1) is a crime of violence that can serve as a predicate under 18 U.S.C. § 924(c). We need not decide whether the attempted offense under § 2332f(a)(2) is also a crime of violence because Defendant's conviction on Count Six would be affirmed in any event. Even if a *Yates* error occurred because the District Court relied on both improper and proper predicate offenses, such error would not have affected Defendant's substantial rights because a rational jury would have found beyond a reasonable doubt that Defendant committed the completed offense.

4. The District Court did not err—substantively or procedurally—in imposing Defendant's sentence.

In light of the foregoing, we **REVERSE** the District Court's judgment as to Count One, **AFFIRM** as to Counts Five and Six and as to Defendant's sentence

(except to the extent that we vacate Count One and the sentence imposed therein),

and **REMAND** for further proceedings consistent with this decision.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

71