21-1058
*United States v. Ullah*

MENASHI, *Circuit Judge*, dissenting:

Akayed Ullah set off a pipe bomb at the Times Square subway station. He did so because ISIS had called on its supporters to conduct attacks against the United States. Ullah transcribed ISIS slogans onto the box in which he stored his bomb-making materials and, less than an hour before the attack, Ullah posted a video in which he dutifully repeated an ISIS rallying cry to show that he was acting on behalf of ISIS. After he was arrested, Ullah told investigators that he "did it on behalf of the Islamic State." App'x 376. Based on this evidence, a jury unsurprisingly convicted Ullah of providing or attempting to provide "material support or resources" to ISIS in the form of "personnel" or a "service."

In its opinion today, however, the court holds that there was insufficient evidence for a rational jury to conclude that Ullah provided or attempted to provide material support to ISIS. The majority recognizes that Ullah "was motivated" to conduct the bombing by messages from ISIS that "exhorted followers to carry out attacks in the United States as part of a global terrorism strategy" and that Ullah "attempted his attack intending to further ISIS's global strategy" in accordance with that exhortation. *Ante* at 14-15. Nevertheless, the majority concludes that "any rational trier of fact" would decide that Ullah acted "entirely independently" of ISIS. *Id.* at 14.

That is wrong. The record shows that Ullah provided or attempted to provide material support to ISIS. To reach the opposite conclusion, the majority rewrites the material-support statute and ignores the evidence presented to the jury.

CERTIFIED COPY ISSUED ON 04/21/2026

A person provides material support to a foreign terrorist organization in the form of "personnel" when he acts under the organization's "direction or control." 18 U.S.C. § 2339B(h). In this case, ISIS directed its supporters to attack the United States, and in accordance with that direction Ullah did so. A person provides a "service" to a foreign terrorist organization when there is a "connection between the service and the foreign group" such that the service is "performed in coordination with, *or at the direction of*, a foreign terrorist organization." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 24 (2010) (emphasis added). That is what happened here.

To minimize the drastic implications of its holding, the majority insists that "[t]he majority and dissenting opinions are aligned" in concluding that Ullah "committed heinous crimes, and that those crimes warrant life imprisonment." *Ante* at 32. The majority describes its opinion as addressing only "a narrow legal question" by overturning Ullah's conviction for "one of the Counts with the shortest terms of imprisonment." *Id.* at 10. But the majority and dissenting opinions are not aligned, and the question the majority answers is not narrow. Congress has criminalized the provision of material support to a foreign terrorist organization. The Second Circuit holds today that Ullah did not violate the material-support statute when he set off a bomb in the subway on behalf of ISIS. To reach that erroneous conclusion, the majority misconstrues § 2339B(h) and disregards the rational conclusion of the jury that Ullah provided or attempted to provide material support to ISIS.

I would *not* vacate the conviction. I would instead adhere to the text of § 2339B(h), which provides no justification for overturning the jury verdict. Ullah's convictions on other counts do not make the majority's error less serious or the disagreement between the majority opinion and this opinion less significant. Today's decision does not

simply absolve Ullah of the crime of providing material support to ISIS. As the majority admits, the decision will "make a difference in future cases." *Id.* at 11.[1]

The majority holds that § 2339B(h) does not apply when a terrorist follows a direction from ISIS to attack the United States by attempting to bomb a subway station. That holding is gravely mistaken, so I dissent.

## I

Congress has made it a crime to knowingly provide or attempt to provide "material support or resources to a foreign terrorist organization." 18 U.S.C. § 2339B(a)(1). Material support or resources may take the form of a "service" or of "personnel … who may be or include oneself." *Id.* § 2339A(b)(1); *see id.* § 2339B(g)(4). The government argued at trial that Ullah provided or attempted to provide material support to ISIS in the form of both personnel and a service. Ullah attempted to provide himself as personnel by carrying out the attack under the direction of ISIS. And Ullah provided a

---

[1] *See, e.g.*, Indictment at 1-5, *United States v. Balat*, No. 26-CR-131 (S.D.N.Y. Apr. 7, 2026), ECF No. 13 (charging two defendants with attempted provision of material support and resources to a foreign terrorist organization because the defendants "attempted to detonate two improvised explosive devices containing shrapnel and triacetone triperoxide … in a crowd gathered near Gracie Mansion," "pledged allegiance to ISIS," and were "inspired by ISIS in conducting the Attack" after having "watched 'radical content' online"); Complaint at 2, *United States v. Khan*, No. 25-CR-63 (S.D.N.Y. Sept. 4, 2024), ECF No. 2 (charging a defendant with attempted provision of material support and resources to a foreign terrorist organization because the defendant planned "to carry out mass shootings at Jewish religious centers" and "repeatedly and explicitly expressed his support for ISIS and his desire to carry out terrorist attacks in support of ISIS").

service to ISIS by carrying out the attack on behalf of ISIS. Based on these theories, the jury found Ullah guilty of providing material support to ISIS.

The majority concludes that the jury acted irrationally in doing so. In the majority's view, the evidence unequivocally showed that Ullah acted entirely independently of ISIS. That is incorrect. Under § 2339B, Ullah's conduct qualified as providing material support to ISIS in the forms of personnel and a service.

## A

Congress amended § 2339B in 2004 to clarify the scope of "personnel."[2]  It added § 2339B(h), which explains that a person has provided personnel to a foreign terrorist organization if, as relevant here, the person acted under the organization's "direction or control." 18 U.S.C. § 2339B(h). Congress further clarified that "[i]ndividuals who act *entirely independently* of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Id.* (emphasis added). In this case, the government has not argued that Ullah acted under the "control" of ISIS. Whether Ullah provided personnel to ISIS turns on whether he acted under the "direction" of ISIS, on the one hand, or "entirely independently" of ISIS, on the other.

---

[2] *See* Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. No. 108-458, § 6603, 118 Stat. 3638, 3763. It did so to address First Amendment concerns not at issue in this case. *See* 150 Cong. Rec. S11939-01, S11995 (Dec. 8, 2004) (statement of Sen. Kyl) (explaining that the amendment "clarifies" the term "personnel" in "response to concerns expressed in recent court decisions").

Congress did not provide a statutory definition of either "direction" or "entirely independently," so we apply each term consistent with its ordinary meaning. *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). As used in the phrase "under the direction of," the word "direction" means "an act of guidance"[3] or "guidance or supervision of action or conduct."[4] "Independent," meanwhile, means "[n]ot subject to the control or influence of another" or "[n]ot dependent or contingent on something else."[5] Thus, to prevail on the personnel theory, the government needed to show that Ullah acted or attempted to act under the guidance or supervision of ISIS when he attacked the subway station. To fall into the independent-activity exclusion, the evidence needed to establish that Ullah acted "entirely" free of ISIS's control or influence and that the attack did not depend and was not contingent on ISIS in any way. 18 U.S.C. § 2339B(h).

Answering this question is not difficult. The evidence demonstrated—and certainly allowed a rational jury to conclude— that Ullah at least attempted to act under the guidance and direction of ISIS when he set off a bomb in the subway station. Even the majority agrees that Ullah attacked the subway station because ISIS instructed its supporters to conduct such attacks. *See ante* at 14-15 ("The evidence also established that Defendant was motivated by those videos to carry out an attack.").

---

[3] *Direction*, Black's Law Dictionary (8th ed. 2004).

[4] *Direction*, Merriam-Webster's Collegiate Dictionary 353 (11th ed. 2003); *see also Direction*, Webster's Third New International Dictionary 640 (2002) ("guidance or supervision of action, conduct, or operation").

[5] *Independent*, Black's Law Dictionary (8th ed. 2004).

To reach its counterintuitive conclusion, the majority adds requirements to the statute beyond those that Congress enacted. The majority insists that the term "direction" in § 2339B(h) does not include a direction delivered through "broadcast propaganda" or "broadly disseminated YouTube videos." *Id.* at 3, 27. But the statute does not exclude *types* of directions or directions disseminated through specific means. A person may receive a direction from a terrorist organization through a broadly disseminated video and attempt to act under that direction. Ullah did precisely that. If the videos had instructed ISIS supporters to engage in prayers or protests, Ullah would have done those things instead.

The majority obsesses over the fact that ISIS transmitted its directions through online videos.[6] But there is no "online video" exception to § 2339B(h). The only exception to the statute is for "[i]ndividuals who act *entirely independently* of the foreign terrorist organization to advance its goals or objectives." 18 U.S.C. § 2339B(h). (emphasis added). Whatever the majority wants to say about a terrorist who followed a direction that ISIS broadcasted online, it

---

[6] *See, e.g., ante* at 3 (explaining that Ullah was "inspired by a foreign terrorist organization's broadcast propaganda"); *id.* at 14 ("[T]he evidence at trial established that [Ullah] watched videos online, including propaganda made by ISIS."); *id.* at 16 ("[E]ven if an ISIS YouTube video contained a 'direction' in some sense, § 2339B(h) is not satisfied simply because one acts after hearing a direction from a terrorist organization."); *id.* at 18 ("Defendant learned about ISIS's goals and objectives from information publicly broadcast by ISIS."); *id.* at 21 ("[W]ere that same independent journalist to watch an online video produced by LTTE imploring supporters to speak out in support of their cause, that independent journalist would be deemed 'personnel' if the journalist chose to continue doing the same work."); *id.* at 30 (insisting that a person does not violate § 2339B by "drawing inspiration from a propaganda video").

cannot be said that the terrorist acted "entirely independently" of ISIS.

Because the ordinary meaning of "direction" covers the interaction between ISIS and Ullah in this case, the majority reads that word out of the statute. The majority observes that § 2339B(h) criminalizes the provision of "personnel" when the person acts "*under that terrorist organization's direction or control.*" *Id.* (emphasis added). According to the majority, the word "under" is "most naturally read to mean 'suffering restriction, constraint, or control by.'" *Ante* at 16 (quoting *Under*, Webster's Third New International Dictionary 2487 (2002)). The majority reasons that because "under" signifies that the person's actions are controlled by the foreign terrorist organization, a direction that is "silent on specifics" and does not "constrain[]" the person cannot qualify as a "direction" under the statute. *Id.* at 16-17.

That argument contradicts elementary principles of statutory interpretation. Congress explained that a person provides personnel to a foreign terrorist organization when he acts under the organization's "direction *or* control." 18 U.S.C. § 2339B(h) (emphasis added). By distinguishing "direction" from "control," Congress clarified that "direction" extends the material-support statute beyond conduct in which the defendant acts under the "control" of the foreign terrorist organization. If the word "under" means what the majority insists it does, the word "control" is superfluous. In other words, if to work "under that terrorist organization's direction" means to work subject to its control, then there would have been no need for Congress to distinguish control from direction. The majority opinion therefore "violates the settled rule that a statute must, if possible, be

construed in such fashion that every word has some operative effect." *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 36 (1992).[7]

The majority does not deny that its interpretation renders part of the statute superfluous. "[T]his is one case where it is warranted," the majority says, to have "overlap in meaning." *Ante* at 17 n.6. It even suggests that the "the phrase 'direction or control'" might "represent a single concept." *Id.* In the criminal context, however, embracing such redundancy "is to disregard what 'or' customarily means." *Loughrin v. United States*, 573 U.S. 351, 357 (2014). The Supreme Court has explained that the "term's 'ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings.'" *Id.* (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). We ought not "construe the two entirely distinct statutory phrases that the word 'or' joins as containing an identical element." *Id.*

To be sure, a statute may sometimes include a redundancy "in a congressional effort to be doubly sure" that the statue covers certain conduct. *Barton v. Barr*, 590 U.S. 222, 239 (2020). But the majority does not read redundancy into the statute to reflect such a belt-and-suspenders approach. The majority does the opposite: It reads "direction" as equivalent to "control" in order to *narrow* the scope of the statutory language—to cover *less* conduct than the words naturally imply. In the majority's view, Congress added "direction" to reinforce a narrow interpretation of "control." That is implausible:

---

[7] The "canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013), because we must avoid "an interpretation of a congressional enactment which renders superfluous another portion of that same law," *id.* (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011)). The majority opinion in this case renders superfluous language within the same statutory clause.

Congress does not add alternative statutory elements in order to *restrict* the circumstances to which the statute will apply.

We know that Congress intended "direction or control" to have a broad scope because it provided an especially narrow exception. When Congress excluded independent activity from conduct undertaken under an organization's "direction or control," it clarified that conduct falls into the exclusion only when the person acts "*entirely* independently of the foreign terrorist organization." 18 U.S.C. § 2339B(h) (emphasis added). [8] The qualifier "entirely" means that there cannot be any direction at all from the foreign terrorist organization that affects the supporter's actions. For the supporter to attempt to act under the direction of the terrorist organization, the organization does not need to specify when, where, how, and against what or whom. *But see ante* at 15-17. If the supporter did not act entirely outside the influence of the foreign terrorist organization, his actions do not qualify for the "entirely independently" exclusion. To make the point clearer, if the supporter acted *mostly* or *largely* independently of the foreign terrorist organization—but not *entirely* independently—then his conduct is not protected from liability under § 2339B(h). It is obvious that Ullah did not act entirely independently of ISIS.

The majority asserts that "Congress did not intend for the definition of personnel under § 2339B to include those acting on inspiration." *Id.* at 24-25. That is a non sequitur; Ullah did not act

---

[8] Congress created the "entirely independently" exclusion to avoid the "constitutional concerns," *Humanitarian L. Project*, 561 U.S. at 35, that might arise if one could "imagine protected expression that falls within the bounds of this term," *Humanitarian L. Project v. Reno*, 205 F.3d 1130, 1138 (9th Cir. 2000).

merely "on inspiration" from ISIS. *Id.* at 25. He received a direction from ISIS, and he acted or attempted to act under that direction.

Moreover, the legislative history from which the majority derives this irrelevant proposition does not support its conclusion. The expert testimony in this case explained that a lone wolf attack might be described as "enabled" or "inspired" by the foreign terrorist organization "because the level of direction is fluid." App'x 546. But any lone wolf attack is "affiliated with a jihadist organization." *Id.* at 539. Instead of relying on personnel fully integrated into the organization, "the Islamic State puts out messages calling for their supporters to conduct these attacks, as well as literature which provides guidance on how to do some of these attacks." *Id.* at 515. ISIS regards those recruits who "carry out attacks in its name" as "martyrs, as part of their cause, as well as soldiers of the caliphate." *Id.* at 516.

Here is where the majority takes "a selective tour through the legislative history." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). In 2004, Congress expanded the definition of "agent of a foreign power" in the Foreign Intelligence Surveillance Act ("FISA") to include any person who "engages in international terrorism or activities in preparation therefor[]." IRTPA § 6001, 118 Stat. at 3742, *codified as amended at* 50 U.S.C. § 1801(b)(1)(C).[9] This expanded definition encompasses not only the lone wolf attackers described in the expert testimony but also those terrorists who act entirely by themselves. The majority argues that the expanded definition in the FISA implies that Congress wanted to limit the scope of the material-support statute. According to the majority, "Congress had text and a model for covering these so-called lone wolf terrorists"

---

[9] The amendment was subject to a sunset provision of the PATRIOT Act. *See* IRTPA § 6001(b), 118 Stat. at 3742.

but "did not deploy that text in the definition of personnel in § 2339B." *Ante* at 24. The majority thus defines "lone wolf" to refer only to a terrorist who acts "entirely independently" and then, because Ullah could be described as a "lone wolf," concludes that Ullah must have acted entirely independently of ISIS. In other words, because the majority cannot directly show that Ullah meets the "entirely independently" standard of § 2339B(h), it bootstraps its novel definition of "lone wolf" into a purported demonstration that the statutory standard is met. That does not work. The majority's definition is not the normal definition of a lone wolf, it was not the understanding of lone wolf terrorism reflected in the trial testimony, and it does not describe what Ullah actually did.

The majority insists that because the amendment to the FISA covered "the lone terrorist acting on inspiration rather than affiliation," *id.* at 23 (quoting H.R. Rep. No. 108-724, pt. 5, at 170 (2004))—or, in other words, "individuals acting on inspiration *alone*," *id.* at 24 (emphasis added)—we must interpret the material-support statute to exclude "those acting on inspiration," *id.* at 25. The majority conspicuously drops the qualification "rather than affiliation"—and the adjective "alone"—when it describes the scope of the material-support statute. It does so because (1) Ullah cannot reasonably be described as acting on inspiration *alone*, so (2) if the "entirely independently" exclusion applies only those acting on inspiration *alone* without an attempted affiliation, then it would not apply to Ullah. In any event, there is no reason to conclude that the meaning of a temporary amendment to the definition of "agent of a foreign power" in the FISA must correspond to the meaning of an exclusion from the definition of "personnel" in the material-support statute.

11

The statutory provisions use different language and serve different purposes.[10]

To the extent that the FISA amendment might inform our interpretation of § 2339B(h), it is irrational to conclude that the same Congress that believed an independent terrorist could be considered an "agent of a foreign power" would also have believed that a lone wolf terrorist committing an attack on behalf of a foreign terrorist organization would be acting "entirely independently" of that organization. And we know from the congressional record that no one believed that. Members of Congress understood the amendments to expand the reach of both statutes in tandem. *See, e.g.*, 150 Cong. Rec. H10994-04, H10999 (Dec. 7, 2004) (statement of Rep. Harman) ("We toughen the penalties for material support of terrorists, *and* we add a provision which enables us to punish the 'lone wolf' terrorist, someone acting alone, as Timothy McVeigh did, to harm our citizens.") (emphasis added). President Bush "strongly support[ed]" IRTPA because it provided "all the necessary tools to prevent terrorist attacks—including provisions to prevent attack by 'lone wolf'

---

[10] The majority accuses me of relying on "cherry-picked statements," but it then cherry picks statements of individual senators using the term "lone wolf" in connection with the FISA amendment to suggest that the amendment provided an exclusive definition of that term—even though neither the FISA nor the material-support statute uses the term "lone wolf," let alone defines it. *Ante* at 24 n.8. As the expert testimony in this case explained, lone wolf attacks fall along a spectrum depending on "the level of direction" from the "jihadist organization." App'x 539-46. The majority then picks out the phrase "acting on inspiration" from the legislative history related to the FISA, *ante* at 23 (quoting H.R. Rep. No. 108-724, pt. 5, at 170), and tries to project that concept into § 2339B(h). I would rely on the language of § 2339B(h) rather than these undefined concepts mentioned in the legislative history of a different statute.

terrorists *and* enhanced provisions to deny material support to terrorists." 150 Cong. Rec. H8978-04, H8985 (Oct. 8, 2004) (emphasis added).

Nothing in the legislative history indicates that Congress would have wanted the definition of personnel in § 2339B to have a narrower scope than its language naturally suggests: A terrorist such as Ullah who acted or attempted to act under a direction from ISIS did not act "entirely independently" of ISIS.

**B**

The majority argues that its reading of § 2339B finds support in an analogy to journalists. It worries that a journalist who independently advocates for a foreign terrorist organization might be transformed into a material supporter of terrorism if the journalist watched "an online video" from the organization "imploring supporters to speak out in support of their cause." *Ante* at 21. Everyone agrees, however, that even "*advocacy* performed in coordination with, or at the direction of, a foreign terrorist organization" qualifies as material support. *Humanitarian L. Project*, 561 U.S. at 24 (emphasis added). The majority concedes that "if the journalist took orders" from the terrorist organization, the advocacy would be criminal. *Ante* at 21. So too if the journalist "attempts" to act under its direction. 18 U.S.C. § 2339B(a)(1).

The majority hypothesizes a closer case in which the journalist was already engaging in the same advocacy before receiving a direction from the foreign terrorist organization. In that case, perhaps it would not be reasonable to draw the inference that the journalist was acting or attempting to act under the direction of the terrorist organization. But this case is not close. Ullah was not engaging in acts of terrorism before he received a direction from ISIS. And he himself

13

admitted that he engaged in terrorism in order to act under the direction of ISIS and on its behalf.

The focus on a hypothetical journalist rather than Ullah seems to reflect the majority's underlying concern that "direction" must be defined narrowly in order to avoid the possibility—in a future case that, unlike this case, involves political advocacy—of "criminalizing people engaging in political advocacy on the basis of broadcast" messages. Oral Argument Audio Recording at 25:19. To state the obvious, Ullah was not engaged in political advocacy, and his terrorist attack receives no First Amendment protection. [11] The majority therefore errs in seeking to "decid[e] how the statute applie[s] in hypothetical circumstances" not present here. *Humanitarian L. Project*, 561 U.S. at 19. The Supreme Court has said that the government "may prohibit" the provision of "material support" even "in the form of speech." *Id.* at 28. The scope of that authority might turn on the "level of coordination" between the defendant and the foreign terrorist organization in a future case. *Id.* at 37. We need not—and should not—distort the meaning of "direction" under § 2339B(h) in anticipation of such a hypothetical case.

In the context of *this* case, the majority's rule that a "direction" must include detailed instructions is absurd. Imagine that ISIS had sent a direct message to Ullah that contained the same instruction as the videos Ullah watched to conduct an attack in the United States. If a few days later Ullah exploded a bomb in the subway, there would

---

[11] "The First Amendment does not protect violence," *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982), and "a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment," *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993).

be no serious argument that Ullah acted entirely independently of ISIS. But he still would not have received specific instructions about the what, when, how, and where of the attack.

The majority emphasizes that Ullah "was not constrained" by the direction from ISIS but "chose" to "attack the United States" after viewing the ISIS videos. *Ante* at 17. But the purpose of criminalizing the knowing provision of material support to a terrorist organization is that people have a choice about whether to provide that support. It makes no sense to read the statute to prohibit acts of terror only when the defendant lacks discretion about how to act. The fact that Ullah chose whether and how to commit a terrorist attack makes him *more* culpable, not less.

The material-support statute does not excuse terrorists who were "inspired by a general online exhortation by a foreign terrorist organization." *Id*. at 4. Acting or attempting to act under the direction of a foreign terrorist organization is proscribed. Actions escape this prohibition only when "entirely independent[]." 18 U.S.C. § 2339B(h). In this case, the jury was entitled to credit evidence that ISIS had issued a video that "instructs supporters to carry out attacks here in the United States." App'x 592-93. The personnel prong of the statute "focuses on submission to the direction and control of a terrorist organization." *United States v. Farhane*, 634 F.3d 127, 152 (2d Cir. 2011). The evidence showed that Ullah sought to submit himself to the direction of ISIS. Given that ISIS's instruction led to his conduct, the jury reasonably concluded that Ullah did not act "entirely independently" of ISIS. 18 U.S.C. § 2339B(h).

## C

When Congress enacted § 2339B(h), it added the term "service" to the definition of "material support or resources." IRTPA § 6603, 118

Stat. at 3762. The Supreme Court has explained that "service" means "the performance of work commanded or paid for by another: a servant's duty: attendance on a superior" or "an act done for the benefit or at the command of another." *Humanitarian L. Project*, 561 U.S. at 23-24 (quoting Webster's Third New International Dictionary 2075 (1993)). The prohibition on "providing a service '*to* a foreign terrorist organization'" indicates "a connection between the service and the foreign group." *Id.* at 24 (quoting 18 U.S.C. § 2339B(a)(1)). Therefore, "a person of ordinary intelligence would understand the term 'service' to cover advocacy performed in coordination with, *or at the direction of*, a foreign terrorist organization." *Id.* at 24 (emphasis added).

Unlike the plaintiffs in *Humanitarian Law Project*, Ullah did not engage in "advocacy." It is even clearer, then, that he provided a "service" to ISIS if he acted "in coordination with, or at the direction of," or "for the benefit" of ISIS. *Id.* at 23-24. There is no question that he did.

To avoid this straightforward conclusion, the majority again adds requirements that appear nowhere in the statute. The majority insists that to prove that Ullah provided a "service" under § 2339B, the government needed to show that Ullah acted on something other than "a terrorist organization's general exhortation." *Ante* at 30. But a defendant such as Ullah—who provided a service in response to a public exhortation from a foreign terrorist organization for its supporters to provide services—has still provided a service. We would consider it a service if we were applying familiar principles of contract law. It is possible to form a legally binding contract in response to a published advertisement if the advertisement is "clear enough to establish the intended terms of the proposed contract." *Chimienti v. Wendy's Int'l, LLC*, 698 F. Supp. 3d 549, 562 (E.D.N.Y.

2023) (quoting *Amalfitano v. NBTY Inc.*, 9 N.Y.S.3d 352, 354 (2d Dep't 2015)).[12] There is no reason why Congress could not criminalize that sort of arrangement between a foreign terrorist organization and its supporter. So there is no obstacle to recognizing that Congress did so in § 2339B.

The majority suggests that the video instruction from ISIS did not qualify as a "direction" under the statute because it did not "contain[] specific instructions or terms for [Ullah] to follow." *Ante* at 33 n.14. At the same time, the majority admits that the evidence allowed the jury to conclude that the videos "exhorted followers to carry out attacks in the United States," that Ullah "was motivated by those videos to carry out an attack," and that "ISIS wanted people to do what [Ullah] attempted to do." *Id.* at 14-15. That is pretty specific— and it certainly was enough for a rational jury to conclude that Ullah acted "for the benefit or at the command of another." *Humanitarian L. Project*, 561 U.S. at 24.

The majority nevertheless insists that there was no "connection between the service and the foreign group" in this case. *Id.* That would be news to Ullah, to ISIS, to the jury, and to any rational person who has read the record in this case. ISIS requested that its supporters provide the service of conducting terrorist attacks. And Ullah—by his own admission to investigators—sought to provide that service to ISIS by conducting an attack on its behalf.

No principle of law or logic requires that the beneficiary of a service know in advance the details of how the service will be performed. Our court and other courts have explained that § 2339B

---

[12] *See* 1 Williston on Contracts § 4:7 (4th ed. 2022) ("[T]he offer must be sufficiently definite to lead the offeree to understand that a bargain is being proposed and how the offeree may conclude the bargain.").

does not require any bilateral communication between the supporter and the terrorist organization. *See, e.g., United States v. Suarez*, 893 F.3d 1330, 1335 (11th Cir. 2018) ("[I]t is irrelevant that [the defendant] did not make contact with ISIS, because the law requires only that [he] directed (or attempted to direct) his services to ISIS."); *see also United States v. Alebbini*, 979 F.3d 537, 548 (6th Cir. 2020). Even if Ullah "did not have an ISIS contact," and he did not swear "a formal oath of allegiance to the organization, the steps he had completed were nonetheless substantial and were 'planned to culminate' in his support of ISIS." *United States v. Pugh*, 945 F.3d 9, 21 (2d Cir. 2019) (quoting *Farhane*, 634 F.3d at 147).

The majority opinion conflicts with those precedents and with the language of § 2339B. The Supreme Court has told us that "a person of ordinary intelligence would understand the term 'service'" in the statute to cover an act "performed in coordination with, *or at the direction of*, a foreign terrorist organization." *Humanitarian L. Project*, 561 U.S. at 24 (emphasis added). These are two equally viable theories: "The 'at the direction of' and 'in coordination with' theories 'provide alternative, independently sufficient grounds for' sustaining the conviction with respect to the 'material support or resources' element." *United States v. Wright*, 937 F.3d 8, 24 (1st Cir. 2019) (quoting *United States v. Gaw*, 817 F.3d 1, 5 (1st Cir. 2016)). To establish that Ullah acted at the direction of ISIS, the number of details that ISIS knew in advance is "irrelevant" because "the law requires only that [Ullah] directed (or attempted to direct) his services to ISIS." *Suarez*, 893 F.3d at 1335. Yet the majority discounts the possibility of showing direction rather than coordination. Its holding that a person cannot act at the direction of ISIS unless he coordinates with ISIS contradicts the controlling interpretation of the Supreme Court that direction and coordination are alternative, independently sufficient theories.

18

Congress imposed criminal penalties on anyone who "knowingly provides material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), including the provision of "any … service," *id.* § 2339A(b)(1). Today's opinion holds that "any service" does not include an act that the foreign terrorist organization told its supporters to perform and that the defendant in fact performed—or attempted to perform—"on behalf of" the organization. That holding conflicts with the statutory text, the applicable case law, and common sense.

**D**

Without any analysis, the majority invokes "the rule of lenity." *Ante* at 27. But the incantation of that phrase cannot save the shoddy statutory interpretation of the majority opinion. We apply the rule of lenity "only when a criminal statute contains a 'grievous ambiguity or uncertainty.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 139 (1998)). There is no such ambiguity in § 2339B. "Applying the statutory terms … 'service,' and 'personnel'" requires no "untethered, subjective judgments" because Congress "took care" to enhance "the clarity of the statute's terms." *Humanitarian L. Project*, 561 U.S. at 21. In particular, "the statutory terms are clear in their application" to Ullah's terrorist attack. *Id.*

This is not a case involving conduct that "neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Cohen*, 260 F.3d 68, 76 (2d Cir. 2001) (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)). We have said that a person "provides—or certainly attempts to provide—material support in the form of personnel" when he "supplies himself as the bomber … sought by the terrorist organization." *Farhane*, 634 F.3d at

152. And even if we had not expressly said that, it would be clear from the statute. No one—except, apparently, the majority—could possibly believe that there is ambiguity about whether exploding a bomb in the subway on behalf of ISIS is prohibited.

The objective of statutory interpretation is to "determine the Legislature's intent as embodied in particular statutory language." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). Congress has enacted into law the express statement of purpose that the material-support statute aims "to provide the Federal Government the *fullest possible basis*, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(b), 110 Stat. 1214, 1247 (emphasis added), *codified at* 18 U.S.C. § 2339B note. That statement of purpose continues to govern the statute as amended in 2004. The majority's artificially narrow reading of the statute contradicts the express statement of purpose that Congress enacted alongside the operative provisions.

## II

The district court concluded that the record contained sufficient evidence to support Ullah's conviction under either a personnel or a service theory. "[A] defendant raising a sufficiency challenge 'faces a heavy burden.'" *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022) (alteration omitted) (quoting *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021)). "In reviewing a claim that the evidence was insufficient to sustain a defendant's conviction, 'we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of

the witnesses' credibility.'" *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010) (quoting *United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007)). "[W]e consider the government's case in its totality rather than in its parts," and we will affirm "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Zhong*, 26 F.4th 536, 559-60 (2d Cir. 2022) (internal quotation marks omitted). Under this deferential standard, Ullah's conviction should be affirmed.

## A

As the district court correctly determined, the evidence "amply establishes" that Ullah provided or attempted to provide personnel to ISIS when he "acted at ISIS's direction by heeding the call of the organization's propaganda and recruiting materials." *United States v. Ullah*, No. 18-CR-16, 2021 WL 21902, at *3 (S.D.N.Y. Jan. 4, 2021). Twelve days before Ullah's attack, ISIS issued the video "Flames of War II." App'x 596. Ullah told investigators that he watched the video, which showed images of bombs over the United States and instructed supporters to conduct further attacks against the United States. The video featured the ISIS slogan "die in your rage, America," which Ullah transcribed onto his passport and onto the box in which he stored bomb-making materials. *Id.* at 595, 626, 636-37**.** Ullah saved other ISIS videos on his laptop, including videos that celebrated terrorists who had previously conducted attacks on behalf of ISIS. *See id.* at 524-25.

Ullah told investigators that he chose the Times Square subway station because he had seen a televised interview at that location about "a recent threat put out by the Islamic State to Times Square." *Id.* at 374-75. Ullah thought the interviewee "did not feel threatened by the recent threat by the Islamic State," so "his goal was to detonate

the device in the precise location where he believed that th[e] interview had taken place." *Id.* at 375.

Less than an hour before his attack, Ullah posted his own video on Facebook with the message "Oh, Trump, you failed to protect your nation. Baqiya." *Id.* at 370-72. Ullah later explained to investigators that he used the ISIS rallying cry "Baqiya" so that ISIS would know he carried out the attack on its behalf. *Id.* at 372. If that were not clear enough, Ullah expressly told investigators that he "did it on behalf of the Islamic State." *Id.* at 376.

The jury also heard testimony about how ISIS uses videos to recruit supporters. An expert witness, Aaron Zelin, testified that ISIS began promoting "inspired attacks" in 2014. *Id.* at 512-13. It did so by issuing videos that told supporters to conduct attacks in areas outside of ISIS-controlled territory. This strategy led to an increase in attacks on behalf of ISIS, primarily in the United States and Europe. ISIS promoted "martyrdom operations" by lauding the suicide attackers responsible for those attacks as "an example that other people should follow." *Id.* at 514-25. ISIS describes those attackers who act on its behalf as "martyrs, as part of their cause, as well as soldiers of the caliphate." *Id.* at 516.

This recruitment effort had a "force multiplier" effect because ISIS increased its impact without needing to plan each attack. *Id.* at 515. Zelin further testified that direct communications between the attacker and ISIS were neither necessary nor desirable for the attacker to act for ISIS. *See id.* at 589; *cf. Alebbini*, 979 F.3d at 543 ("[I]n response to questions about his lack of contact with ISIS, he said he did not contact 'people from there' because it would raise suspicion.").

In sum, the record showed that (1) ISIS employed propaganda videos to direct individuals to conduct attacks for ISIS without the

organization planning the specific details of the attack; (2) Ullah viewed such a video, released twelve days before his attack, that directed him to attack the United States; (3) Ullah posted a video of himself issuing an ISIS rallying cry on the morning of the attack to show ISIS that he was acting on its behalf; and (4) Ullah told officers that he conducted the attack for ISIS. This evidence allowed a rational jury to find beyond a reasonable doubt that Ullah at least attempted to provide himself as personnel to ISIS when he blew up a bomb in a subway station on its behalf.

**B**

Amazingly, the majority opinion concludes that any rational juror would be compelled to find that Ullah acted "entirely independently" of ISIS. *Ante* at 69. It is possible to reach that conclusion only by discounting Ullah's statements, the evidence on his laptop, and Zelin's testimony. But even taken at face value, the reasoning of the majority opinion is incoherent. The majority acknowledges that "the evidence at trial established" that Ullah consumed "propaganda made by ISIS" instructing supporters to "carry out attacks in the United States," that "ISIS wanted people to do what Defendant attempted to do," and that Ullah "was motivated by those videos to carry out an attack." *Id.* at 14-15. That means Ullah did not act "entirely independently" of ISIS. 18 U.S.C. § 2339B(h).

The majority disagrees with the inferences the jury drew from the evidence and testimony, but that disagreement does not justify vacating Ullah's conviction. Ullah argued to the jury in summation that he "acted alone," App'x 1004, but the evidence allowed the jury to draw a different inference—that Ullah decided to follow the direction of ISIS to attack the United States. It is the role of the jury, not an appellate court, to weigh the evidence. *See Zhong*, 26 F.4th at

559; *Pugh*, 945 F.3d at 19. Because a rational jury could find that Ullah acted or attempted to act under the direction of ISIS, our court should not replace the jury's verdict with its own factual inferences.

## C

The majority attempts to distinguish this case from our prior decisions in *Farhane* and *Pugh* and the Sixth Circuit's decision in *Alebbini*. But those decisions show that it is erroneous to conclude that Ullah engaged in "independent conduct." *Ante* at 26.

The majority emphasizes that the defendants in the prior cases "attempted to submit to the 'direction or control' of a terrorist group by joining its ranks." *Id*. at 27. There is no doubt that submitting oneself to the control of ISIS would amount to material support. But Congress specified that a person provides proscribed material support when he acts under the foreign terrorist organization's "direction *or* control," 18 U.S.C. § 2339B(h) (emphasis added). The word "direction" is right there in the statute.

In *Farhane*, we explained that "when a person supplies himself as the bomber … sought by the terrorist organization, he provides— or certainly attempts to provide—material support in the form of personnel as soon as he pledges to work under the direction of the organization." 634 F.3d at 152. Ullah heard the direction of ISIS, pledged to work under that direction by announcing that he was acting on behalf of ISIS, and carried out the sort of attack that ISIS directed its supporters to conduct. Ullah did not formally join ISIS. But § 2339B does not depend on the institutional formalities of a foreign terrorist organization. "Section 2339B does not require … that the defendants themselves be *part of* the organization." *United States v. Dhirane*, 896 F.3d 295, 302 (4th Cir. 2018). One does not need to be inducted into an organization to provide or attempt to provide

24

oneself as personnel. The jury inferred from the evidence that Ullah pledged to work for ISIS—he admitted as much to investigators—and there is no reason to disturb its reasonable verdict on appeal.

The principles articulated in prior cases support the conviction here. Like Ullah, the defendant in *Pugh* argued that "he only indulged in an online interest in ISIS propaganda" and "expressed his political views." 945 F.3d at 20. But we held that this sort of evidence supported the conclusion that he intended to support ISIS. *See id.* That inference is even clearer in this case, in which Ullah did not merely travel in the expectation of joining ISIS at some future point but committed a violent attack on its behalf.

The majority insists that Ullah acted to support ISIS under circumstances in which "ISIS does not know he exists" and "has no expectation he will hear ISIS's messages or act on them." *Ante* at 15. But those circumstances were present in *Pugh*. The defendant in that case argued that he could not have attempted to provide material support to ISIS "without an ISIS contact in Turkey and/or Syria to help him cross the border." 945 F.3d at 21. We rejected that argument because the jury could have credited evidence that "although most people seeking to join ISIS make connections ahead of time, it is not necessary for someone to secure assistance in Turkey before reaching [ISIS in] Syria." *Id.*

The defendant in *Alebbini* talked to investigators just as Ullah did. In an interview with FBI agents after his arrest, Alebbini "referred to [ISIS] in the first-person plural, 'we,' as if he had already joined." 979 F.3d at 542. He declared that his "country is going to be the Islamic State" after his release from prison. *Id.* at 550. The Sixth Circuit held that such evidence supported Alebbini's conviction for attempting to provide personnel to ISIS. *See id.* at 549-50. The jury in

this case was similarly entitled to credit Ullah's statements after the bombing as evidence that he had provided or attempted to provide himself as personnel to ISIS. By holding that it does not matter that Ullah "subjectively conceived of himself as a soldier of ISIS," *ante* at 15, today's decision creates a circuit split regarding the evidence that supports a conviction for material support.

The question before us is whether the evidence—taken as a whole and with inferences drawn in favor of the verdict—supports Ullah's conviction. When the majority admits that Ullah watched ISIS videos instructing supporters to carry out attacks in the United States and that he "was motivated by those videos to carry out an attack," *id.* at 15, it effectively concedes that a rational jury could conclude that Ullah at least attempted to act under the direction of ISIS. That is what the jury reasonably did, and this court has no justification for erasing the verdict.

## D

The majority opinion additionally holds that no rational juror could conclude that Ullah provided a service to ISIS. That is wrong too. The record evidence showed that ISIS issued videos directing its supporters to carry out attacks on its behalf. The videos allowed ISIS to direct attacks without planning the attacks itself. Ullah received the direction in the videos before carrying out his attack. Ullah posted a message before the attack to indicate that he was acting on behalf of ISIS, and he admitted after the attack that he acted "on behalf of the Islamic State." App'x 376.

By conducting an attack "for the benefit" of ISIS, Ullah provided a service that reflected a "connection between the service and the foreign group." *Humanitarian L. Project*, 561 U.S. at 24. Because Ullah answered ISIS's call to conduct such attacks, he acted

"at the direction of" ISIS rather than independently. *Id.* The district court was correct to hold that "the record evidence readily supports the conclusion that [Ullah] carried out the attack as directed by ISIS in its propaganda videos for the express purpose of benefiting ISIS." *Ullah*, 2021 WL 21902, at *4. The majority insists that Ullah was only "drawing inspiration from a propaganda video." *Ante* at 30. But the jury was entitled to credit Ullah's own words to investigators that he planned the attack "on behalf of the Islamic State." App'x 376.

The majority insists that it is impossible for Ullah to provide material support to ISIS "if ISIS does not know he exists" and does not exert control over him. *Ante* at 15. At summation, Ullah emphasized that "ISIS did not take credit for [his] actions, and we should not give it to them in this courtroom." App'x 1011. On appeal, Ullah emphasizes that ISIS did not claim credit for his attack "because no one died," and ISIS generally claims credit only for successful attacks. Appellant's Br. 16. It should go without saying that the scope of the material-support statute does not depend on the public-relations decisions of foreign terrorist organizations. The jury could credit record evidence and testimony explaining why ISIS did not claim credit. *See* App'x 591-92.

The government was not required to show that Ullah informed ISIS of his plans in advance. Even so, the evidence showed that Ullah attempted to communicate with ISIS by posting a video with the rallying cry "Baqiya," which he expected ISIS to recognize. *Id.* 372. On appeal, we are required to draw all reasonable inferences in favor of the verdict. *See Sabhnani*, 599 F.3d at 241. The majority has violated that duty.

The majority incorrectly argues that the conviction depends on "one phrase" from *Humanitarian Law Project*—that a service is "done

'for the benefit of another.'" *Ante* at 30 (alteration omitted) (quoting *Humanitarian L. Project*, 561 U.S. at 24). But when it rejected Ullah's Rule 29(c) motion, the district court correctly determined that the record supported the conclusion that Ullah "carried out the attack *as directed* by ISIS." *Ullah*, 2021 WL 21902, at *4 (emphasis added). Viewing the evidence in favor of the jury verdict, a rational jury could find beyond a reasonable doubt that Ullah acted or attempted to act at the direction of ISIS—as well as on its behalf. The majority is fighting a strawman when it says that a benefit alone is not enough.

### III

I would also hold that the jury was properly instructed on Count One. Ullah argues that the district court should not have instructed the jury on the personnel theory because "[h]e acted entirely alone." Appellant's Br. 40. Ullah further argues that he could not be convicted for attempting to provide personnel because if he had succeeded in killing himself, then he would have no longer been available to work for ISIS. *Id.* at 38, 40. With respect to a service theory, Ullah argues that the district court erred by instructing the jury that (1) a service includes an act done "for the benefit of another," and (2) the jury could find Ullah guilty if ISIS "invited" his conduct and Ullah acted in part because of that invitation. *Id.* at 20, 41-42.

Ullah's arguments are meritless. With respect to personnel, the district court's instruction followed the text of § 2339B. The district court instructed the jury that "[a] person provides or attempts to provide personnel … if he provides or attempts to provide ISIS with one or more individuals who may be or include himself to work under that organization's direction or control." App'x 1075. The district court clarified that "individuals who act entirely independently of ISIS to advance its goals or objectives are not

considered to be working under ISIS's direction and control." *Id.* Those instructions were correct.

The district court did not err by including attempt in its personnel instruction. Zelin testified that ISIS encourages its supporters to conduct "martyrdom operations," and once they do so, ISIS regards these attackers "as martyrs, as part of their cause, as well as soldiers of the caliphate." *Id.* at 516. A rational jury could conclude that Ullah attempted to provide himself as personnel to ISIS in this way.[13]

The district court's jury instructions about providing a service also described the correct legal standard. The district court recited the Supreme Court's definition of service from *Humanitarian Law Project*, which includes work done "for the benefit of another." *Id.* at 1074-75. Ullah objects to that language, but the district court clarified that the jury must find that "ISIS invited conduct such as the conduct alleged here," that Ullah "carried out the conduct alleged here," and that Ullah "was motivated by such an invitation." *Id.* at 1075. Ullah is wrong that the jury could have convicted him for an "entirely

---

[13] In dicta, the majority insists that "[t]he only aspect of Defendant's crime that was arguably incomplete—that conceivably could have turned an attempted § 2339B offense into a completed one—would have been his own death, which is simply not a step toward providing material support." *Ante* at 28 n.12. That statement implies that a foreign terrorist organization would never seek the martyrdom of its personnel—which is obviously untrue—and it discounts other theories of attempt. If Ullah provided himself as personnel that he believed ISIS wanted—but that ISIS did not in fact want—that would also be an attempt to provide personnel. *See Pugh*, 945 F.3d at 21 (concluding that a defendant "engaged in a substantial step toward providing material support to ISIS" when he traveled "in an effort to join ISIS" even though no evidence showed that ISIS expected him or would have wanted him to join).

independent act." Appellant's Br. 42. The district court's use of the word "invited" required the jury to consider whether Ullah performed his attack "in coordination with, or at the direction of, the foreign terrorist organization." *Humanitarian L. Project*, 561 U.S. at 24. That is the sort of service that § 2339B proscribes.

\* \* \*

When it enacted § 2339B, Congress recognized that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization*"—"even seemingly benign support"—"facilitates that conduct." *Id.* at 29, 36 (internal quotation marks and alteration omitted). The statute plainly prohibits committing a terrorist attack—exploding a bomb in a crowded subway station with the intent to "inflict maximum damage," App'x 381—on behalf of a foreign terrorist organization. Today's decision avoids that obvious conclusion by rewriting the statute, distorting applicable precedent, and discounting the evidence before the jury. It is "wrong, wrong, and wrong again." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 80 (2013) (Kagan, J., dissenting). I dissent.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

30